**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW YORK, et al.,

        Plaintiffs,

        v.

FACEBOOK, INC.,

        Defendant.

Case No. 1:20-cv-03589-JEB

**MEMORANDUM IN SUPPORT OF FACEBOOK, INC.'S
MOTION TO DISMISS STATES' *PARENS PATRIAE* COMPLAINT**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................3

ARGUMENT .....................................................................................................................4

I.  THE STATES DO NOT HAVE *PARENS PATRIAE* STANDING ...................................4

II.  LACHES BARS THE STATES' CLAIMS....................................................................8

III.  THE STATES FAIL TO PLAUSIBLY ALLEGE THAT THE
     ACQUISITIONS OF INSTAGRAM AND WHATSAPP VIOLATED
     THE CLAYTON ACT.........................................................................................12

    A.  The States' Claim That Facebook's Acquisitions Of Non-
        Competitors Violated Section 7 Fails As A Matter Of Law..................................13

    B.  The States Fail To Allege That Instagram Or WhatsApp Was
        Uniquely Situated To Compete With Facebook .....................................................18

    C.  Allegations Concerning "Intent" Cannot Satisfy The States'
        Pleading Burden....................................................................................................20

IV.  THE STATES FAIL TO STATE A CLAIM UNDER SECTION 2 .................................22

    A.  The States Fail To Plead A Cognizable Relevant Market .....................................22

    B.  The States Fail To Plead That Facebook Has Monopoly Power ...........................22

    C.  The States Fail To Allege Exclusionary Conduct.................................................24

        1.  The States Fail To Allege That Any Facebook Acquisition
            Was Unlawful .............................................................................................25

        2.  The States' Claim That Facebook's 2011-2018 Policies
            Prevented Competitors From Making Unrestricted Use
            Of Its Proprietary Platform Fails As A Matter Of Law .............................28

        3.  The States Have Not Pleaded Any Consumer Harm ................................28

CONCLUSION.................................................................................................................29

i

# TABLE OF AUTHORITIES[*]

Page

CASES

*Alberta Gas Chems. Ltd. v. E.I. DuPont de Nemours & Co.*, 826 F.2d 1235
(3d Cir. 1987)......................................................................................................26

\* *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982) .........................1, 4, 6

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159
(C.D. Cal. 2000)..................................................................................................10

*Asa Accugrade Inc. v. Am. Numismatic Ass'n*, 370 F. Supp. 2d 213 (D.D.C. 2005) ...................24

\* *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .............................................3, 6, 15, 29

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...............................................26

*California v. Am. Stores Co.*, 495 U.S. 271 (1990) ..................................................9, 11

*Dresses for Less, Inc. v. CIT Grp./Commercial Servs., Inc.*, 2002 WL 31164482
(S.D.N.Y. Sept. 30, 2002) ....................................................................................19

*Fed. Home Loan Bank Bd. v. Elliott*, 386 F.2d 42 (9th Cir. 1967).................................10

*Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal. 2015)....................................7

*Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47 (1st Cir. 2002) .............................18

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ...........................................14, 20

*FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) ...............................16, 18, 20

\* *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439 (1945)..............................................4, 5

*Ginsburg v. InBev NV/SA*:

      649 F. Supp. 2d 943 (E.D. Mo. 2009), *aff'd*, 623 F.3d 1229 (8th Cir. 2010) ................... 16

      623 F.3d 1229 (8th Cir. 2010) ................................................................10

\* *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)...............................................1, 4, 8

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913 (9th Cir. 1975) .................11

*Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999)...................................25

---

[*] Authorities principally relied upon are marked with an asterisk.

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045
(5th Cir. 1982) ................................................................................................11

*Koker v. Aurora Loan Servicing, LLC*, 915 F. Supp. 2d 51 (D.D.C. 2013) ..................................15

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160 (4th Cir. 2014)....................24

*Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019) .........................................4

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004)................................9

*Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2017) ....................................7

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421 (3d Cir. 2016)....................24

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ..........................................8

* *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292 (D.N.M. 2018) ........................5, 6, 7

*New York v. Kraft Gen. Foods, Inc.*, 862 F. Supp. 1030 (S.D.N.Y.), *aff'd mem.*,
14 F.3d 590 (2d Cir. 1993)..............................................................................8

*New York v. Microsoft Corp.*, 209 F. Supp. 2d 132 (D.D.C. 2002).....................................5

* *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ....................................25, 28

* *Packaged Seafood Prods. Antitrust Litig., In re*, 338 F. Supp. 3d 1079
(S.D. Cal. 2018) .......................................................................................6, 7

* *Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976) ........................................4, 5, 7

*Pro-Football, Inc. v. Harjo*:

    415 F.3d 44 (D.C. Cir. 2005) ...................................................................12

    567 F. Supp. 2d 46 (D.D.C. 2008), *aff'd*, 565 F.3d 880 (D.C. Cir. 2009)................... 11-12

*Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464 (D.P.R. 2020) .........................................9, 10

* *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)....................................................24

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)....................................22

* *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981
(N.D. Cal. 2020)..................................................................................2, 8, 10

*S. Pac. Commc'ns Co. v. AT&T Co.*, 556 F. Supp. 825 (D.D.C. 1982), *aff'd*,
740 F.2d 980 (D.C. Cir. 1984) .......................................................................25

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
    778 F.3d 775 (9th Cir. 2015) ...................................................................17

*Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014)................................ 9-10

*Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464 (10th Cir. 1993) ...............................................6

*Standard Oil Co. v. United States*, 221 U.S. 1 (1911) ..................................................................26

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, --- F.3d ---, 2021 WL 630521
    (4th Cir. Feb. 18, 2021)........................................................................14

*Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 763 F. Supp. 2d 1341
    (S.D. Fla. 2011), *aff'd*, 711 F.3d 1264 (11th Cir. 2013).....................................26

*Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118 (N.D. Cal. 2011)................................................10

*Tenneco, Inc. v. FTC*, 689 F.2d 346 (2d Cir. 1982)......................................................................16

*Tobacco/Governmental Health Care Costs Litig., In re*, 83 F. Supp. 2d 125
    (D.D.C. 1999) .............................................................................................7

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ......................................................16

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ...............................................14

\* *United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990)........................................13, 14

*United States v. Columbia Steel Co.*, 334 U.S. 495 (1948) ............................................................27

*United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377 (1956) .........................................22

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)...................................................................22

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ..........................................14

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) ......................................16, 17

\* *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)..............................21, 24, 27, 28

*United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980) .......................................................16

*Utah Div. of Consumer Prot. v. Stevens*, 398 F. Supp. 3d 1139 (D. Utah 2019)..............................8

\* *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398
    (2004) ................................................................................................24, 28

*Walgreen Co. v. AstraZeneca Pharm. L.P.*, 534 F. Supp. 2d 146 (D.D.C. 2008) ...................... 22-23

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965).....................22

*Washington v. Chimei Innolux Corp.*, 659 F.3d 842 (9th Cir. 2011) ................................5

*Washington v. Franciscan Health Sys.*, 388 F. Supp. 3d 1296 (W.D. Wash. 2019) ..............12, 13

*Yamaha Motor Co. v. FTC*, 657 F.2d 971 (8th Cir. 1981) ..........................16

*Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014) ....................................9


STATUTES AND RULES

Clayton Act, 15 U.S.C. § 12 *et seq.* ............................................2, 4, 8, 12, 25

§ 7, 15 U.S.C. § 18.........................................2, 9, 12, 13, 14, 15,

16, 17, 18, 22, 25, 26

§ 16, 15 U.S.C. § 26.........................................................4, 8, 9, 10

Sherman Act, 15 U.S.C. § 1 *et seq.* .........................................................2, 26

§ 2, 15 U.S.C. § 2.........................................2, 3, 9, 20, 22, 26, 28

Fed. R. Civ. P. 12(b)(6).........................................................8


ADMINISTRATIVE MATERIALS

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines*
(2010).........................................................................17


OTHER MATERIALS

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*:

(1998).........................................................................19

(4th ed. 2020).........................................................12, 17, 26

Mem. Amicus Curiae of the United States Regarding Microsoft Corp.'s Mot.
for Dismissal of the Non-Settling States' Demand for Equitable Relief,
*New York v. Microsoft Corp.*, No. 98-cv-1233 (D.D.C. Apr. 15, 2002).........................8-9

Richard A. Posner, *Antitrust Policy and the Supreme Court:  An Analysis of the
Restricted Distribution Horizontal Merger and Potential Competition
Decisions*, 75 Colum. L. Rev. 282 (1975) .........................17

17 Charles A. Wright et al., *Federal Practice and Procedure* (1988).........................6

## INTRODUCTION

The complaint filed by the State Attorneys General does not and cannot assert that their citizens paid higher prices, that output was reduced, or that any objective measure of quality declined as a result of Facebook's challenged actions.  Instead, the States, even more explicitly than the Federal Trade Commission ("FTC"), ground their lawsuit in public policy concerns – digital privacy, for example – that are not competition-law concerns.  And, like the FTC, the States focus their attacks on what Facebook did long ago:  its acquisitions of Instagram (2012) and WhatsApp (2014), and its refusal to assist rivals by giving them free and unfettered access to its proprietary Platform (2011-2018).  These two acquisitions and the Platform policies were openly disclosed at the time, and the acquisitions were carefully reviewed and cleared by the FTC.  For nearly a decade (six years for WhatsApp), the States did not think there was a competitive problem with any of these things.  Their afterthought claims are brought by the wrong parties, are untimely, and are empty as a matter of antitrust law.

The States' complaint fails on multiple grounds.

*First*, the States lack standing to bring this case.  They sue not as federal law enforcers or for injuries suffered by the States themselves but as "*parens patriae*" on behalf of their citizens.  To have standing to sue in that capacity, the States must allege not only cognizable antitrust injury to their citizens but also a quasi-sovereign interest that is distinct from any citizen injury.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 733 n.14 (1977); *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 602 (1982).  The States have alleged no such quasi-sovereign interest.  They assert only the rights of citizens who have brought their own cases – flawed as they are – elsewhere in the federal court system.  Their complaint should therefore be dismissed.  *See infra* Part I.

*Second*, the States' claims based on Facebook's acquisitions are barred by the doctrine of laches, or unfair delay.  The States waited far too long to act – far longer than the four years that is the outer limit of the yardstick for laches when States and private parties sue under federal antitrust laws.  Facebook would be unfairly prejudiced if the case were allowed to proceed.  Both the inordinate delay after the States' claims accrued in 2012 (Instagram) and 2014 (WhatsApp), and the prejudice to Facebook if this challenge were allowed to proceed now, after Facebook invested billions of dollars and set business strategy in reliance on the governments' decisions, are apparent on the face of the complaint, which should therefore be dismissed.  Another federal district court so held last year in dismissing similar claims under the doctrine of laches.  *See Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 990-92 (N.D. Cal. 2020) (dismissing Clayton Act Section 7 and Sherman Act Section 2 claims in putative class action because laches barred a "challenge [to] Facebook's 2012 and 2014 acquisitions of Instagram and WhatsApp").  *See infra* Part II.

*Third*, the States fail to state a plausible claim under Section 7, for two basic reasons.  To begin, they have alleged only that Instagram and WhatsApp were *potential* competitors and have only speculated that these potential rivals could have brought benefits to competition and consumers.  The only support for this speculation is a small handful of emails and messages reflecting Facebook executives' *own* speculation about what might happen in the future with these and many other potential rivals.  This is insufficient as a matter of law.  Moreover, no court has adopted the theory the States seek to enshrine in law for the first time.  The States' complaint fails even to check the boxes of, much less allege facts to satisfy, the test the FTC itself has proposed for similar "potential competitor" claims.  There are no pleaded facts sufficient to establish that, at the time of the acquisitions, it was likely that either Instagram or WhatsApp was

poised to enter the claimed relevant product market, and even less basis for an entirely implausible claim that they were the only potential entrants capable of bringing the benefits of competition to consumers.  *See infra* Part III.

*Fourth*, the States' Section 2 claim tracks the FTC's parallel claim, and their complaint likewise fails to plead the elements of that claim.  The States' market-definition allegations (which mirror those of the FTC essentially verbatim) and the States' assertions that Facebook has monopoly power fail to pass muster under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Nor do the States allege exclusionary conduct under settled antitrust standards:  the States' "buy-or-bury" theme, accompanied by vague assertions that the impact of an entire course of conduct was greater than the sum of its parts, does not relieve the States of the obligation to plead facts establishing that Facebook's actions violated a duty under the antitrust laws and harmed competition.  The States provide additional atmospherics but rely almost entirely on the same three lawful actions challenged by the FTC; they allege no *facts* establishing a plausible claim that Facebook engaged in unlawful exclusionary conduct that harmed competition and ultimately consumers.  *See infra* Part IV.

## BACKGROUND

The background relevant to both the instant motion and the parallel motion to dismiss the FTC action is set forth in the Memorandum in Support of Facebook's Motion To Dismiss FTC's Complaint, Case No. 1:20-cv-03590-JEB (D.D.C. Mar. 10, 2021) ("FTC Br.").  The States' divergent and supplemental factual allegations are discussed below at Parts III and IV.

## ARGUMENT

### I.   THE STATES DO NOT HAVE *PARENS PATRIAE* STANDING

To prosecute this action the States must have standing, or the legal right to proceed.  *See Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019) ("A State's standing depends on the capacity in which it initiates a lawsuit.").  The States claim standing to sue under Section 16 of the Clayton Act, 15 U.S.C. § 26, purportedly as *parens patriae* "to protect the economic wellbeing of their states and residents," Compl. ¶ 18, ECF No. 70.  But the complaint's factual allegations fail to support *parens patriae* standing, which requires both actionable antitrust injury to the States' citizens and *also* harm to the States' own distinct quasi-sovereign interests.  *See Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 447, 450-51 (1945) (recognizing *parens patriae* standing under Section 16 where "the economy of Georgia and the welfare of her citizens have seriously suffered" such that Georgia had "'quasi-sovereign' interests" "apart from that of particular individuals").  This cannot simply be a hand-wave argument that, where citizens are affected, states suffer too.  *See Alfred L. Snapp*, 458 U.S. at 602 ("A quasi-sovereign interest must be sufficiently concrete to create an actual controversy between the State and the defendant.").

The States fail to establish standing, and the case must be dismissed, because there are no facts alleged to show that Facebook injured any of the States' concrete, quasi-sovereign interests.  The States have no sovereign interest in enforcement of the federal antitrust laws, *see Illinois Brick*, 431 U.S. at 733 n.14, and they assert no pecuniary or proprietary interest "apart from the interests of particular private parties," *Alfred L. Snapp*, 458 U.S. at 607; *see Pennsylvania v. Kleppe*, 533 F.2d 668, 673 (D.C. Cir. 1976) ("states suing parens patriae are limited to causes in which the state itself can be said to have a quasi-sovereign interest"; affirming dismissal).

"Examples of quasi-sovereign interests include abating a public nuisance, preventing environmental pollution, or avoiding economic damage of such severity and pervasiveness that it

causes injury not only to individual citizens, but to the welfare, prosperity, and economic standing of the State as a whole." *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292, 1311 (D.N.M. 2018) (dismissing complaint for failure to establish *parens patriae* standing). Because the States' complaint is based solely on supposed economic harm – and not other harms to citizens' general health or welfare, *see* Compl. ¶¶ 18-19 – the States are required to allege facts establishing that the alleged conduct caused "severe and generalized" harm to each State's economy. *Kleppe*, 533 F.2d at 675. Allegations like the States' have never been held to meet that standard. For example, the Supreme Court recognized a state's quasi-sovereign interest in disrupting an alleged rail freight price-fixing conspiracy based on facts demonstrating the pervasive impact of railroad rates on all sectors of the state's World War II-era economy. *See Georgia*, 324 U.S. at 450 (anticompetitive rates could "stifle, impede, or cripple old industries and prevent the establishment of new ones," thus "arrest[ing] the development of a State or put[ting] it at a decided disadvantage"). These were serious harms distinct from those suffered by the ratepayers themselves. A similar impact on "competition within the state" – given the pervasive reliance of enterprises in each of the United States on "PCs running on Microsoft software" – was recognized as a basis for *parens patriae* standing in *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 149-55 (D.D.C. 2002) (addressing *parens patriae* standing in dicta because Microsoft's belated argument was "hobbled at the outset by the existing law of the case").

By contrast, where challenged conduct affects only individual citizens – even many of them – there is no basis for the States to pursue those claims as *parens patriae*. *See Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011) (to bring a claim in its *parens patriae* capacity, the sovereign must allege both "injury to a sufficiently substantial segment of its

population" *and* "an interest apart from the interests of particular private parties"); *Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1469 (10th Cir. 1993) ("[p]arens patriae standing has been explained on the ground that the plaintiff state is not merely advancing the rights of individual injured citizens") (quoting 17 Charles A. Wright et al., *Federal Practice and Procedure* § 4047, at 223 (1988)).

For example, in *Navajo Nation*, the plaintiff Nation (treated the same as a state for these purposes) alleged that "one of the biggest banks in the United States" had "systematically preyed on Navajo tribal members," harming the Nation's citizens.  344 F. Supp. 3d at 1298, 1300. Nevertheless, because the Nation's claims were "based on allegations that Defendants harmed individual tribal members," and the Nation "fail[ed] to describe any *separate* harm to its quasi-sovereign interests," the court dismissed its federal statutory claims.  *Id.* at 1312-13 (emphasis added).  Similarly, in *In re Packaged Seafood Products Antitrust Litigation*, the court dismissed a claim, based on the allegation that citizens of the Cherokee Nation had overpaid for packaged tuna, for want of plausible allegations that there was "injury to the Cherokee Nation" apart from overpayments by those citizens.  338 F. Supp. 3d 1079, 1096-97 (S.D. Cal. 2018).

Here, the States have made no fact-based claim of any "interest apart from the interests of particular private parties."  *Alfred L. Snapp*, 458 U.S. at 607.  They assert (¶ 18) an interest in "the economic wellbeing of their states," but that is a legal conclusion – a "formulaic recitation" of an "element" of a *parens patriae* cause of action – supported by no facts and thus entitled to no weight on a motion to dismiss.  *Twombly*, 550 U.S. at 555-56.  And the States allege no more: they do not even assert that Facebook's conduct threatens some *State* economic interest.  Rather, they allege only that some of their citizens who use Facebook have had a supposedly lower "quality" experience.  *See* Compl. ¶¶ 235, 247-250.  Taking those allegations as true says

nothing of any "severe and generalized" harm to the States' economies, *Kleppe*, 533 F.2d at 675, or of any injury to the "welfare, prosperity, and economic standing *of the State as a whole*," *Navajo Nation*, 344 F. Supp. 3d at 1311 (emphasis added).

The conclusion that the States are not appropriate plaintiffs is reinforced by the fact that their allegedly aggrieved citizens can and have sought relief for the same supposed injuries. Other private plaintiffs have filed numerous consumer class actions alleging almost exactly the same facts and legal theories as those alleged by the States.[1]  The existence of citizens "capable of bringing suit to redress these injuries" should "prevent" the States "from bringing suit as *parens patriae*." *In re Tobacco/Governmental Health Care Costs Litig.*, 83 F. Supp. 2d 125, 134 (D.D.C. 1999) (granting motion to dismiss); *see also*, *e.g.*, *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 652 (9th Cir. 2017) (affirming dismissal; noting "*parens patriae* standing is inappropriate where an aggrieved party could seek private relief"; collecting cases); *Kleppe*, 533 F.2d at 675 (stating that *parens patriae* standing is rarely appropriate in "the presence or absence of a more appropriate party or parties capable of bringing the suit"); *In re Packaged Seafood*, 338 F. Supp. 3d at 1097 ("perhaps the proper recourse is for individual consumers to join putative class actions . . . or bring their own claims").

To be sure, the claims of the individual and class plaintiffs are themselves flawed on their face.  *See*, *e.g.*, *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1028-29 (N.D. Cal. 2015) (holding that general allegations of "threatened harm to innovation and consumer choice" are "entirely too conclusory and speculative" to establish antitrust injury).  But those defects do not improve the

---

[1] The States themselves have filed notices of related cases concerning nine such private actions.  ECF No. 5 (Dec. 9, 2020); ECF No. 6 (Dec. 9, 2020); ECF No. 9 (Dec. 11, 2020); ECF No. 14 (Dec. 14, 2020); ECF No. 56 (Dec. 22, 2020); ECF No. 85 (Jan. 6, 2021); ECF No. 86 (Jan. 6, 2021); ECF No. 109 (Jan. 29, 2021); ECF No. 110 (Jan. 29, 2021).

States' argument for proceeding here.  The absence of cognizable antitrust injury to their citizens

is likewise grounds for dismissal of the States' suit.  *See Illinois Brick*, 431 U.S. at 733 n.14

(explaining that *parens patriae* suits create "no new substantive liability" under the antitrust

laws, but instead are a "procedural device" for states to act "on behalf of their citizens"); *Utah*

*Div. of Consumer Prot. v. Stevens*, 398 F. Supp. 3d 1139, 1147 (D. Utah 2019) (granting motion

to dismiss *parens patriae* action where state alleged only "that its citizens share the general

interests it has identified" in preventing fraudulent business practices, without alleging anything

more than an "indirect and amorphous" harm in fact).

## II.    LACHES BARS THE STATES' CLAIMS

The States' belated claims for equitable relief are barred by the doctrine of laches, which

applies where a plaintiff "unreasonably delays in filing a suit" resulting in "prejudice" to the

defendant.  *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002).

Where, as here, the delay and the resulting harm to the defendant are clear on the face of the

complaint, federal courts will apply the doctrine to dismiss the claims under Federal Rule of

Civil Procedure 12(b)(6).  *See Reveal Chat*, 471 F. Supp. 3d at 991-92.

The States proceed under Section 16 of the Clayton Act, which permits "[a]ny person" to

seek injunctive relief "against threatened loss or damage by a violation of the antitrust laws . . .

when and under the same conditions and principles as injunctive relief against threatened conduct

that will cause loss or damage is granted by courts of equity."  15 U.S.C. § 26.  The States, as

"any person," are therefore like any other private litigant and are subject to the same doctrinal

limitations.  *See New York v. Kraft Gen. Foods, Inc.*, 862 F. Supp. 1030, 1033 (S.D.N.Y.) (New

York treated like any other "private party"), *aff'd*, 14 F.3d 590 (2d Cir. 1993) (table); Mem.

Amicus Curiae of the United States Regarding Microsoft Corp.'s Mot. for Dismissal of the Non-

Settling States' Demand for Equitable Relief at 4, *New York v. Microsoft Corp.*, No. 98-cv-1233

(D.D.C. Apr. 15, 2002) ("[The states] do not stand on equal footing with the United States as enforcers of the federal antitrust laws. . . .  In pursuing injunctive relief, . . . the States appear before the Court as private parties, not as sovereign law enforcers.").  And the Supreme Court has noted that, when a plaintiff challenges an acquisition under Section 16, "equitable defenses such as laches . . . may protect consummated transactions from belated attacks."  *California v. Am. Stores Co.*, 495 U.S. 271, 295-96 (1990); *see id.* at 298 (Kennedy, J., concurring) (consequences of delay by state "may include the bar of laches"); *see also Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 474-75 (D.P.R. 2020) (granting motion to dismiss *parens patriae* antitrust claims brought by Puerto Rico under Section 16 on several grounds including laches).

The two acquisitions alleged as the sole basis for the States' Section 7 claims (as well as the primary support for their Section 2 claim) were announced, investigated by the FTC, and closed in 2012 (Instagram) and 2014 (WhatsApp); any cause of action based on those transactions accrued at those times.  *See Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004) (Section 7 claim accrued on consummation of challenged acquisition); *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 598-99 (6th Cir. 2014) (Section 2 claim accrued when challenged transaction closed).  Indeed, all of the States' allegations related to Facebook's acquisitions involve pre-2017 conduct – the Glancee acquisition closed in 2012 (¶ 184), the Onavo acquisition closed in 2013 (¶ 137), and the Eyegroove acquisition closed in 2016 (¶ 184).

The States' unprecedented delay in acting requires dismissal under the doctrine of laches. The "deadline for suits for equitable relief under the antitrust laws is governed by laches," and "the four-year statute of limitations in 15 U.S.C. § 15b 'furnishes a guideline for computation of the laches period.'"  *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 (9th Cir.

2014) (citation omitted); *see Carpenter*, 442 F. Supp. 3d at 474 (applying laches in Section 16 case brought as *parens patriae*, noting that, "in applying laches, the Court looks to the same legal rules that animate the four-year statute of limitations").  We have found no case in which a court has permitted a state or any other private party to challenge an acquisition consummated more than four years before suit was filed.

Indeed, in cases involving transactions that were publicly announced, like the Instagram and WhatsApp acquisitions, laches frequently bars equitable claims brought sooner – even much sooner – than four years after the event.  *See, e.g.*, *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010) (plaintiff who waited only two months after announced merger agreement to bring lawsuit engaged in "inexcusable delay[ ]"); *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1123-24 & n.8 (N.D. Cal. 2011) (barring a challenge seeking divestiture brought one day after closing); *cf. Fed. Home Loan Bank Bd. v. Elliott*, 386 F.2d 42, 56 (9th Cir. 1967) (affirming summary judgment for defendant on ground of laches where shareholders waited three months to challenge transaction).  Laches can even apply where a plaintiff does not act before a merger or acquisition closes.  *See Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1172 (C.D. Cal. 2000) (doctrine of laches bars claim where Section 16 plaintiffs "were on notice of the merger, yet took no significant action prior to its consummation").

As another federal court recently decided, comparable delays in challenging the Instagram and WhatsApp acquisitions were unreasonable and warranted dismissal under the doctrine of laches.  *See Reveal Chat*, 471 F. Supp. 3d at 991-92 (granting motion to dismiss).  Here, as in *Reveal Chat*, the States' "years-long delay in bringing the action was inexcusable." *Id.* at 990.  As the court observed, "Facebook's acquisitions of Instagram and WhatsApp were widely publicized in 2012 and 2014 respectively." *Id.* at 993.  Indeed, the States allege that

Facebook took steps "announcing the Instagram acquisition," Compl. ¶ 124, and "announced" the WhatsApp acquisition, *id.* ¶ 166.  They even cite (¶ 170) publicly available market analysis published "at the time" to support the assertion that Facebook acquired WhatsApp to eliminate "a potential competitor" – all without any attempt to explain (or even acknowledge) this egregious delay.  The States assert (¶ 68) that Facebook was "dominant" by 2011 and that these well-publicized acquisitions cemented its dominance.  *See id.* ¶¶ 264-265, 269-270.  And this Court can take judicial notice of the fact that both transactions were reported to the FTC and cleared, in the case of Instagram on a 5-0 Commission vote in 2012.  *See* FTC Br. 7-8.  The States allege no facts to explain or excuse their delay.  The facts presented on the face of the complaint establish delay far more inexcusable than the much shorter lags that required dismissal under the doctrine of laches in the cases cited above.

        "The bare fact of delay creates a rebuttable presumption of prejudice" that the complaint makes no attempt to overcome.  *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 926 (9th Cir. 1975), *disapproved of on other grounds by California v. Am. Stores Co.*, 495 U.S. 271 (1990); *see also, e.g.*, *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982) (affirming order granting motion to dismiss antitrust counterclaim and noting that, "if the plaintiff's claim is brought outside the analogous limitations period, 'the bare fact of delay creates a rebuttable presumption of prejudice to the defendant'") (citation omitted).  Moreover, it is clear from the States' own allegations that their lengthy delay has caused prejudice sufficient to establish laches here.  Prejudice "arises from investment in and development of" an asset after a plaintiff fails to "press[] its claims in a timely manner." *Pro-Football, Inc. v. Harjo*, 567 F. Supp. 2d 46, 59-60 (D.D.C. 2008) (finding prejudice where it was "undisputed" that the defendant had invested "millions of dollars" in its trademarks),

*aff'd*, 565 F.3d 880 (D.C. Cir. 2009); *see also Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 50 (D.C. Cir. 2005) (showing of "economic prejudice" may support a finding of laches).  The States acknowledge that Facebook has spent many years growing and investing in Instagram and WhatsApp.  *See* Compl. ¶ 12.  That expenditure of time and resources, as well as Facebook's reliance on the passage of time in forming and executing its business strategy, would be gutted by the relief sought in this untimely action.

## III.   THE STATES FAIL TO PLAUSIBLY ALLEGE THAT THE ACQUISITIONS OF INSTAGRAM AND WHATSAPP VIOLATED THE CLAYTON ACT

The FTC decided not to plead a Section 7 claim for good reason.  No such claim can plausibly be alleged.  The States' complaint fails to state a claim under Section 7 of the Clayton Act because it proceeds on a novel legal theory that is inconsistent with settled law, with no facts to support it in any event.  It fails to allege facts establishing that, at the time of the transactions, the acquisition of either Instagram in 2012 or WhatsApp in 2014 was likely to "substantially . . . lessen competition" in any market and harm consumers.  15 U.S.C. § 18.

Section 7 is expressly forward looking:  it prohibits certain acquisitions where a plaintiff pleads and proves that, at the time of the acquisition, it is likely that "the effect of such acquisition may be" to harm competition.  *Id.*  The standard could hardly be otherwise, lest a transaction deemed lawful when it closes become retrospectively unlawful because of perceived subsequent events.  *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1205c2 (4th ed. 2020) ("Areeda") ("[R]etroactive illegality should not be imposed on a merger that was lawful as of the time it was consummated."); *Washington v. Franciscan Health Sys.*, 388 F. Supp. 3d 1296, 1300-01 (W.D. Wash. 2019) (rejecting state's argument that a court may "find a violation of the Clayton Act in an earlier transaction based only on analysis which incorporates a later transaction").

Accordingly, the States must plead facts establishing that, in 2012 and 2014, it was more likely than not that the acquisitions of Instagram and WhatsApp would harm consumers.  (Not that, as the States allege (¶¶ 265, 270) – contrary to fact – it later turned out that way.  *See Franciscan Health*, 388 F. Supp. 3d at 1300-02.)  While the statute uses the term "may," virtually anything *might* have a negative effect.  Courts have consistently required plaintiffs to show, with facts, that it was probable that the harm would occur.  *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) (inquiry under Section 7 addresses "*probabilities*, not certainties or possibilities").

The States fail to clear that hurdle.  *First*, the States have not alleged facts to support a viable legal theory.  Their "potential competitor" claim – that it was probable that both Instagram and WhatsApp would pivot to enter the alleged relevant product market if left alone – has not been accepted by any court, has no plausible factual support, and ignores allegations in the complaint that make it implausible.  *Second*, with respect to both transactions, the complaint does not even satisfy standards that the FTC has elsewhere proposed for advancing a claim based on potential competition.  There is nothing but conclusory assertions and speculation at the root of both Section 7 claims, and such conclusions and speculations cannot be and have never been held to be sufficient to state a claim under Section 7.

### A. The States' Claim That Facebook's Acquisitions Of Non-Competitors Violated Section 7 Fails As A Matter Of Law

The States proceed on a novel and untested legal theory:  they claim that acquisitions of firms that are potential *future*, but not *actual*, product-market rivals can be enjoined, based on the possibility that those targets might have decided to compete with the acquirer had the transaction not happened.  No court has ever found liability under that theory, and there are sound reasons

13

why no court should, particularly based on speculative assertions like those the States rely upon here.

1.      "The basic outline of a section 7 horizontal acquisition case is familiar." *Baker Hughes*, 908 F.2d at 982.  The government is required to show that "a transaction will lead to undue concentration in the market for a particular product in a particular geographic area," which "establishes a presumption that the transaction will substantially lessen competition." *Id.*  The States allege no such facts and claim no such presumption, which has been a decisive factor in substantially all, if not all, recent cases finding liability (or a likelihood of success) under Section 7.  *See, e.g.*, *Steves & Sons, Inc. v. JELD-WEN, Inc.*, --- F.3d ---, 2021 WL 630521, at *5-6 (4th Cir. Feb. 18, 2021); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 209 (D.D.C. 2017); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011).  Even if the Court were to accept at face value the viability of the alleged "Personal Social Networking Market," *but see infra* p. 22, the States do not allege and cannot plausibly allege that either Instagram or WhatsApp had any share of that market – that is, was an actual competitor – at the time of the transactions.

The States allege that WhatsApp was a "mobile messaging service[]," Compl. ¶ 154, and therefore expressly *exclude* WhatsApp from the alleged relevant market, *see id.* ¶ 36.  The complaint fails to allege that Instagram was in the market either.  It draws a sharp distinction between Facebook circa 2012 – "a full-featured Personal Social Networking Service" – and Instagram, "a young photo-sharing startup built for mobile." *Id.* ¶¶ 108-109.  The States' allegation is not that Instagram was competing in the market in which Facebook was supposedly "dominant," *id.* ¶ 68, but instead that it had begun to build a mobile-only "network" and that, "once a firm such as Instagram obtained a robust enough network of users who shared photos

14

with one another, *it could become* a full-featured Personal Social Networking Service to rival Facebook Blue," *id.* ¶ 108 (emphasis added).  The same could be said of any number of firms.

The States do incant the conclusions that "Facebook's acquisition of Instagram removed a significant and growing competitor from the market for Personal Social Networking Services" and that the acquisition "[e]liminat[ed] *actual* and potential competition" between Facebook Blue and Instagram.  *Id.* ¶¶ 264-265 (emphasis added).  (The States omit the relevant language in the corresponding paragraphs related to WhatsApp.  *See id.* ¶¶ 269-270.)  But these conclusory allegations – which imply that Instagram was already competing in the relevant market in 2012 – are properly discounted as "a formulaic recitation of the elements" of the States' cause of action under Section 7, rather than "enough factual matter (taken as true)" to allow the claim to proceed, particularly in light of the inconsistency of that assertion with the facts specifically pleaded indicating that Instagram was not competing with Facebook.  *Twombly*, 550 U.S. at 555-56; *cf. Koker v. Aurora Loan Servicing, LLC*, 915 F. Supp. 2d 51, 64 (D.D.C. 2013) (holding that complaint "does not state a plausible claim to relief" because "plaintiff's allegations are contradictory").

    **2.**      The States' potential-competition theory is thus entirely based on speculation that Instagram and WhatsApp might have altered their businesses to offer "personal social networking services," supposedly in direct competition with Facebook's own.  Such an inherently speculative prediction cannot be the basis for a Section 7 claim as a matter of law.

Indeed, we are aware of no appellate decision crediting a merger challenge under such a "potential competition" theory, and courts' decisions in other cases involving "potential competition" demonstrate why such a claim cannot proceed.  Federal enforcers have occasionally challenged, under Section 7, transactions that eliminated an established product-

market competitor that did not compete in the acquirer's geographic market.  *See*, *e.g.*, *FTC v. Steris Corp.*, 133 F. Supp. 3d 962, 966 (N.D. Ohio 2015).  Notably, the Supreme Court has expressly declined to accept even that more modest theory of potential competition as a basis for liability.  *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 639 (1974); *see also United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 75 (D.D.C. 2017) ("Whether actual potential competition is a viable theory of section 7 liability has not been answered by the Supreme Court.").  And potential-competition claims have been routinely rejected for failing to establish that new entry is likely.  *See*, *e.g.*, *Tenneco, Inc. v. FTC*, 689 F.2d 346, 352 (2d Cir. 1982) (rejecting FTC challenge to consummated merger where there was no evidence that, "absent [the merger, one of the parties] *would likely have entered* the [other's] market in the near future" and "that such entry . . . carried a *substantial likelihood* of ultimately producing . . . significant procompetitive effects") (emphases added); *United States v. Siemens Corp.*, 621 F.2d 499, 506-07 (2d Cir. 1980) (affirming order denying preliminary injunction under Section 7 where there was no "clear proof that entry would occur"); *Steris*, 133 F. Supp. 3d at 977 (denying preliminary injunction under Section 7 based on absence of evidence that target's entry was likely).[2]

Here, the States' claim that a non-competitor might have someday decided to compete is *legally* insufficient.  On their own, Instagram and WhatsApp might or might not have prospered;

---

[2] The Eighth Circuit upheld an FTC challenge to a joint venture based on the claim that the joint venture blocked entry by an actual competitor in the relevant product market that competed in every developed country's geographic market except the highly concentrated U.S. market.  *See Yamaha Motor Co. v. FTC*, 657 F.2d 971, 974 (8th Cir. 1981); *see also Ginsburg v. InBev NV/SA*, 649 F. Supp. 2d 943, 951 (E.D. Mo. 2009) (distinguishing *Yamaha*), *aff'd*, 623 F.3d 1229 (8th Cir. 2010).  That case – read for all it is worth – cannot support the States' speculative theory that Instagram or WhatsApp would have changed its business to offer a product that it did not yet offer at the time of the acquisitions, much less that its entry would have had a significant and objectively determinable positive effect for consumers.

they might or might not have adopted features that would satisfy the States' market definition. That is all the complaint fairly alleges. But possibilities provide no basis for blocking a transaction, let alone undoing one. *See Marine Bancorporation*, 418 U.S. at 622-23 ("[Section] 7 deals in 'probabilities,' not 'ephemeral possibilities.'") (citation omitted). All the States have pleaded is speculation, and that has never been enough under any standard.

There are, moreover, good reasons why courts have been reluctant to accept *any* Section 7 challenge based on the acquisition of potential, rather than actual, competitors. Acquisitions that do not involve direct competitors do not increase market concentration or reduce consumers' competitive options. At the same time, mergers have the "potential to generate significant efficiencies . . . , which may result in lower prices, improved quality, enhanced service, or new products." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 789 (9th Cir. 2015) (quoting U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 10 (2010)); *see also* Areeda ¶ 901a (mergers may "achieve synergies in the production or distribution of complementary goods, to put inefficiently run assets into the hands of superior management"). Blocking those benefits on no more than speculation that the target might decide to change its business if not acquired would harm the very consumers the antitrust laws are intended to help.

Furthermore, it is impossible to predict, with any degree of certainty, whether or how a firm not competing in a particular alleged market will actually enter that market, let alone identify future successes. That is true even for actual competitors that have not yet entered a particular geographic market. *See* Richard A. Posner, *Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution Horizontal Merger and Potential Competition Decisions*, 75 Colum. L. Rev. 282, 323-24 (1975) ("There is no judicially workable method of

ranking, even crudely, the potential competitors in a market for the purpose of identifying a set

of most likely or most feared entrants."); *cf. Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47,

71 (1st Cir. 2002) (noting that "there is no possible way to predict just what would happen" in a

world in which the challenged transaction had not been completed).  It is far more uncertain

whether a company not competing *at all* in the alleged product market will ever decide to do so,

and even more uncertain as to what effect, if any, such entry would have on competition and

consumers.

### B.    The States Fail To Allege That Instagram Or WhatsApp Was Uniquely Situated To Compete With Facebook

Even on the FTC's own view as to what the law *should be*, a plaintiff challenging the

acquisition of a potential competitor under Section 7 must prove not only likely entry but also

that the target is one of few firms with the capacity, as an independent company, to discipline the

acquirer.  *See Steris*, 133 F. Supp. 3d at 966.  While the States *say* in conclusory fashion that

both Instagram and WhatsApp were likely to become "personal social networking" competitors,

they allege no facts amounting to more than speculation.  *See supra* pp. 14-18.  Even more

telling is the States' failure to allege any facts to establish that either Instagram or WhatsApp was

among the very few firms that could possibly enter and discipline Facebook.

While they attach the label "unique" to both, Compl. ¶ 12, that is pure conclusion with no

supporting facts and moreover is contradicted by other specific allegations that render the claim

implausible.  The States identify *many* other competitive "threats" that worried Facebook,

including, among others, Snapchat, LINE, WeChat, Kakao, Path, Foursquare, Vine, MessageMe,

and Circle.  *See id.* ¶¶ 103, 134, 137, 154, 183, 207, 213-215, 218-219, 225-226.  The States'

allegations do not establish that Instagram and WhatsApp were the only firms capable of

impactful entry; they establish the opposite.  The notion that, for example, WhatsApp was a

unique threat, while Apple's iMessage was not, is implausible on its face, and nothing in the complaint supports a plausible claim that only Instagram and WhatsApp could be looked to for market salvation.  The States allege only that it was *possible* that an independent Instagram or WhatsApp, or both, might have developed into a product that would satisfy the States' arbitrary definition of a "personal social networking service."  But the same could be said for nearly any app vying for users' time and attention that was in existence at the time (or today).  The States' own allegations make that point.  *See*, *e.g.*, *id.* ¶¶ 130-131 (alleging that Facebook was threatened by Snapchat, which started as "a photo-sharing app" that "quickly became extremely popular"); *id.* ¶ 149 (alleging that Facebook was "concerned" that "one or more" messaging apps could "add features and compete in the Personal Social Networking Services market"); *id.* ¶ 152 ("Facebook anticipated that one or more [messaging apps] could add additional features and then compete in the Personal Social Network market."); *id.* ¶¶ 182-184 (alleging that Facebook identified Foursquare, Glancee, and Eyegroove as among a group of "apps that have 'amazing traction' or are 'becoming huge'"); *id.* ¶¶ 186-187, 206 (alleging "numerous examples" of when Facebook enforced Platform policies against "actual or potential competitors").

For related reasons, the States' claims would fare no better if they had alleged facts establishing that Instagram had already begun competing in the claimed relevant market.  That would allege only the loss of one competitor among many.  Indeed, as noted above, the States identify a plethora of companies that, the States claim, were also potential rivals to Facebook around the time of the Instagram acquisition.  *See supra* p. 18 (listing competitive threats).  Any horizontal acquisition by definition eliminates a competitor, but that "mere fact . . . has never been a sufficient basis for illegality."  *Dresses for Less, Inc. v. CIT Grp./Commercial Servs., Inc.*, 2002 WL 31164482, at *12 (S.D.N.Y. Sept. 30, 2002) (quoting Areeda ¶ 901a (1998)).  Without

any allegations about market structure, the target's share of the market, or the existence of other competitors, there is no basis for any colorable allegation that the acquisition would have substantially reduced competition.  *See H.J. Heinz*, 246 F.3d at 715.

The States' allegations regarding Snapchat in particular illustrate the inadequacy of their "potential competition" claims.  Founded shortly after Instagram, and with allegedly eye-popping growth by late 2012, *see* Compl. ¶ 131, Snapchat allegedly spurned Facebook's acquisition offers, including an offer to pay four times the price that Facebook had paid for Instagram the year before, *see id.* ¶ 134.  The States' parallel Section 2 claim necessarily rests on the implication that Snapchat, as it exists today, fails to constrain Facebook's monopoly power; but, if that is so, there can be no plausible allegation that Instagram – "a company with 16 employees and zero revenue," *id.* ¶ 107 – would have been any different.  Indeed, the complaint itself establishes that the Instagram transaction benefited consumers:  Instagram succeeded by virtue of Facebook's support.  *See id.* ¶ 125.  Accepting these alleged facts as true establishes that the Instagram acquisition was procompetitive – there is no factual allegation that these consumer welfare benefits would have been realized if the transaction had not occurred.

Where the States do not even come close to pleading facts that plausibly satisfy the requirements of the test the FTC itself advocates for "potential competition" claims, *see Steris*, 133 F. Supp. 3d at 966, it is apparent that they have failed to state a claim on which relief can be granted.  Neither the States nor any court have suggested a lower bar.

### C.       Allegations Concerning "Intent" Cannot Satisfy The States' Pleading Burden

In place of factual allegations concerning market structure and market shares to align their theory with precedent, the States rely on statements by Facebook executives expressing concerns about Instagram and WhatsApp as potential competitors.  *See*, *e.g.*, Compl. ¶¶ 114-115, 160, 164.  But, on their face, the documents tend to undermine, rather than support, the theory

20

that either Instagram or WhatsApp posed any unique threat:  Instagram is lumped in with "Path, Foursquare, etc." *Id.* ¶ 115.  And messaging competitors generally (not just WhatsApp, but Apple's iMessage, and SMS/MMS provided by Verizon and AT&T, among others) are described as "a huge threat," indeed "the biggest threat to our product that I've ever seen" and a "threat to our core businesses." *Id.* ¶¶ 151-152.  The States' claim of competitive paranoia limited to Instagram and WhatsApp is implausibly narrow.  The very documents they incorporate by reference establish that those were only two of many potential rivals that were a source of concern, and that they were *not* unique competitive threats.

More fundamentally, antitrust law treats all "intent" evidence with caution and rightly so: what matters is "the effect" – or, here, the likely effect – "of . . . conduct, not . . . the intent behind it." *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001).  The documents prove nothing as to effect; as to intent, they prove only Facebook's procompetitive motivation to "improve [its] service."  Compl. ¶ 115.  The supposedly protectionist strategy behind the Instagram acquisition depended on making Instagram a success – lest "some new competitors spring[ ] up," *id.* – not strangling Instagram in its crib, *see id.*

Concern about competition is the essence of competition, not proof of antitrust violation.  No court has held that such common sentiments in the context of dynamic competition push speculative claims such as the States' over the goal line of plausibility.

***

The States seek to launch an unprecedented challenge to acquisitions that by all conventional measures of consumer welfare have been massive successes for the consumers who use and enjoy the products that Facebook has built.  Even if the Court had the power to assume the legislative prerogative, this is not the case for creation of a new "potential competitor"

Section 7 cause of action.  And the allegations here do not even rise to the level of the FTC's own notions of what such a claim should require.

## IV.   THE STATES FAIL TO STATE A CLAIM UNDER SECTION 2

For the reasons explained in Facebook's motion to dismiss the FTC action, the States' mirror-image Section 2 claim fails to plead facts plausibly defining a relevant market and likewise fails to plead that Facebook possesses monopoly power.  Despite alleging some additional details concerning acquisitions and Platform-related conduct, the States do not allege any exclusionary conduct.

### A.   The States Fail To Plead A Cognizable Relevant Market

The States fail to allege a plausible definition of the relevant antitrust market for the same reasons articulated in Facebook's motion to dismiss the FTC action.  *See* FTC Br. 10-19.

### B.   The States Fail To Plead That Facebook Has Monopoly Power

**1.**   The States fail to allege facts sufficient to establish that Facebook possesses "the power to control prices or exclude competition."  *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (quoting *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 391 (1956)).  The States do not allege that Facebook "restricted output" or charged "supracompetitive prices," *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); on the contrary, the States admit that Facebook's service is provided to users for free, *see* Compl. ¶¶ 2, 48, 234; *see also* FTC Br. 20-21.  And, like the FTC, the States fail to allege any objective reduction in quality.  Product changes that are not measurable or that are a matter of subjective tastes – which are all that the States allege – cannot be relied upon "to measure [Facebook's] ability to lessen or destroy competition."  *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965); *see also Walgreen Co. v. AstraZeneca Pharm. L.P.*, 534 F. Supp. 2d 146, 151

(D.D.C. 2008) ("Courts and juries are not tasked with determining which product among several is superior.  Those determinations are left to the marketplace.").

The States' allegations that Facebook has changed its privacy policies do not satisfy their burden:  there is no claim that there has been any objectively measurable, across-the-board reduction in "privacy" – in fact, users can adjust their "privacy settings" and are not required to use the "default" settings.  *See* Compl. ¶¶ 237-238.  Moreover, as the States admit and as the policies they incorporate by reference explain, Facebook's changes enabled improvements to product features, site security, and advertising quality.  *See id.* ¶¶ 238, 240-241 (acknowledging Facebook collected new categories of data "to enable its 'Instant Personalization' product," facilitate "financial transactions," and "identify users in photos, videos, and camera experiences").  The States offer no principle of antitrust law that would allow the Court to treat this as a bane to consumers generally.  No such principle exists.

The States also allege that Facebook has increased its "ad load" over time.  *See id.* ¶ 250.  This is an *increase* in output – an antitrust benefit.  But even if "ad loads" are treated solely as a user-side quality dimension, the States make no allegation that ad loads are above competitive levels – or even what competitive levels are or how they can be measured.  As the States acknowledge, Facebook's advertisements have also become more "finely targeted" over time, with the result that they "accurately" show consumers products they are likely to find interesting. *See id.* ¶¶ 48, 51.  Whether, on balance, seeing more interesting and relevant advertising is a quality improvement or degradation is not plausibly alleged, much less supported with facts. Consumer response to such relevant advertising is a matter of subjective taste, especially if the alternative would be paying for Facebook's services.  *See*, *e.g.*, *id.* ¶ 48 (alleging that "users don't pay a fee to use Facebook" because "Facebook has chosen to monetize through advertising").

**2.**     Lacking facts to support any plausible allegation of direct proof of monopoly power, the States must resort to alleging indirect proof of high market share in a plausible relevant market – and a share protected by significant barriers to entry.  *See Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435 (3d Cir. 2016).  The States have not pleaded the required elements here.  Indeed, the States allege *no* facts concerning Facebook's current market share in the purported market for personal social networking services.  The States' allegation that Facebook told certain advertising clients *a decade ago* that it had 95% of "social media in the US" (¶ 68) is not a substitute for factual allegations about Facebook's share today of a different purported market for "personal social networking."  The States' allegation that a 2016 survey reported that "78% of respondents" visited Facebook "at least once a month" (¶ 69) is similarly irrelevant.  The States do not purport to use this survey to calculate Facebook's share in the alleged market for personal social networking, much less plead facts to support such a calculation.  Absent a high market share in a properly defined relevant antitrust market, there can be no plausible claim of monopoly power.  *See Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174-75 (4th Cir. 2014); *see also*, *e.g.*, *Asa Accugrade Inc. v. Am. Numismatic Ass'n*, 370 F. Supp. 2d 213, 218 (D.D.C. 2005) (granting motion to dismiss for insufficiently alleged market share, which precluded "an inference" that defendants had "achieved monopoly power").

**C.     The States Fail To Allege Exclusionary Conduct**

The States, like the FTC, fail to allege any facts amounting to legally cognizable, much less plausible, "anticompetitive conduct."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).  They have alleged no acts that "harm the competitive *process* and thereby harm consumers."  *Rambus Inc. v. FTC*, 522 F.3d 456, 463 (D.C. Cir. 2008) (quoting *Microsoft*, 253 F.3d at 58) (emphasis in *Microsoft*).  The States focus on the acquisitions

of Instagram and WhatsApp, along with a handful of others, and Facebook's Platform-related conduct, claiming that Facebook followed a "buy-or-bury strategy."  But as explained in the motion to dismiss the FTC action, none of these things is plausibly alleged to be unlawful exclusionary conduct.  *See* FTC Br. 23-39.

The States, unlike the FTC, suggest that the whole is greater than the sum of its parts, such that Facebook's "buy-or-bury strategy" can be exclusionary even if each of the underlying acts is not.  Compl. ¶ 258.  But this rhetoric cannot transform acts that are competitively valid individually into an unlawful course of conduct.  *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) (rejecting plaintiffs' attempt to "alchemize" lawful conduct into a "new form of antitrust liability" by combining acts that did not individually violate the antitrust laws); *see also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1366-67 (Fed. Cir. 1999) (rejecting the argument that "the degrees of support for each legal theory should be added up" and holding that "[e]ach legal theory must be examined for its sufficiency and applicability").  A defendant that "has committed *no* acts in themselves violative of the Sherman Act" cannot be "found guilty of antitrust violations on some theory that the acts have 'synergistic effects' that convert lawful conduct into violations of law."  *S. Pac. Commc'ns Co. v. AT&T Co.*, 556 F. Supp. 825, 888 (D.D.C. 1982), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984).

### 1. The States Fail To Allege That Any Facebook Acquisition Was Unlawful

The States fail to allege that any acquisition described in the complaint constituted unlawful exclusionary conduct.

*First*, the States' failure to allege that Facebook's acquisitions of WhatsApp and Instagram were unlawful under the standards that specifically apply under Section 7 of the Clayton Act, as described above, means that those transactions cannot constitute exclusionary

conduct under Section 2 of the Sherman Act.  *See supra* pp. 12-22.  Section 7 is more restrictive than the standards that apply under Section 2.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 318 n.32, 328-29 (1962).

*Second*, unlike the FTC, which challenges only the Instagram and WhatsApp acquisitions, the States cast a broad and conclusory net over Facebook's acquisitions generally. *See* Compl. ¶¶ 105-106.  But in no instance do the States plead facts establishing that any of these non-competitor acquisitions harmed competition and consumers.  *Cf. Standard Oil Co. v. United States*, 221 U.S. 1, 32-33 (1911) (acquisition by monopolist of all other competing oil refineries in geographic market violated Sherman Act).  On the contrary, the States' other transaction-related allegations fail to allege any competitive harm at all.

In the case of Onavo, the States assert (¶¶ 141, 147-148) only that the company's data analytics gave Facebook "competitive insights" that it used to "watch for emerging competitive threats."  But developing and applying market intelligence is procompetitive – not anticompetitive – conduct.  *See Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 763 F. Supp. 2d 1341, 1351-52 (S.D. Fla. 2011), *aff'd*, 711 F.3d 1264 (11th Cir. 2013).  Nor is there any allegation that competitors did not have or could not develop their own sources of market intelligence, such that the acquisition caused foreclosure.  *See* Areeda ¶ 1001 ("Only where foreclosure has reached monopolistic proportions or threatens to do so, does it become troublesome, and even then the effects will not be detrimental unless entry barriers are increased or competitive pricing is threatened."); *see also Alberta Gas Chems. Ltd. v. E.I. DuPont de Nemours & Co.*, 826 F.2d 1235, 1244 (3d Cir. 1987) ("Clearly, de minimis foreclosure of a market is not an antitrust dereliction in itself.").  The States do not allege that Onavo somehow made it possible for Facebook to identify any acquisition target that would have otherwise

slipped by; rather, they allege only that it may have been helpful to Facebook, which is far short of alleging facts to show that "the effect" of the Onavo acquisition was "to unreasonably restrict the opportunities of competitors," *United States v. Columbia Steel Co.*, 334 U.S. 495, 524 (1948).

The States' allegations (¶¶ 85-91) relating to FriendFeed and Octazen – which, like Onavo, are concededly not even potential competitors in any claimed relevant market – similarly fail to state any plausible claim. The States do not allege they were the only firms that provided their respective products, and there is no plausible, fact-based claim that Facebook's acquisition of either was of any significance to Facebook's competitors, let alone prevented them from competing. The States allege (¶ 85) that Facebook acquired FriendFeed to "block[ ] Twitter from acquiring this asset," but they do not allege that Twitter or any of Facebook's other purported competitors were foreclosed from obtaining from anywhere else whatever made FriendFeed attractive to Twitter (the States do not say).

The States allege (¶ 184) that Facebook acquired Glancee and Eyegroove to keep those apps out of the hands of competitors and then subsequently shut down both Glancee and Eyegroove. To the extent the States suggest that this was exclusionary because it prevented competitors from acquiring the apps, the argument fails because they have not alleged market foreclosure. To the extent the States challenge shutting down the apps, they have not plausibly alleged how that harmed competition – they do not even allege whether either app was a Facebook competitor, let alone one of significance.

Finally, the States' allegations (¶¶ 129-136) regarding Snapchat are puzzling: Facebook did not acquire Snapchat, and there is no allegation that the alleged attempt affected the market in any way. *See Microsoft*, 253 F.3d at 58 (exclusionary act must have "anticompetitive effect").

As noted above, if the incident illustrates anything, it is the absence of a basis to claim that Facebook's earlier acquisition of Instagram (for a fraction of what Facebook supposedly offered for Snapchat) can be plausibly claimed to be anticompetitive.

> **2.     The States' Claim That Facebook's 2011-2018 Policies Prevented Competitors From Making Unrestricted Use Of Its Proprietary Platform Fails As A Matter Of Law**

Although the States elsewhere claim that Facebook had little serious competition in its "personal social networking" market, *see* Compl. ¶ 4, they later claim that the company provided less than full access to its proprietary Platform to many competitors that sought to use that free resource to take users away from Facebook.

These allegations fail as a matter of settled Supreme Court precedent.  As explained in Facebook's motion to dismiss the FTC action, the States assert a pure refusal-to-deal claim that is foreclosed by on-point Supreme Court authority and cannot be squeezed into any limited exception to the categorical rule of *Trinko* and *linkLine.  See* FTC Br. 36-39.

> **3.     The States Have Not Pleaded Any Consumer Harm**

The D.C. Circuit has held that a Section 2 claim requires a showing of consumer harm. *See Microsoft*, 253 F.3d at 58*.*  But, like the FTC, the States fail to allege any facts plausibly establishing that Facebook's challenged conduct caused anticompetitive effects – that is, actual consumer harm.  Like the FTC, the States do not and cannot allege that Facebook caused the core harms the antitrust laws were designed to prevent:  increased prices or reduced output.  *See* FTC Br. 20-21, 25-26.  Nor could they:  the States admit that Facebook's products are free.  *See* Compl. ¶¶ 2, 48.  The States rest the claim on purported quality concerns.  But they do not allege that Facebook degraded the objective quality of its product or caused the overall quality of competing products to be reduced in any objectively measurable way.  Instead, the States assert only that quality *could be better* in a "but for" world in which Facebook had not acquired

Instagram and WhatsApp, or limited competitor access to Platform.  That is nothing but speculation untethered to any facts, entitled to no weight on this motion to dismiss.  *See Twombly*, 550 U.S. at 555-56.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion and dismiss the States' complaint in its entirety.

Respectfully submitted,

March 10, 2021

/s/  *Mark C. Hansen*
Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Leslie V. Pope (D.C. Bar No. 1014920)
L. Vivian Dong (D.C. Bar No. 1722506)*
Alex A. Parkinson (D.C. Bar No. 166695)*
Ana Nikolic Paul (D.C. Bar No. 1531904)*
Julius P. Taranto (D.C. Bar No. 230434)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Facebook, Inc.*

* Applications for Admission to the
Bar of the U.S. District Court for the
District of Columbia Pending