# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF NEW YORK, *et al.*,

                      Plaintiffs,

v.                                        Case No.: 1:20-cv-03589-JEB

FACEBOOK, INC.,

                      Defendant.

## STATES' MEMORANDUM IN OPPOSITION TO FACEBOOK'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 4

ARGUMENT ....................................................................................................................... 5

I.      PLEADING STANDARD ......................................................................................... 5

II.     THE STATES HAVE *PARENS PATRIAE* STANDING. ....................................... 5

        A.      States Enforce the Federal Antitrust Laws in the Public Interest. ........... 6

        B.      The States Have a Quasi-Sovereign Interest in a Competitive
                Marketplace. .............................................................................................. 7

        C.      Facebook's Conduct Harms Several Quasi-Sovereign Interests. ............. 7

        D.      Facebook's Conduct Harmed Hundreds of Millions of the States'
                Residents. .................................................................................................. 9

III.    LACHES DOES NOT BAR THE STATES' CLAIMS. ......................................... 9

        A.      The States Seek Injunctive Relief in the Public Interest. ....................... 10

        B.      The Complaint Is Timely Because the States Allege Ongoing
                Conduct. .................................................................................................. 12

        C.      Facebook's Prejudice Argument Is Premature and Has No Merit. ........ 15

IV.     THE INSTAGRAM AND WHATSAPP ACQUISITIONS
        VIOLATED SECTION 7 OF THE CLAYTON ACT. ........................................... 15

        A.      Facebook's Acquisition of Instagram Violated Section 7. ..................... 17

        B.      Facebook's Acquisition of WhatsApp Violated Section 7. ..................... 18

        C.      Facebook's Arguments Are Inconsistent with the Law and the
                Pleaded Facts. ......................................................................................... 20

                1.      Section 7 applies to acquisitions by monopolists of nascent
                        threats outside of the relevant market. ....................................... 20

                2.      A transaction violates Section 7 if it is illegal at the time of suit. ........... 23

                3.      Acquisitions that eliminate threats are illegal even if the threat
                        is not "unique." ........................................................................... 24

                4.      Facebook acquired Instagram and WhatsApp to preserve its
                        monopoly in an already-concentrated market. ........................... 24

5.     Facebook's own assessment of competitive conditions and monopolistic intent can be relied upon to establish a Section 7 violation. .................................................................................. 25

6.     Facebook itself expected significant competition from Instagram and WhatsApp......................................................... 25

V.     FACEBOOK UNLAWFULLY MAINTAINED ITS MONOPOLY IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT....................................... 27

A.     Facebook's Conduct Harmed Competition in the Market for Personal Social Networking Services in the United States.................. 28

B.     Facebook Has Monopoly Power in the Relevant Market. ..................... 29

1.     Facebook has a dominant position in the relevant market that is protected by high barriers to entry. ........................................ 29

2.     Facebook profited by degrading the quality of its product, thereby reducing output and effectively raising prices. ........................... 30

C.     Facebook's Exclusionary Conduct Unlawfully Maintained Its Monopoly. .................................................................................. 32

1.     Facebook protected its monopoly by acquiring Instagram and WhatsApp. .............................................................................. 33

2.     Facebook used its Platform to suppress and exclude competition........... 34

a.     Facebook's conditional dealing deterred competition. ................. 35

b.     Facebook's Platform conduct constitutes an exclusionary refusal to deal. .............................................................. 37

c.     Facebook's Platform conduct is exclusionary on its face............ 39

d.     Facebook's refusals to deal are starkly anticompetitive in context............................................................................. 40

e.     Facebook's remaining arguments relating to its exclusionary Platform conduct have no merit. ......................... 41

3.     Facebook made several other acquisitions as part of an overall course of conduct that protected its monopoly power. ..................... 42

4.     The States' Section 2 claim is independent of the Section 7 Claims. ................................................................................... 44

D.     Facebook's Anticompetitive Conduct Harmed Consumers................... 44

CONCLUSION.................................................................................... 45

# TABLE OF AUTHORITIES

### CASES

\* *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ....................... 6, 7

*Allis-Chalmers Mfg. Co. v. White Consol. Indus., Inc.*, 414 F.2d 506 (3d Cir. 1969),
    *cert. denied*, 396 U.S. 1009 (1970) ...................................................................................... 24

\* *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ........................... passim

*Biden v. Knight First Amendment Inst. at Columbia Univ.*, No 20-197, 593 U.S. __,
    slip op. (Apr. 5, 2021) (THOMAS, J. concurring) ........................................................... 30

\* *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........................................................ 16, 22

\* *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) ............................................... 6, 7, 11, 14

*CollegeNET, Inc. v. Common Application, Inc.*, 711 F. App'x 405 (9th Cir. 2017) ................... 45

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ................................... 33

*Costello v. United States*, 365 U.S. 265 (1961) .......................................................................... 15

*Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005) ..................................... 41

*Daingerfield Island Protective Soc. v. Lujan*, 920 F.2d 32 (D.C. Cir. 1990) ........................ 10, 15

*Ekco Products v. FTC*, 347 F.2d 745 (7th Cir. 1965) ................................................................. 21

*Fraser v. Major League Soccer, LLC*, 284 F.3d 47 (1st Cir. 2002) ............................................ 27

*Free Freehand Corp. v. Adobe Sys.*, 852 F. Supp. 2d 1171 (N.D. Cal. 2012) ............................ 16

*FTC v. Actavis*, 570 U.S. 136 (2013) ................................................................................... 22, 36

*FTC v. Alliant Techsystems, Inc.*, 808 F. Supp. 9 (D.D.C. 1992) ................................................ 45

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ............................................................... 27

\* *FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ...................................................... 17, 20, 21

*FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) ......................................... 23 n.5, 27

*FTC v. Western Meat Co.*, 272 U.S. 554 (1926) ......................................................................... 14

*Gaudreau v. Am. Promotional Events, Inc.*, 511 F. Supp. 2d 152 (D.D.C. 2007) ....................... 14

\* *Georgia v. Penn. R. Co.*, 324 U.S. 439 (1945) ...................................................................... 5, 6

\* Authorities chiefly relied on are marked with an asterisk.

*Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45 (D.D.C. 2009)...................................................5

*In re Ins. Antitrust Litig.*, 938 F.2d 919 (9th Cir. 1991), *aff'd in part, rev'd in part on other grounds, sub nom. Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993)...................................................................................................................7

*In re Intuniv Antitrust Litig.*, No. 1:16-CV-12396-ADB, --- F.Supp.3d ----, 2020 WL 5995984 (D. Mass. Oct. 9, 2020)...............................................................................33

*In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1079 (S.D. Cal. 2018)......................................................................................................................9

*In re Thalomid & Revlimid Antitrust Litig.*, Civ. No. 14–6997 (KSH) (CLW), 2015 WL 9589217 (D.N.J. Oct. 29, 2015).......................................................................39

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913 (9th Cir. 1975) ...............10, 11

*Kansas v. Colorado*, No. 105, ORIGINAL, 1994 WL 16189353 (Oct. 3, 1994), *aff'd* 514 U.S. 673 (1995)..................................................................................................10, 15

*Kemp v. Eiland*, 139 F. Supp. 3d 329 (D.D.C. 2015) ...........................................................10, 15

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ......................................................................33

\* *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951)...............................................34, 35, 36

*Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004)............................41

*Nat'l R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).......................................................10

*Nat'l Soc'y of Prof. Engineers v. United States*, 435 U.S. 679 (1978)........................................45

*Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292 (D.N.M. 2018) ..............................9

*New York v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ...............................................................6

*New York v. Kraft Gen. Foods, Inc.*, 862 F. Supp. 1030 (S.D.N.Y. 1993)...........................11 n.3

*New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321 (S.D.N.Y. 1995).............................11 n.3

*New York v. Microsoft*, 209 F. Supp. 2d 132 (D.D.C. 2002)....................................................7, 9

*Osborn v. Visa Inc.*, 797 F.3d 1057 (D.C. Cir. 2015)...................................................................5

*Pennsylvania v. Mid-Atl. Toyota Distribs., Inc.*, 704 F.2d 125 (4th Cir. 1983)........................6, 7

*Polygram Holding, Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005)...................................................43

*Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208 (11th Cir. 2012)......................................................16

*Pro-Football, Inc. v. Harjo*, 415 F.3d 44 (D.C. Cir. 2005) ........................................... 15

*Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464 (D.P.R. 2020) ...................................... 11, 12

*Shtauber v. Gerson*, 239 F. Supp. 3d 248 (D.D.C. 2017) .......................................... 10

*Standard Oil Co. of N.J. v. United States*, 221 U.S. 1 (1911) ...................................... 45

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021) .................................. 23 n.5

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*,
     311 F. Supp. 3d 468 (D.R.I. 2018) ............................................. 39

*Tenneco, Inc. v. FTC*, 689 F.2d 346 (2d Cir. 1982) ........................................... 27

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ....................................... 23 n.5

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990) ...................... 23 nn.5 & 6, 27

*United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966
     (N.D. Cal. Jan. 8, 2014) ............................................... 25

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964) .......................................... 24, 25

* *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ....................... 13, 14, 23

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ..................................... 21

*United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974) ................................... 3, 16

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ................................. 14

*United States v. H&R Block Corp.*, 384 U.S. 563 (1966) ................................ 23 n.5, 24

*United States v. ITT Cont'l Baking*, 420 U.S. 223 (1975) ..................................... 13, 14

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) .................................... 26, 27

* *United States v. Microsoft Corp.*, 253 F. 3d 34 (D.C. Cir. 2001) ......................................... passim

*United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980) ...................................... 27

*United States v. Swift & Co.*, 286 U.S. 106 (1932) ....................................... 43

* *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
     540 U.S. 398 (2004) ............................................... passim

* *Viamedia Inc. v. Comcast Corp.*, 951 F. 3d 429 (7th Cir. 2020) ............................... 39, 41, 42, 45

*Washington v. Franciscan Health Sys.*, 388 F. Supp. 3d 1296 (W.D. Wash. 2019) .............. 23 n.6

**STATUTES**

Clayton Act § 7, 15 U.S.C. § 18 ......................................................................... 3, 4, 15

Clayton Act § 16, 15 U.S.C. § 26 ............................................................................ 5, 6

Hart-Scott-Rodino Antitrust Improvements Act of 1976 § 4c,
   15 U.S.C. § 15c ................................................................................................... 6

Sherman Act § 2, 15 U.S.C. § 2 .................................................................................. 4

**LEGISLATIVE MATERIALS**

*Disinformation Nation: Social Media's Role in Promoting Extremism and
   Misinformation: Hearing before the H. Subcomm. on Commc'ns
   & Tech. and the H. Subcomm. on Consumer Prot. & Commerce*,
   117th Cong. __ (Mar. 25, 2021), *video available at* https://www.c-span.org/
   video/?510053-1/house-hearing-combating-online-misinformation-disinformation. ........ 45 n.8

S. Rep. No. 81-1775 (1950) ........................................................................................ 22

**ADMINISTRATIVE MATERIALS**

*Completed acquisition by Facebook, Inc. of GIPHY, Inc. Terms of reference*,
   GOV.UK (Apr. 1, 2021), https://assets.publishing.service.gov.uk/media/
   6065973b8fa8f515b28f4c78/Facebook_GIPHY_-_Terms_of_reference.pdf .................. 12, 13

U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines (Aug. 19, 2010) ............... 16, 17, 19

**OTHER MATERIALS**

C. Scott Hemphill & Tim Wu, *Nascent Competitors*,
   168 U. Penn. L. Rev. 1879 (2020) ........................................................................ 22

Herbert Hovenkamp, *Antitrust and Platform Monopoly*,
   130 Yale L.J. 1901 (forthcoming 2021),
   *available at* https://ssrn.com/abstract=3639142 .................................................... 40

Joint Case Management Statement, *Klein v. Facebook, Inc.*,
   Case No. 5:20-cv-08570-LHK, ECF No. 78 (N.D. Cal. Mar. 31, 2021) ........................ 6 n.2, 7

Phillip E. Areeda & Herbert Hovenkamp,
   Antitrust Law (5th ed. 2020) ......................................................................... 16, 44

Press Release, Facebook, Inc., *Response to Six4Three Documents* (Dec. 5, 2018),
   https://about.fb.com/news/2018/12/response-to-six4three-documents/ ................... 13

## INTRODUCTION

Facebook is a monopolist. Hundreds of millions of U.S. consumers, and billions around the world, turn to Facebook when they want to connect to friends and family, and they have no meaningful alternatives. As Facebook's internal documents put it as early as 2010: "For hundreds of millions of people today who want to connect with their friends and family, [Facebook is] the first—and more importantly—only choice."

Facebook has maintained its monopoly illegally for nearly a decade. Deploying a buy-or-bury scheme of predatory acquisitions and exclusionary conduct, Facebook successfully squashes, suppresses, and deters competition, entrenching its monopoly power to this day. The consequence is that consumers who live in the Plaintiffs' jurisdictions continue to be deprived of the benefits of competition, including innovation, quality, and choice. As the Complaint alleges and as described below, Facebook's anticompetitive conduct is part of a deliberate scheme that its executives knew would be effective, based on their understanding of the industry.

Free from concern that its users might choose another service, Facebook retains total control over what content to display to whom and when, and it can disregard users' interests and preferences when monetizing their personal information. This has allowed Facebook to profit handsomely as it degrades privacy protections, increases data collection, and increases ad load, because users are effectively stuck with Facebook.

Despite Facebook's protestations, those harms are no less actionable and no less painful simply because they do not involve a monetary price increase. To the contrary, those harms increase the cost of participating in what Facebook's CEO Mark Zuckerberg refers to as "the digital equivalent of a town square." The majority of people over age thirteen in the United States use Facebook daily to connect with friends and family, sharing personal milestones and other intimate details about their lives. Facebook's illegal monopoly forces consumers to accept

the costs imposed by its illegal monopoly or disengage from that "town square" conversation.

The illegality of Facebook's conduct does not depend on some novel theory (as Facebook would like this Court to believe). Facebook follows a monopolist's playbook—using predatory acquisitions, along with Facebook's power as the dominant incumbent, to intimidate and exclude companies that have threatened to encroach on its turf.

It is not surprising (and certainly not a reason for dismissal) that the targets of Facebook's conduct are nascent, in that they were relatively new and just beginning to threaten Facebook's monopoly. That merely reflects the way competition works in a technology sector characterized by strong network effects, such as this one. As Facebook itself understood, the greatest threats to its dominant position—those it feared most and that were the focus of its anticompetitive scheme—are likely to come from firms that develop new, innovative social features and establish strong, rapidly growing user networks. Just as Microsoft more than two decades ago used its operating system dominance to extinguish nascent threats like Netscape to maintain its monopoly, Facebook uses its buy-or-bury tactics to do the same.

Facebook's motion to dismiss is fatally flawed: (1) disputing facts presented in the States' Complaint, which must be taken as true; (2) relying on the introduction of new and contested facts that must be disregarded on a motion to dismiss; and (3) cherry picking phrases from past precedents to support novel legal standards that would effectively insulate Facebook (and other technology giants) from antitrust scrutiny. In particular:

- Facebook's argument that the States lack standing is wrong. *See infra* Section II. The States bring this suit *parens patriae*, in the public interest and on behalf of the residents of our respective jurisdictions. The States enforce the federal antitrust laws in the public interest and have a quasi-sovereign interest in a competitive marketplace that supports *parens patriae*

standing. The States allege detailed facts establishing that Facebook's conduct harms competition and therefore harms the States' quasi-sovereign interests. In addition, that harm is broad-based, affecting hundreds of millions of consumers across our collective jurisdictions.

- Facebook's argument that the States' claims are barred by laches is also wrong. *See infra* Section III. The equities favor allowing this litigation to proceed because it is brought to vindicate the public interest. To the extent it applies at all to government suits, laches is an affirmative defense (as to which Facebook has the burden of proof), and it raises issues of fact that are not properly before the Court on a motion to dismiss. In any event, as alleged in the Complaint, the States' claims are timely, and Facebook suffered no prejudice due to the passage of time; to the contrary, it benefited.

- Facebook's arguments that the acquisitions of Instagram and WhatsApp do not violate Section 7 of the Clayton Act fail. *See infra* Section IV. Those arguments ignore the text, purpose, and precedents of Section 7, which prohibits acquisitions, the effect of which "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The statute was "designed to arrest the creation of monopolies in their incipiency," *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 505 n.13 (1974). A monopolist's acquisitions of rapidly growing emerging firms that threaten its monopoly from within its own market (like Instagram) or from a separate market (like WhatsApp) are of special concern in a highly networked, technologically advanced market. As the States allege, Instagram and WhatsApp, both rapidly growing, innovative companies, were particularly well-situated to undermine Facebook's monopoly. No one knew this better than Facebook's leaders, who identified these threats and paid exorbitant prices to extinguish them.

- Finally, Facebook's arguments that it did not violate Section 2 of the Sherman Act

likewise fail. *See infra* Section V. Facebook has monopoly power in the relevant market—Personal Social Networking Services—and has willfully maintained that power by buying or burying rivals or potential rivals that presented a viable competitive threat. While driven by the singular objective of protecting its monopoly, Facebook's strategy is two-pronged. The first prong consists of a string of acquisitions that has eliminated nascent rivals and deprived other firms of access to tools that would help them compete, with the overall purpose and effect of erecting a competitive moat. The second prong is Facebook's use of its monopoly power to condition access to and block potential rivals from important tools, that is, Facebook's "Platform" interconnections. As the States allege, whether taking the elements of Facebook's two-pronged strategy separately or together, Facebook has unlawfully maintained its monopoly power, which remains intact and stronger than ever.

For the foregoing reasons and those detailed below, Facebook's motion should be denied.

## BACKGROUND

Plaintiffs—46 States, the District of Columbia, and the Territory of Guam (the "States")—are charged with protecting over 300 million consumers, and filed a detailed Complaint on December 9, 2020. Compl., ECF No. 3. The States allege that Facebook has monopoly power in the market for Personal Social Networking Services, and unlawfully maintained its monopoly in violation of Section 2 of the Sherman Act (15 U.S.C. § 2) by engaging in a course of conduct that includes (1) acquiring firms that it believed were well-positioned to erode its monopoly, and (2) conditioning access to and excluding firms from valuable tools on the Facebook Platform that it viewed as competitive threats. The States also allege that Facebook's acquisitions of Instagram and WhatsApp violated Section 7 of the Clayton Act (15 U.S.C. § 18) because they lessened competition in Personal Social Networking Services and entrenched Facebook's already-existing monopoly in that market. The FTC filed a similar complaint the same day. Compl., *FTC v.*

*Facebook, Inc.*, 1:20-cv-203590-JEB, ECF No. 3. Facebook moved to dismiss both complaints. *See* Motion to Dismiss, ECF No. 114 ("Facebook Br."); Motion to Dismiss, *FTC v. Facebook*, 1:20-cv-203590-JEB, ECF No. 56 ("Facebook FTC Br.").[1]

## ARGUMENT

## I.     PLEADING STANDARD

"Under the familiar Twombly-Iqbal standard, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1066 (D.C. Cir. 2015) (cleaned up). As demonstrated below, the States meet and exceed this standard.

"In deciding a motion brought under Rule 12(b)(6), a court is restricted from considering matters 'outside' the pleadings [except] documents upon which the plaintiff's complaint necessarily relies [and] matters about which the Court may take judicial notice." *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) (cleaned up) (citing Fed. R. Civ. P. 12(d)). The Court can therefore reject Facebook's arguments to the extent they dispute the pleaded facts.

## II.     THE STATES HAVE *PARENS PATRIAE* STANDING.

The States bring this suit as *parens patriae* through Section 16 of the Clayton Act to remedy Facebook's violations of the Sherman Act and the Clayton Act. *See* Compl. ¶¶ 5–6 (citing 15 U.S.C. § 26); *see also Georgia v. Penn. R. Co.*, 324 U.S. 439, 447 (1945) (recognizing *parens patriae* standing to sue under Section 16). To sue as *parens patriae*, the States must implicate their quasi-sovereign interests, as opposed to bringing suit "for the benefit of particular

---

[1] Facebook incorporates its arguments in the FTC case by reference into its Motion to Dismiss the States' case. *See* Facebook Br. 3, 11, 22, 25, 28. Accordingly, in sections of this brief, the States refer to the FTC's Memorandum of Law in Opposition to Defendant Facebook, Inc.'s Motion to Dismiss Complaint ("FTC Opp. Br.").

individuals." *Id.* at 446. States have a quasi-sovereign interest in a competitive marketplace and

the well-being of their residents. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,

458 U.S. 592, 607 (1982). The States have met their burden to plausibly allege *parens patriae*

standing by alleging harms to competition that affect large portions of their residents.[2]

### A. States Enforce the Federal Antitrust Laws in the Public Interest.

"[A]ttorneys general have undoubted authority to pursue litigation that advances or

vindicates public interests." *Pennsylvania v. Mid-Atl. Toyota Distribs., Inc.*, 704 F.2d 125, 131

(4th Cir. 1983) (states have a quasi-sovereign interest in enforcing federal antitrust laws); *cf. New

York v. Actavis PLC*, 787 F.3d 638, 662 (2d Cir. 2015) (actions by states to enforce federal

antitrust laws are "presumed to be in the public interest").

Congress gave the States an independent role in enforcing federal antitrust laws on behalf

of the public. The States may do so by seeking injunctions of anticompetitive actions, as in this

case, or through suits for damages. *See* 15 U.S.C. §§ 26, 15c. This "was in no sense an

afterthought; it was an integral part of the congressional plan for protecting competition."

*California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990). The purpose of giving states an

enforcement role was "not merely to provide private relief," but "to serve as well the high

purpose of enforcing the antitrust laws," by complementing federal enforcement. *Id.* (quoting

*Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 130–31 (1969)). The Supreme

Court has long recognized states' rights to seek injunctive relief as *parens patriae* in antitrust

cases. *See Georgia v. Penn. R.*, 324 U.S. at 447.

---

[2] Last week, Facebook told another court that the States have *parens patriae* standing in this very case. *See* Joint Case Management Statement, *Klein v. Facebook, Inc.*, Case No. 5:20-cv-08570-LHK, ECF No. 78, at 25, 37–38 (N.D. Cal. Mar. 31, 2021), Declaration of Zachary W. Biesanz ("Biesanz Decl.") Ex. 1 ("*Klein* Statement") ("the States [in *New York v. Facebook*] are deemed to represent all of their citizens under the doctrine of *parens patriae*").

**B. The States Have a Quasi-Sovereign Interest in a Competitive Marketplace.**

Quasi-sovereign interests include a state's interests in the economic well-being of its residents. *See Alfred L. Snapp*, 458 U.S. at 607. That includes the enforcement of "federal statutes creating benefits or alleviating hardships [which] create interests that a State will obviously wish to have accrue to its residents." *Id.* at 608. Addressing harm to competition—and, by extension, harms to investment, innovation, and consumer choice—serves the "high purpose of enforcing the antitrust laws" elaborated in *American Stores*, 95 U.S. at 284, and therefore vindicates a quasi-sovereign interest.

Courts have held repeatedly that states have a quasi-sovereign interest in preventing or remedying harm to competition. "The state's interest in preventing harm to its citizens by antitrust violations is, indeed, a prime instance of the interest that the *parens patriae* can vindicate by obtaining damages and/or an injunction." *In re Ins. Antitrust Litig.*, 938 F.2d 919, 927 (9th Cir. 1991), *aff'd in part, rev'd in part on other grounds, sub nom. Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993). In *Mid-Atlantic Toyota Distributors*, the court held that the plaintiff states' "public interest" in "promoting a smoothly functioning economy freed of antitrust violations" established standing. 704 F.2d at 132. In *New York v. Microsoft*, this court accepted the United States' Amicus argument that the states have *parens patriae* standing to seek injunctions under Section 16. *See* 209 F. Supp. 2d 132, 151–52 (D.D.C. 2002).

The States' interest in preventing harm to competition goes beyond the interests of the directly affected individuals, as Facebook has argued elsewhere. *See Klein* Statement, Biesanz Decl. Ex. 1, at 37–38, asserting that "competition issues" are public rights that bestow *parens patriae* authority.

**C. Facebook's Conduct Harms Several Quasi-Sovereign Interests.**

The States' Complaint alleges that the States are bringing this action in their "quasi-

sovereign capacities to safeguard the well-being of the states and their residents," and that "Facebook's actions . . . have harmed the general welfare and economies, as well as the residents, of the Plaintiff States." Compl. ¶¶ 17–19.

The States allege that Facebook's conduct causes substantial harms to their residents and economies due to reduced competition, discussed further *infra* Section V.D. Those harms include suppressed innovation and investment, *see* Compl. ¶ 231, which affect state economies well beyond their immediate effects on individual residents. The States also allege reduced choice and diminished quality of services for consumers, *see id.* ¶ 247 and *infra* Section V.D, both of which diminish the value users get in exchange for their time, attention, and personal data. The States allege other harms such as degraded privacy protections, *see* Compl. ¶ 248, and proliferation of fake accounts, *see id.* ¶ 249, which can erode consumers' trust in businesses.

The States also allege that Facebook's monopolistic conduct in the user market causes several forms of harm to advertisers, ranging from loss of audience, to lack of transparency about Facebook's reporting metrics, to diminished brand safety. *See id.* ¶¶ 252–54. Many small and medium businesses, in every State, advertise on Facebook. *See id.* ¶ 52. Their businesses suffer from Facebook's actions, which further affects the States' general economies.

Additionally, the States allege that as part of its monopoly maintenance scheme, Facebook degraded the functionality and distribution of potential rivals. This degradation suppressed the flow of user traffic to services operated by firms Facebook perceived to be a threat, reducing their ability to gain traction, and reducing output. *See id.* ¶¶ 187, 205.

Thus, the States' Complaint robustly alleges adverse effects on the welfare of the States' residents and on the States' economies, all quasi-sovereign interests.

**D. Facebook's Conduct Harmed Hundreds of Millions of the States' Residents.**

The harm to competition from Facebook's conduct cuts broadly and deeply across the States; it is not limited to a small identifiable group. In *New York v. Microsoft*, the trial court distinguished the states' interests in protecting competition in a market affecting "[m]illions of citizens" from a situation where the "primary thrust of an alleged wrong is injury to a narrowly limited class of individuals, and the harm to the economy as a whole is insignificant by comparison." 209 F. Supp. 2d at 152 (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 675 & n.38 (D.C. Cir. 1976) (citing cases)).

Facebook cites no case to the contrary. The two cases that it does cite are inapposite. *See* Facebook Br. 6–7 (citing *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1079, 1096–97 (S.D. Cal. 2018) (where the Cherokee Nation's failure to include any allegations that the defendants' conduct affected a substantial proportion of its population was dispositive) and *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292, 1312–13 (D.N.M. 2018) (where plaintiffs' allegations were based only on harm to individual tribal members)).

Here, the States allege that "more than half of the United States population over the age of 13" use Facebook every single day, Compl. ¶ 1, and detail the pervasive harms to the States' residents and general economies, *see id.* ¶¶ 245–55. Accordingly, the States do not bring this suit in a nominal capacity to protect the interests of a few, but in furtherance of the States' quasi-sovereign interests to protect the public welfare.

**III. LACHES DOES NOT BAR THE STATES' CLAIMS.**

Facebook asks this Court to apply the equitable doctrine of laches to bar the States' Complaint as a matter of law. This request is improper. Facebook's arguments raise issues of fact that are not properly before the Court on a motion to dismiss. In addition, the equities favor allowing this litigation to proceed because it is brought to vindicate the public interest, because

the States' claims are timely, and because Facebook's claims of prejudice ring hollow.

Laches is an affirmative defense. *See, e.g.*, *Daingerfield Island Protective Soc'y v. Lujan*, 920 F.2d 32, 37 (D.C. Cir. 1990) (citing Fed. R. Civ. P. 8(c)). Laches requires proof of 1) lack of diligence by the plaintiff, and 2) prejudice to the defendant. *See Nat'l R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121–22 (2002). The defendant bears the burden of establishing the elements of laches, which is a fact-intensive defense poorly suited to a motion to dismiss. *See Kemp v. Eiland*, 139 F. Supp. 3d 329, 349–50 (D.D.C. 2015).

**A. The States Seek Injunctive Relief in the Public Interest.**

Dismissing a state's claim to enforce a federal statute is disfavored absent extraordinary circumstances. The States bring this *parens patriae* suit in the public interest with the support of nearly every state-level jurisdiction in the country, in recognition of the broad-based harms caused by Facebook's anticompetitive conduct. *See supra* Section II. This positions the States differently from private litigants pursuing private interests, and it shifts the equities in the States' favor. Moreover, any such balancing of equities would be inappropriate at the motion to dismiss stage. *See, e.g.*, *Shtauber v. Gerson*, 239 F. Supp. 3d 248, 256 (D.D.C. 2017) (denying motion to dismiss where "the balance of equities could lead to a different conclusion").

The Supreme Court's Special Master in *Kansas v. Colorado* recognized the important difference between government enforcement agencies and private plaintiffs, noting that laches is "generally held not to apply against a public agency," especially for "disputes at the state or national level." No. 105, ORIGINAL, 1994 WL 16189353, at *62 (Oct. 3, 1994), *aff'd* 514 U.S. 673, 688 (1995). The Special Master went on to explain that "[t]he rationale is often said to be that the public interest should not be penalized" unless "exceptional prejudice" is involved. *Id.*

Facebook relies on *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 928

(9th Cir. 1975) ("*IT&T*") to argue that "[t]he bare fact of delay creates a rebuttable presumption of prejudice" Facebook Br. 11. But it neglects to note that the *IT&T* court's concerns were explicitly about private plaintiffs—not government enforcers—citing concerns that "a plaintiff under § 16 could seriously interfere with a ***rival's*** business operations" with "none of the safeguards of the public-interest standards and expertness which presumably guide the government when it is a plaintiff." *IT&T*, 518 F.2d at 926–27 (emphasis added). The court thus recognized that government enforcement agencies are entitled to more deference than private plaintiffs. *See id.* at 929 (remanding to the district court to determine equities). Similarly, Justice Kennedy's lone concurrence in *American Stores*, 495 U.S. at 296—cited by Facebook in support of its argument that laches should protect its monopoly—is contradicted by the unanimous opinion's statement that "equitable defenses such as laches . . . may protect consummated transactions from belated attacks by ***private parties*** when it would ***not be too late for the Government to vindicate the public interest.***" *Id.* (emphasis added). Again, the Court's driving concern about the laches defense is that a private litigant could use a late-filed antitrust claim for individual financial gain in a market in which it participates.

While Facebook cites a string of cases that allowed laches defenses against merger challenges, Facebook Br. 9–11, all but one were brought by private parties.[3] The sole exception is *Puerto Rico v. Carpenter Co.*, in which the Court had concerns that the case would be a "needless fishing expedition" because Puerto Rico previously had dismissed its claims against "the alleged mastermind in this ongoing price-fixing conspiracy and the Defendant most

---

[3] Facebook also cites to *New York v. Kraft General Foods, Inc.*, 862 F. Supp. 1030 (S.D.N.Y. 1993), which did not consider laches. In fact, the court allowed New York's challenge to this consummated merger to proceed to trial. *See New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 325 (S.D.N.Y. 1995).

mentioned in the Complaint." 442 F. Supp. 3d 464, 475–76 (D.P.R. 2020). Such concerns are not present here. Not only do the States allege continuing conduct and entrenchment of monopoly power, the Complaint also alleges specific violations of the antitrust laws, supported by the documents and testimony compiled during the investigation: hardly a "fishing expedition."

### B.  The Complaint Is Timely Because the States Allege Ongoing Conduct.

The States allege one count of monopoly maintenance in violation of Section 2 of the Sherman Act and two counts of acquisitions that substantially lessened competition and tended to create a monopoly in violation of Section 7 of the Clayton Act. All three counts involve continuing conduct.

The States' Complaint is replete with allegations detailing Facebook's continuing conduct. *See, e.g.*, Compl. ¶ 4 ("Facebook illegally maintains [its] monopoly power by deploying a buy-or-bury strategy that thwarts competition and harms both users and advertisers"); *id.* ¶ 6 (Facebook continues to "chill[] innovation, deter[] investment, and forestall[] competition"); *id.* ¶¶ 125–26 (as recently as 2018, █████████████████████████████ █████████████████████████); *id.* ¶¶ 175–76 (Facebook has never shown any "genuine desire to expand WhatsApp's feature set and user base," likewise ensuring that it will not compete with Facebook); *id.* ¶ 185 (Facebook's acquisitions strategy serves to "extinguish competitive threats," "hobble competitors," keep "targets out of the hands of other firms [and] prevent competitors and potential competitors from having access to next generation technology"). Other regulators are also worried about Facebook's ongoing conduct: just last week, the U.K. Competition and Markets Authority announced that, due to concerns about a substantial lessening of competition, it is deepening an investigation into a Facebook acquisition that closed this past year. *See Completed acquisition by Facebook, Inc. of GIPHY, Inc. Terms of*

*reference*, GOV.UK (Apr. 1, 2021), https://assets.publishing.service.gov.uk/media/

6065973b8fa8f515b28f4c78/Facebook_GIPHY_-_Terms_of_reference.pdf, Biesanz Decl. Ex. 2.

Moreover, Facebook does not dispute that it maintained an official Platform policy of

denying interconnection access to potential rivals through 2018. *See* Facebook FTC Br. 5, 9.

Facebook announced the retraction of this policy in response to the public scrutiny following the

U.K. Parliament's leak of internal Facebook documents that publicly revealed Facebook's

anticompetitive strategy. *See* Press Release, Facebook, Inc., *Response to Six4Three Documents*

(Dec. 5, 2018), https://about.fb.com/news/2018/12/response-to-six4three-documents/, Biesanz

Decl. Ex. 3. That policy alone brings Facebook's conduct within the four-year timeline that

Facebook asks this Court to use as a guideline for laches. Facebook Br. 9–10. Facebook's

professed withdrawal of the policy does not establish that Facebook stopped the conduct, given

its history of offering pretextual reasons when cutting off access to apps that it viewed as threats.

*See* Compl. ¶ 218 (Path); *id.* ¶ 219 (Circle).

The States also allege that the passage of time made clear the continuing anticompetitive

effects of the Instagram and WhatsApp acquisitions. Compl. ¶¶ 115–16, 128, 174–180, 254.

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957), is instructive in evaluating

the timeliness of the States' claims. In *du Pont*, the Supreme Court found illegal a merger that

had been consummated decades earlier and remanded to the district court for appropriate

remedies. The Supreme Court described its concerns vividly:

> [T]he test of a violation of §7 is whether, at the time of suit, there is a reasonable
> probability that the acquisition is likely to result in the condemned restraints. The
> conclusion upon this record is inescapable that such likelihood was ***proved*** as to
> this acquisition. The fire that was kindled in 1917 [when the defendant acquired
> the General Motors stock] continues to smolder. It burned briskly to forge the ties
> that bind the General Motors market to du Pont . . . .

*Id.* at 607 (emphasis added). *See also United States v. ITT Cont'l Baking*, 420 U.S. 223, 241

13

(1975) (interpreting Clayton Act Section 7, the Court held that an acquisition "means holding as well as obtaining assets."); *du Pont*, 353 U.S. at 597 ("To accomplish the congressional aim, the Government may proceed at any time that an acquisition may be said with reasonable probability to contain a threat that it may lead to a restraint of commerce or tend to create a monopoly of a line of commerce."); *FTC v. W. Meat Co.*, 272 U.S. 554, 559 (1926) ("Further violations of the act through continued ownership could be effectively prevented only by requiring the owner wholly to divest itself of the stock and thus render possible once more free play of the competition which had been wrongfully suppressed.") (cited in *Am. Stores*, 495 U.S. at 285 n.11). The Court's reasoning in *du Pont*, *ITT Continental*, and the other cases cited applies equally to acquisitions that violate the Sherman Act and those that violate the Clayton Act. *United States v. Grinnell Corp.*, 384 U.S. 563, 577, 580 (1966) (affirming divestitures as a Section 2 remedy, including of a company acquired in 1953, as "essential," on the basis that "adequate relief in a monopolization case should put an end to the combination").

The States also allege multiple forms of ongoing harm flowing from Facebook's conduct. *See, e.g.*, Compl. ¶ 246 ("innovation . . . continues to be suppressed"); *id.* ¶ 247 ("users . . . continue to be deprived of the benefits of additional competition"); *id.* ¶ 252 ("advertisers . . . continue to be deprived of the benefits of competition"). The relief that the States seek—relief that will restore and enable competition—is therefore prospective, *see* Compl. ¶ 277(2)–(4), (8), and "it is well established that laches generally does not apply to bar claims for prospective injunctive relief," *Gaudreau v. Am. Promotional Events, Inc.*, 511 F. Supp. 2d 152, 159 (D.D.C. 2007); *see id.* at 156 (denying a motion to dismiss on laches grounds, finding that plaintiffs had alleged continuing wrongs and sought prospective relief).

### C. Facebook's Prejudice Argument Is Premature and Has No Merit.

"[A] finding of laches cannot rest simply on the length of delay." *Daingerfield Island*,

920 F.2d at 37.[4] Laches "requires proof of . . . prejudice to the party asserting the defense." *Pro-*

*Football, Inc. v. Harjo*, 415 F.3d 44, 47 (D.C. Cir. 2005). The party asserting a laches defense

bears the burden of proving the elements of a laches defense. *Id*.

The States allege that Facebook's anticompetitive conduct was profitable, enabling it to

degrade user quality to boost its ad sales. *See* Compl. ¶¶ 234–44. Facebook's 2019 revenue

approached ███ billion in the United States alone. *See id.* ¶ 48. Facebook cannot establish that it

has suffered "exceptional prejudice," *Kansas v. Colorado*, 1994 WL 16189353, at *62, when it

has benefitted from the States not filing sooner. *See Costello v. United States*, 365 U.S. 265, 282

(1961) (refusing to apply laches because, *inter alia*, there was no prejudice where the passage of

time "worked to petitioner's benefit, not to his detriment").

Instead of offering proof of prejudice, or even specific facts that would plausibly give rise

to a claim of prejudice, Facebook has merely stated that it expended unspecified "time and

resources" on Instagram and WhatsApp and that it "reli[ed] on the passage of time in forming

and executing its business strategy." Facebook Br. 12. The Court may not credit such

suggestions on a motion to dismiss. *See, e.g.*, *Kemp v. Eiland*, 139 F. Supp. 3d at 349–50

("Laches is a fact-intensive defense poorly suited to a motion to dismiss.").

## IV. THE INSTAGRAM AND WHATSAPP ACQUISITIONS VIOLATED SECTION 7 OF THE CLAYTON ACT.

Section 7 of the Clayton Act prohibits acquisitions, the effect of which "may be

substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The statute

---

[4] Facebook argues that delay alone "creates a rebuttable presumption of prejudice," Facebook Br. 11, but cites no cases that applied such a presumption against a government plaintiff.

was "designed to arrest the creation of monopolies 'in their incipiency,'" *Gen. Dynamics Corp.*, 415 U.S. at 505 n.13, and, as discussed below, it prohibits a monopolist from protecting its monopoly by acquiring competitive threats. *See, e.g.*, *Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208, 1215 (11th Cir. 2012) (requiring divestiture under Section 7 of a company acquired to "remove . . . a competitive threat" in a highly concentrated market).

Mergers involving a monopolist are different from other cases. Mergers of potential competitors have "special significance when one of the firms is a monopolist." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 701d (5th ed. 2020); *see also id.* ¶ 1122 ("[W]hen the acquiring firm is a dominant firm or monopolist, competitive harm can be predicted with considerably more confidence than is true of the ordinary potential competition case . . . . This indicates a harsh rule against such mergers."); *Brown Shoe Co. v. United States*, 370 U.S. 294, 321 n.36 (1962) (illegal effects "could be perceived through findings . . . that the relative size of the acquiring corporation had increased to such a point that its advantage over competitors threatened to be 'decisive'") (quoting House Report on H.R. 2734); U.S. Department of Justice & FTC, Horizontal Merger Guidelines § 5.3 (Aug. 19, 2010) ("lessening of competition . . . is more likely to be substantial, the larger is the market share of the incumbent"); *see also Free Freehand Corp. v. Adobe Sys.*, 852 F. Supp. 2d 1171, 1189 (N.D. Cal. 2012) ("[T]here are kinds of acts which would be lawful in the absence of monopoly but, because of their tendency to foreclose competitors from access to markets or customers or some other inherently anticompetitive tendency, are unlawful under Section 2 if done by a monopolist.") (quoting *Mishawaka v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980)).

Indeed, a monopolist's acquisition of even a firm with a small market share may substantially lessen competition or tend to create a monopoly if the acquired firm "threatens to

disrupt market conditions with a new technology or business model." Horizontal Merger

Guidelines § 2.1.5. The merging firms need not be in the same product market to be covered by

Section 7. *See FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967).

The States allege that Facebook was a monopolist at the time it acquired Instagram and

WhatsApp and that both acquisitions substantially reduced competition and further entrenched

the company's monopoly position. Accordingly, the States' allegations are more than sufficient

to state valid and plausible claims that the acquisitions violate Section 7.

## A. Facebook's Acquisition of Instagram Violated Section 7.

The States allege that Facebook had monopoly power in the market for Personal Social

Networking Services at the time of the Instagram acquisition. Compl. ¶ 68. The States also allege

that Instagram was an actual competitor of Facebook's at the time of the acquisition, and that it

was a significant and rapidly growing competitive threat. *Id.* ¶¶ 107–11, 114–15, 117, 119, 125,

264–65. Instagram offered an innovative and popular mobile-first Personal Social Networking

Service built around photo-sharing; it resonated with users and capitalized on Facebook's

relatively weak mobile experience. *Id.* ¶¶ 107–10.

In addition, the States' allegations include compelling evidence that Facebook executives,

the people most knowledgeable about the relevant market's dynamics, at the time viewed

Instagram as a significant competitive threat. For example, the States' Complaint details how

CEO Mark Zuckerberg was explicit about the competitive threat posed by Instagram. He worried

that Facebook's Personal Social Networking Service was already "very behind" Instagram "in

both functionality and brand on how one of the core use cases of Facebook will evolve in the

mobile world." Compl. ¶ 102. Being so far behind, said Zuckerberg, was "really scary" and

therefore a reason that Facebook "might want to consider paying a lot of money" for Instagram.

*Id.* And that is precisely what Facebook did. At Zuckerberg's direction, Facebook neutralized the competitive threat of Instagram by paying $1 billion on a valuation of $500 million. *Id.* ¶¶ 119–20. Buying the rapidly growing Instagram prevented it from competing with Facebook and, as Zuckerberg predicted, would bar any "Instagram alternative" from doing so. *Id.* ¶¶ 115–16.

Buying Instagram removed a competitive constraint on Facebook's Personal Social Networking Service. After the acquisition, Facebook ███████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████ *id.* ¶¶ 125–28, and allowed Facebook's mobile photo app, Facebook Camera, to die, *id.* ¶ 124. Thus, Facebook lessened competition and entrenched the monopoly power that it holds to this day, by eliminating Instagram as an independent competitor. *Id.* ¶ 128.

Facebook is simply wrong that there is an inconsistency in the States' Complaint regarding whether Instagram was in the relevant market at the time of the acquisition. *See* Facebook Br. 14–15. The States allege that the acquisition of Instagram "removed a significant and growing competitor" from the relevant market and "[e]liminat[ed] actual and potential competition" from that market. Compl. ¶¶ 264–65. Indeed, the primary allegation Facebook points to in support of this supposed contradiction recognizes that Instagram was in the Personal Social Networking Services market, but merely acknowledges that Instagram was not yet "full-featured" in the way Facebook feared, and the States allege, it was well-positioned to become. *Id.* ¶ 108. The States' market definition does not allege that participants in the relevant market must have *all* of the same features, and thus this acknowledgment does not contradict the States' clear allegations that Instagram was in the relevant market when acquired.

## B. Facebook's Acquisition of WhatsApp Violated Section 7.

The allegations with regard to WhatsApp are similarly strong. The States allege that

Facebook's leadership became concerned with the rapid growth and development of WhatsApp's cross-platform mobile messaging service and feared it would pivot into the relevant market. *Id.* ¶¶ 149–52, 158. Importantly, WhatsApp was cross-platform (unlike iMessage and Android's messaging apps) and internet-based, meaning it could add features and develop a network of all users across all platforms. *Id.* ¶¶ 37, 103. Indeed, WhatsApp was experiencing rapid user growth, and had added new features such as photo sharing, privacy blocking, group chat, backup and restore, transport encryption, location sharing, and profile photos, all of which raised concerns at Facebook about the threat from WhatsApp. *Id.* ¶¶ 160, 168. In contrast to the other leading mobile messaging services, which had little traction outside Asia, WhatsApp had achieved significant adoption in Europe and was building share in the United States. *Id.* ¶ 155. In 2014, WhatsApp had over 400 million active users worldwide. *Id.* ¶¶ 154–55.

Facebook feared that these characteristics positioned WhatsApp as a critical threat that could pivot into the relevant market (on its own or in the hands of another firm) and disrupt Facebook's monopoly. Compl. ¶ 179. These fears were stated vividly by Facebook's lead for acquisition strategy, Amin Zoufonoun (and other senior executives). Zoufonoun wrote to Zuckerberg: "the scary part, of course, is that this kind of mobile messaging is a wedge into broader social activity/sharing on mobile we have historically led in web." *Id.* ¶ 160. Facebook was concerned that even if WhatsApp did not pivot into the relevant market on its own, "it might make such a shift if it was acquired by a company like Google." *Id.* ¶ 164. Thus, even though WhatsApp was not competing in the relevant market at the time, WhatsApp threatened to upset Facebook's monopoly position by "disrupt[ing] market conditions with a new technology or business model." Horizontal Merger Guidelines § 2.1.5.

Further, the States allege that Facebook paid a remarkable $19 billion for WhatsApp,

Compl. ¶ 166, even though WhatsApp had modest income, *id.* ¶ 157, and Facebook had ███

███████████████████ *id.* ¶¶ 172–73, 176, and even though WhatsApp was never valued at

anywhere near $19 billion, *id.* ¶ 167. Facebook's own personnel were shocked by the price

Facebook was paying. *See id.* ¶ 169. And, as some analysts recognized, the only rationale for

Facebook's $19 billion purchase price was the elimination of a potential competitor poised to

mount a major challenge to Facebook's monopoly. *Id.* ¶ 170. Facebook's acquisition put an end

to the potential threat of WhatsApp (on its own or in the hands of another firm), lessening

competition and entrenching Facebook's already strong monopoly power. *Id.* ¶¶ 179, 269–70.

## C. Facebook's Arguments Are Inconsistent with the Law and the Pleaded Facts.

1. Section 7 applies to acquisitions by monopolists of nascent threats outside of the relevant market.

Facebook's argument that Section 7 applies only to acquisitions of firms already in the

relevant market conflicts with precedent and Congress's clear purpose in enacting Section 7.

To begin with, Facebook's argument conveniently elides the fact that the States plainly

allege, and Facebook's own documents confirm, that Instagram was an actual, albeit small,

competitor of Facebook's in the relevant market at the time of the acquisition. Moreover,

Facebook's claim that acquisitions of nascent threats outside the relevant market (like

WhatsApp) cannot, as a matter of law, lessen competition or tend to create a monopoly, is

inconsistent with the plain text and intended scope of Section 7, the D.C. Circuit's *Microsoft*

decision, and longstanding Supreme Court precedent.

In *Procter & Gamble*, the Court affirmed the FTC's unwinding of the Procter & Gamble

("P&G") acquisition of Clorox, the nation's leading bleach manufacturer. 386 U.S. at 570–71. At

the time of the acquisition, P&G did not produce bleach. *See id.* at 572. The Supreme Court ruled

that the court of appeals had erred by concluding that the acquisition did not violate Section 7:

> *[A]ll mergers are within the reach of § 7*, and all must be tested by the same standard . . . . As noted by the Commission, this merger is neither horizontal, vertical, nor conglomerate . . . . The anticompetitive effects with which this product extension merger is fraught can easily be seen: (1) the substitution of the powerful acquiring firm for the smaller, but already dominant, firm *may substantially reduce the competitive structure of the industry by raising entry barriers and by dissuading the smaller firms from aggressively competing*; (2) the acquisition eliminates the potential competition of the acquiring firm.

*Id*. at 577–78 (emphasis added).

*Procter & Gamble* thus stands for the propositions that (i) acquisitions of firms outside the relevant market can violate Section 7, and (ii) in evaluating such cases, courts should consider the likely effect of the acquisition on the competitive structure of the industry going forward. *Accord United States v. Falstaff Brewing Corp*., 410 U.S. 526, 531 (1973) (Section 7 bars "certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition"); *see also Ekco Prods. v. FTC*, 347 F.2d 745, 751–52 (7th Cir. 1965) (affirming divestiture order because the FTC showed a reasonable probability that the acquisition of a firm in a different market may "entrench and preserve [defendant's] monopoly").

Similarly, the *Microsoft* court recognized significant threats to a monopolist's market position can come from firms outside the relevant market. Although Microsoft argued, as Facebook does here, Facebook Br. 14–15, 21, that there was tension between the government's market definition and an alleged threat to Microsoft's monopoly power from outside that market, the court found none. *United States v. Microsoft Corp.*, 253 F. 3d 34, 54 (D.C. Cir. 2001). The court perceived the central issue as "whether as a general matter the exclusion of nascent threats is . . . reasonably capable of contributing significantly to a defendant's continued monopoly power" and concluding that "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will—particularly in

industries marked by rapid technological advance and frequent paradigm shifts." *Id.* at 79.

The *Microsoft* court recognized that in an industry characterized by network effects, the greatest threat to an entrenched monopolist may come from a rapidly growing firm in an adjoining market, particularly when new technology creates a new use case that may enable a firm to achieve network scale and overcome barriers to entry. That's what Netscape and the newly emerging internet browser was to Microsoft's operating system monopoly, *id.*, and that's what the States allege—and Facebook's own documents confirm—was the case with the acquisition of WhatsApp. Indeed, Facebook's argument to the contrary would have allowed Microsoft to purchase Netscape, thus turning the *Microsoft* decision on its head.

This is consistent with the text and purpose of Section 7. As summarized by the Supreme Court in *Brown Shoe*, "Congress used the words '***may be*** substantially to lessen competition' (emphasis supplied), to indicate that its concern was with probabilities, not certainties." 370 U.S. at 323. Congress intended the Clayton Act to "cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding." S. Rep. No. 81-1775, at 4–5 (1950). Just as the *Microsoft* court concluded that "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will," so too it would be inimical to the purpose of the ***Clayton*** Act to allow monopolists free reign to ***acquire*** nascent, albeit unproven, competitors at will. *See also* C. Scott Hemphill & Tim Wu, *Nascent Competitors*, 168 U. Penn. L. Rev. 1879, 1880 (2020) ("[S]ometimes, innovation by an unproven outsider is the only way to introduce new competition to an entrenched incumbent. That makes the treatment of nascent competitors core to the goals of the antitrust laws."). *Cf. FTC v. Actavis*, 570 U.S. 136, 158 (2013) (payment by a dominant drug manufacturer to eliminate the ***risk*** of competition is the very harm

condemned by the antitrust laws). And the concerns are heightened when the acquiring firm is a monopolist. *See supra* pp. 16–17.[5]

2. A transaction violates Section 7 if it is illegal at the time of suit.

Facebook prefaces its Section 7 arguments with a non-issue: it claims that because the language of Section 7 "is expressly forward looking," it applies only where the plaintiff "pleads and ***proves***" that the acquisition was unlawful at the time it was made. Facebook Br. 12 (emphasis added). The States have pleaded that the acquisitions were illegal both then and now. *See, e.g.*, Compl. ¶¶ 267, 272 (alleging that "[t]he Instagram and WhatsApp acquisition[s] violated and continu[e] to violate Section 7"). Moreover, Facebook ignores Supreme Court precedent flatly to the contrary. In *du Pont*, a suit brought 30 years after the acquisition, the Court held: "We repeat that the test of a violation of § 7 is whether, ***at the time of suit***, there is a reasonable probability that the acquisition is likely to result in the condemned restraints." 353 U.S. at 607 (emphasis added).[6]

_____

[5] None of the cases Facebook cites in support of its argument involve a merging firm with a monopoly share of the market and are therefore inapplicable to evaluating acquisitions by a monopolist like Facebook. *See, e.g.*, *United States v. Baker Hughes Inc.*, 908 F.2d 981, 983 n.3, 986 (D.C. Cir. 1990) (allowing merger of firms with 41% and 18% shares in "volatile and shifting" market); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 699, 704 (4th Cir. 2021) (unwinding 36% plus 16% merger); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 208 (D.D.C. 2017) (blocking 41–48% plus 6–8% merger); *United States v. H&R Block*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (blocking 15.6% plus 12.8% merger); *FTC v. Steris Corp.*, 133 F. Supp. 3d 962, 964 (N.D. Ohio 2015) (declining to preliminarily enjoin merger of second and third largest sterilization firms).

[6] Facebook's reliance upon a single district court case in support of its theory, *Washington v. Franciscan Health System*, 388 F. Supp. 3d 1296 (W.D. Wash. 2019), is inapposite. The court simply held in that case that the acquisition of market power because of a subsequent merger would not render a prior acquisition illegal. *Id.* at 1300, 1303. Here, the States allege that Facebook had monopoly power in the relevant market and acquired WhatsApp and Instagram to maintain that power. Neither is *Baker Hughes* helpful to Facebook, as it was decided on appeal after trial and pertained only to the narrow question of what standard applies when a Section 7 defendant attempts to rebut the plaintiff's *prima facie* case. 908 F.2d at 982–83.

3.   <u>Acquisitions that eliminate threats are illegal even if the threat is not "unique."</u>

Facebook further wrongly claims that the States must allege that Instagram and

WhatsApp were among the very few firms that could erode Facebook's monopoly. Facebook Br.

18. But Section 7 does not require that an acquired threat must be unique for an acquisition to

violate the law. *See H&R Block*, 833 F. Supp. 2d at 79–80 (enjoining acquisition even though

target was not "unique" as an aggressive competitor). Nevertheless, the evidence cited in the

Complaint shows that Facebook believed that both Instagram and WhatsApp were particularly

well-situated to threaten Facebook's monopoly and "each posed a unique and dire threat to

Facebook's monopoly." Compl. ¶ 12; *see also id.* ¶¶ 102–03, 110–11, 116–17, 123 (discussing

the unique threat posed by Instagram); *id.* ¶¶ 150, 154, 160, 166 (discussing the unique threat

posed by WhatsApp).

4.   <u>Facebook acquired Instagram and WhatsApp to preserve its monopoly in an already-concentrated market.</u>

Facebook argues incorrectly that the States must allege that the transactions lead to

"undue concentration" in a particular product market, but cannot do so because they do not

allege Instagram or WhatsApp had any share of the relevant market. Facebook Br. 14. First, the

States allege a relevant market for Personal Social Networking Services and Facebook's

monopoly power in that market. *See infra* Section V.A–B. Delineating specific market shares is

unnecessary in the preliminary stages of a case. *See Allis-Chalmers Mfg. Co. v. White Consol.*

*Indus., Inc.*, 414 F.2d 506, 520 (3d Cir. 1969), *cert. denied*, 396 U.S. 1009 (1970).

Second, in the case of a monopolist, the effect of a merger on market share is evident

from the monopolist's maintenance of its monopoly position. "Where 'concentration is already

great, the importance of preventing even slight increases in concentration and so preserving the

possibility of eventual deconcentration is correspondingly great.'" *United States v. Cont'l Can*

24

*Co.*, 378 U.S. 441, 461–462 (1964) (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 365 n.42 (1963)). Analyzing market concentration, pre- and post-merger, is one tool used to predict whether a merger will likely harm competition. But here, no such tool is needed because Facebook acquired Instagram and WhatsApp to ensure that the market remained monopolized and therefore highly concentrated. *See* Compl. ¶¶ 102, 111, 113, 154–55, 164, 170.

     5.   <u>Facebook's own assessment of competitive conditions and monopolistic intent can be relied upon to establish a Section 7 violation.</u>

     Facebook bizarrely questions the States' reliance on Facebook's own documents to show that the acquisitions of WhatsApp and Instagram violated Section 7. Facebook Br. 20. Facebook's documents reveal not only Facebook's anticompetitive intent, but importantly, Facebook's contemporaneous assessment of the competitive significance of Instagram and WhatsApp. *See, e.g.*, Compl. ¶¶ 111, 113–15, 117, 122–23 (describing Facebook's assessment of Instagram's significance); *id.* ¶¶ 150–53, 160, 164 (describing Facebook's assessment of WhatsApp's significance). As the *Microsoft* court recognized, intent evidence "helps us understand the likely effect of the monopolist's conduct." 253 F. 3d at 59. *See also, e.g.*, *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966, at *11 (N.D. Cal. Jan. 8, 2014) (in finding the merger illegal, the court observed that the anticompetitive rationale expressed by parties' executives undercut Bazaarvoice's arguments at trial).

     6.   <u>Facebook itself expected significant competition from Instagram and WhatsApp.</u>

     Facebook writes off the States' Section 7 claims as "speculation" about the likelihood of Instagram and WhatsApp competing with Facebook. Facebook Br. 15–18. But the States have no need to speculate; Facebook's own executives, based on their experience in the industry, found these apps to be significant and growing competitive threats. *See supra* Section IV.A–B. In Section 7, "Congress used the words '***may be*** substantially to lessen competition' (emphasis

supplied), to indicate that its concern was with probabilities, not certainties." *Brown Shoe,* 370 U.S. at 323. The States' allegations are more than sufficient to meet this test.

Quoting Facebook internal documents, the States allege facts that establish that it was probable that Facebook would have faced increasing competition from Instagram but for the acquisition. *See* Compl. ¶¶ 111, 114 (Zuckerberg said that Instagram had features that users wanted, was building a network competitive with Facebook's, and "could be very disruptive" to Facebook); *id.* ¶ 115 (Facebook bought Instagram to "neutralize a potential competitor"); *id.* ¶ 123 (Zuckerberg: "Instagram was our threat and not Google+. . . . One thing about startups though is you can often acquire them."). And, as Facebook's leadership predicted, once Instagram was removed as an independent competitor, innovation, quality, and choice decreased. *See supra* Section IV.A.

Similarly, the statements of Facebook leadership support the claim that it was probable that WhatsApp, alone or in the hands of a company other than Facebook, would continue to grow as a competitive threat to Facebook's monopoly in the Personal Social Networking Services market. *See* Compl. ¶¶ 158–59; *id.* ¶ 160 (Zoufonoun: "this kind of mobile messaging is a wedge into broader social activity/sharing on mobile we have historically led in web."); *id.* ¶ 163 (Zuckerberg: "I doubt we even have a year before WhatsApp starts moving in this direction."); *id.* ¶¶ 164–165 (Zuckerberg and other Facebook executives feared that even if an independent WhatsApp did not enter the relevant market, it might do so if acquired by a company like Google); *id.* ¶¶ 166–74 (only rationale for Facebook's $19 billion purchase price was the elimination of a potential competitor poised to mount a major challenge to Facebook's monopoly).

Facebook cites *United States v. Marine Bancorporation, Inc.*, in which the Supreme

Court rejected a potential competition theory on the grounds that "stringent" barriers made entry into the relevant market unlikely. 418 U.S. 602, 641 (1974); *see also id.* at 625 (noting that "the concept of perceived potential entry has been accepted in the Court's prior § 7 cases"). Here, the States allege that Instagram and WhatsApp were exceptional in that they had cleared (or were well on their way to clearing) a significant barrier to entering and competing in the relevant market: establishing large (and rapidly growing) user networks. *See* Compl. ¶¶ 40–42 (describing the barrier); *id.* ¶¶ 116–17 (describing Instagram's "established" network and "remarkable growth"); *id.* ¶¶ 159, 162, 166, 168 (describing WhatApp's reach and "rapid growth").

Every other case Facebook cites is inapposite because they did not involve an acquisition by a monopolist, the facts otherwise differ greatly from the case at hand, and not one was decided on the pleadings. *See Fraser v. Major League Soccer, LLC*, 284 F.3d 47 (1st Cir. 2002) (appeal from jury verdict); *FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) (reversing denial of preliminary injunction after evidentiary hearing); *Baker Hughes*, 908 F.2d at 986 (appeal after trial); *Tenneco, Inc. v. FTC*, 689 F.2d 346 (2d Cir. 1982) (appeal after administrative trial); *United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980) (decision on preliminary injunction after evidentiary hearing); *FTC v. Steris*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) (same as *Siemens*).

## V.     FACEBOOK UNLAWFULLY MAINTAINED ITS MONOPOLY IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT.

Monopolization under Section 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Microsoft*, 253 F.3d at 50 (quoting *Grinnell*, 384 U.S. at 570–71). The States have sufficiently discharged their burden at the

pleading stage by alleging that Facebook obtained monopoly power in the relevant market by at least as early as 2011 and pleading a series of acquisitions and other exclusionary conduct that, separately and collectively as part of Facebook's "buy or bury" strategy, served to illegally maintain Facebook's monopoly. As a result, consumers have been deprived of the benefits of competition.

As discussed below, all of Facebook's arguments fail to provide grounds for dismissal, either because they introduce new facts that must be disregarded or because they conflict with established precedent.

### A. Facebook's Conduct Harmed Competition in the Market for Personal Social Networking Services in the United States.

The States allege a relevant market for Personal Social Networking Services that is identical to the market the FTC alleges and is therefore valid for all the same reasons described by the FTC in its brief. *See* FTC Opp. Br. § I.A.1–2.

The States' allegations regarding the relevant market are identical in all material respects to the FTC's. *See* Compl. ¶ 28 (Personal Social Networking Services enable sharing and connecting "with friends, family, and other personal connections."); *see also id.* ¶¶ 1, 30, 41, 47, 242 (purpose is sharing and connecting with friends and family). Each of the three key characteristics of Personal Social Networking Services the States allege is the same as those the FTC alleges. *See id.* ¶ 29 ("Personal Social Networking Services are built on a social graph"); *id.* ¶ 30 ("Personal Social Networking Services include . . . a shared social space"); *id.* ¶ 31 ("Personal Social Networking Services include features that allow users to find and connect with other users to build a network of personal connections.").

The States also allege that "other types of internet services are not adequate substitutes" and "not reasonably interchangeable." *Id.* ¶¶ 33–34; *see also id.* ¶¶ 35–36 (specifically alleging

that specialized social networking services, online video or audio consumption-focused services, and mobile messaging services are all distinct and not reasonably interchangeable).

Like the FTC, the States allege a market that includes all entities competing in the Personal Social Networking Services market rather than a single-firm market. *Id.* ¶ 68 ("Facebook had become the ***dominant player***") (emphasis added); *id.* ¶ 69 ("Facebook was 'the ***most widely used*** social network in the US'") (emphasis added); *see also id.* ¶¶ 71, 247. The States also allege that Facebook competes on non-price dimensions that support the alleged market definition. *Id.* ¶ 32 ("Personal Social Networking providers compete for users based on a variety of factors, including quality of the user experience, functionality, and privacy protections, among other factors."); *see also, e.g.*, *id.* ¶¶ 246–50.

These allegations, like the FTC's, amply support the definition of a market for Personal Social Networking Services.

**B. Facebook Has Monopoly Power in the Relevant Market.**

Monopoly power is "the power to control prices or exclude competition." *Microsoft*, 253 F.3d at 51 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). Showing that a firm has profitably done so constitutes direct evidence and establishes that "the existence of monopoly power is clear." *Microsoft*, 253 F.3d at 51. Alternatively, monopoly power may be inferred indirectly from allegations showing high market shares in a relevant market protected by high barriers to entry. *See id.* The States plead market power both indirectly (alleging a dominant position) and directly (alleging quality degradations that reduce output or effectively increase price).

    1.  Facebook has a dominant position in the relevant market that is protected by high barriers to entry.

The States allege that Facebook has held a dominant position in the Personal Social

Networking Services market since at least 2011; as Facebook itself bragged to advertisers, "Facebook is now 95% of all social media in the US." Compl. ¶ 68. Further, an internal survey in 2016 showed that Facebook was "the most widely used social network in the United States, with 78% of respondents visiting [Facebook] at least once a month," *id.* ¶ 69, and a 2010 study commissioned by Facebook stated that "[f]or hundreds of millions of people today who want to connect with their friends and family, [Facebook is] the first—and more importantly—only choice," *id*. ¶ 242. The States also allege that Facebook's monopoly position has been durable for nearly a decade, *id.* ¶ 233, and that it is protected by significant barriers to entry, *id*. ¶¶ 39–46 (identifying network effects, high switching costs, and data as significant barriers to entry protecting Facebook's monopoly power); *see also Biden v. Knight First Amendment Inst. at Columbia Univ.*, No 20-197, 593 U.S. __, Slip Op. at 7 (Apr. 5, 2021) (Thomas, J. concurring) ("The Facebook suite of apps is valuable largely because 3 billion people use it. . . . These network effects entrench these companies. . . . That these companies have no comparable competitors highlights that the industries may have substantial barriers to entry.").

Those allegations regarding Facebook's dominant position and barriers to entry in the relevant market are similar to those in the FTC Complaint and are sufficient to plead monopoly power indirectly for all the reasons described by the FTC. *See* FTC Opp. Br. § I.A.3.

2. Facebook profited by degrading the quality of its product, thereby reducing output and effectively raising prices.

The States also allege direct evidence of monopoly power demonstrated by Facebook's ability to profitably degrade the quality of its Personal Social Networking Service, effectively raising prices and reducing output. Compl. ¶¶ 234–35. Historically, Personal Social Networking Services have not charged a monetary price to users; instead "users receive services, functionality, privacy protections and the like in exchange for allowing their data to be added to

the social graph, and for lending their attention to the platform on which advertisements are shown to them, both of which enable the platform to monetize its services." *Id.* ¶ 234. Unlike traditional business models in which monopolists exercise their power by raising prices, the most effective way for Facebook to extract monopoly rents is by degrading the quality of its service. Facebook has done just that, including by degrading privacy terms and protections and by increasing ad load, thereby profitably reducing the value of this exchange for users, effectively raising its price, and reducing output. *Id.* ¶¶ 232–44, 250.

Because there is no meaningful alternative to Facebook's Personal Social Networking Services, users who are dissatisfied with the data usage and privacy options available on Facebook have nowhere else to go, even after scandals over data usage that drove customer dissatisfaction. *Id.* ¶¶ 242, 244. "Facebook's monopoly meant it faced little competitive constraint on its approach to privacy, leaving users and their personal data to the whims of whatever metric Facebook was focused on optimizing at a given time." *Id.* ¶ 243. For example, Facebook launched privacy check-up tools in 2016 that it then discontinued because of concerns that Facebook users were using these tools "to turn on more restrictive privacy settings." *Id.* Tellingly, Facebook's monopoly power is so strong that the Cambridge Analytica data-leak scandal, which exposed the data of millions of Facebook users and ███████████████████████ ████████████████████████████████████████████████████████████████ ███████████ *Id.* ¶ 244. ████████████████████████████████████████████ ████████████████████████████████████████████████ *Id.*

Facebook argues that its privacy degradations were ultimately beneficial to users because they "enabled improvements to product features, site security, and ad quality." Facebook Br. 23. That is a question of fact, however, that conflicts with allegations in the Complaint that must be

taken as true for the purposes of this motion. Compl. ¶ 237 (Facebook often "present[ed] its privacy changes as giving users greater control" while in fact making "more privacy settings public and thus less protective by default"); *see also id.* ¶¶ 238–41 (detailing specific privacy degradations by Facebook from 2011 to 2018).

Similarly, ad load, the proportion of Facebook content in a user's feed that is advertisements, steadily increased between early 2015 and 2020 on Facebook's mobile feed. *See* Compl. ¶ 250. This increase in ad load means that content generated from friends and family is more frequently interrupted, and users need to scroll further in their newsfeed to see the same quantity of content from their friends and family. *Id.* Facebook itself predicts an increase in ad load will decrease user engagement (output), and its executives refer to ads as a "tax." *Id.* Despite this, Facebook was able to substantially increase ad load while its average revenue per user steadily increased. *Id.*

### C. Facebook's Exclusionary Conduct Unlawfully Maintained Its Monopoly.

The States allege that Facebook's "buy or bury" strategy—whether viewed in the aggregate or by components—constitutes unlawful exclusionary conduct, rather than competition on the merits. *See Microsoft*, 253 F.3d at 50 ("the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident").

Facebook has been driven by a singular objective—"to buy or bury rivals or potential rivals that presented a viable competitive threat"—supported by a two-pronged strategy. Compl. ¶¶ 104–05. The first prong consists of a "string of acquisitions" with the overall purpose and effect of erecting a "competitive moat," *id.* ¶ 5, that both eliminated nascent rivals and deprived any survivors of access to the tools to compete effectively, *id.* ¶ 185. Instagram and WhatsApp

are the most prominent, but not the only, examples of that prong of the course of conduct. And each of those acquisitions was anticompetitive under both Section 2 of the Sherman Act and Section 7 of the Clayton Act. The second prong was the "exclusionary deployment of [Facebook's] power and position to block potential rivals from access to key inputs," in the form of Facebook's "Platform" interconnections. Compl. ¶¶ 104, 186, 202. Whether viewed separately or together, this two-pronged strategy had the intended effect: Facebook's monopoly power remains "intact and stronger than ever." *Id.* ¶ 104.

The States' allegations detail a purposeful and successful scheme to foreclose competition in the relevant market, and those allegations are more than sufficient to meet the States' burden at the pleading stage. Moreover, despite Facebook's protestations to the contrary, courts evaluating alleged anticompetitive schemes look to defendants' conduct as a whole. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc) (applying *Cont'l Ore* to Section 2 claims); *In re Intuniv Antitrust Litig.*, No. 1:16-CV-12396-ADB, --- F.Supp.3d ----, 2020 WL 5995984, at *26 (D. Mass. Oct. 9, 2020) ("Courts do not require that every single action in an anticompetitive scheme be, on its own, anticompetitive.") (collecting cases).

1. Facebook protected its monopoly by acquiring Instagram and WhatsApp.

As discussed *supra* in Section IV.A, Instagram was a competitor in the relevant market at the time Facebook acquired it. Facebook was a monopolist and saw Instagram, designed for mobile experience, as a competitive threat due to its fast-growing network and superior photo-sharing functionality (which Facebook viewed as the new frontier for social sharing). The States' claim that Facebook's acquisition of Instagram violated Section 2 is based on substantially the same facts as support the States' claim that the acquisition substantially lessened competition or

tended to maintain Facebook's monopoly in violation of Section 7.

Likewise, as discussed *supra* in Section IV, Facebook was a monopolist at the time it acquired WhatsApp. WhatsApp was a mobile messaging app and was not in the relevant market at the time it was acquired, but Facebook perceived WhatsApp's large and growing network of more than 400 million users, its platform-neutral internet technology, and its ease of sharing content as a threat—one that could develop a competing service, either on its own or in the hands of another potential rival. The States' claim that Facebook's acquisition of WhatsApp violated Section 2 is based on substantially the same facts as their claim that the acquisition substantially lessened competition or tended to maintain Facebook's monopoly in violation of Section 7.

Accordingly, both acquisitions had the purpose and effect of neutralizing competitive threats and served to illegally maintain Facebook's monopoly. For further discussion of how the Instagram and WhatsApp acquisitions violated Section 2, see FTC Opp. Br. § I.B.1.

2. Facebook used its Platform to suppress and exclude competition.

For competitive threats that Facebook did not eliminate through acquisition, the company turned to its arsenal of exclusionary Platform policies and practices to maintain its monopoly. Although a monopolist like Facebook has a "general right" to choose the parties with which it deals, this right is qualified. *Lorain Journal Co. v. United States*, 342 U.S. 143, 155 (1951) ("***In the absence of any purpose to create or maintain a monopoly***, the act does not restrict the long-recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.") (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (emphasis in *Lorain Journal*)). A monopolist's actions violate Section 2 when they serve to maintain the monopolist's power by means other than competition on the merits, such as by "attempting to exclude rivals on some basis other than

efficiency." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985).

Courts have recognized multiple frameworks for identifying unlawful exclusionary conduct by a

monopolist. Taking the allegations in the States' complaint as true, Facebook's Platform conduct

was exclusionary, whether evaluated as conditional dealing (as in *Lorain Journal*) or as a refusal

to deal (as in *Aspen*).

### a. *Facebook's conditional dealing deterred competition.*

Under the doctrine of conditional dealing, a monopolist violates Section 2 when it

requires third parties seeking to obtain its products or services to refrain from taking some action

that would tend to foster competition on the merits. *See Lorain Journal*, 342 U.S. at 149. In

*Lorain Journal,* the Supreme Court held that a newspaper with a monopoly in the local

advertising market violated Section 2 by precluding merchants from purchasing advertising if

they did business with a radio station the newspaper viewed as a threat to its monopoly. *Id.*

The States allege that Facebook Platform, a suite of application programming interfaces

(APIs) and other tools offered by Facebook that enable third-party apps and websites to interact

with Facebook and leverage its various social functionalities, is an important tool for app

developers, providing Facebook with significant power over those apps' business trajectories.

*See* Compl. ¶¶ 188, 197, 199, 202. Like the defendant in *Lorain Journal*, Facebook used its

leverage to deter competitive threats to its monopoly, by adopting policies prohibiting app

developers from promoting competing social networks or, later, replicating Facebook

functionality. *See id.* ¶¶ 199–201. These policies deterred apps with established user networks

from either developing social features that would have threatened Facebook or working with

other networks that did so; these policies have stifled investment and innovation, and have

hobbled competition in the relevant market. *See id.* ¶¶ 15, 187, 199, 230–31.

Facebook asks the court to adopt two legally unsupported requirements for conditional dealing claims. First, Facebook posits that the States must establish its "monopoly power over developers in some properly defined antitrust market," by which it apparently means a separate market for the sort of services it offered to app developers specifically. Facebook FTC Br. 38. No such requirement is found in *Lorain Journal,* and Facebook cites no cases that establish such a requirement. The States allege that Facebook holds monopoly power in the Personal Social Network Services market, *see* Compl. ¶¶ 4, 38; *supra* Section V.B, and that Facebook conditioned valuable access to its Platform on terms that had the purpose and effect of harming competition and preserving Facebook's monopoly in the relevant market, *see* Compl. ¶¶ 197, 199–204. These allegations suffice to state a claim for unlawful conditional dealing that is plausible on its face.

Facebook next asserts that the States failed to allege that Facebook "conditioned developers' access to that monopoly on their agreement not to deal with Facebook's rivals." Facebook Br. 38. As a matter of fact, the States did allege that Facebook's Platform policy "aimed at forbidding 'competing social platforms,' ***and*** any apps that linked or integrated with competing social platforms, from accessing its APIs." *See* Compl. ¶ 199 (emphasis added). As a matter of law, the doctrine of conditional dealing is not limited to agreements not to deal with one's rivals, and Facebook cites no authority holding that the doctrine is confined to that fact pattern. A monopolist's conditional-dealing policy is exclusionary if it impedes competition on the merits and is an attempt to exclude rivals "on some basis other than efficiency." *See Lorain Journal*, 342 U.S. at 149; *Aspen*, 472 U.S. at 605; *see also* FTC Opp. Br. § I.B.1.b, (discussing *FTC v. Actavis*, 570 U.S. at 157 (anticompetitive harm may result from an agreement that "seeks to prevent the risk of competition")).

36

In summary, the States' allegations are more than sufficient to claim that the conditions Facebook imposed on developers' access to its Platform restrained developers from cooperating with third parties or competing independently, and thus served to entrench the company's monopoly in violation of Section 2.

### b.   Facebook's Platform conduct constitutes an exclusionary refusal to deal.

The exclusionary nature of Facebook's conduct is also illegal when evaluated as a monopolist's refusal to deal, consistent with the framework in *Aspen* and *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). The *Aspen* Court held that a monopolist's refusal to deal violated Section 2 where the monopolist discontinued a prior voluntary course of dealing that demonstrated that it "was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." 472 U.S. at 610–11.

The States' Complaint includes multiple allegations that, taken as true, demonstrate that Facebook's access policies for Platform and its related conduct are exclusionary, having the purpose and effect of suppressing competitive threats. Moreover, although it is not necessary because Facebook's Platform policies are exclusionary on their face, *see infra* Section V.C.2.c, the States' allegations establish each factor discussed by *Aspen*. This includes allegations that Facebook had established a prior course of dealing, evidenced by its "open first–closed later" approach to Platform access, and was willing to—and in fact did—sacrifice short-term benefits like shared content and ad sales. *See, e.g.*, Compl. ¶¶ 191–96, 199–202, 213–14, 217–21, 231.

With respect to prior course of dealing, for years after Facebook launched Platform in 2007, Facebook provided Platform access to many thousands of apps and websites on the same terms, and expressly "welcome[d] developers with competing applications" to build on Platform.

Compl. ¶ 189. After becoming a monopolist, however, Facebook adopted restrictions that explicitly prohibited conduct related to "competing social platforms," *id.* ¶ 199, or "replicat[ing] [Facebook's] core functionality," *id.* ¶ 201, and then selectively enforced those restrictions against those apps that Facebook worried might one day threaten its monopoly. *See, e.g.*, *id.* ¶¶ 202, 209, 217–18.

To the extent there is a short-term sacrifice requirement that is distinct from a voluntary course of dealing, the States also plainly allege facts showing that Facebook "was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival[s]." *Aspen*, 472 U.S. at 610–11. First, Facebook's short-term sacrifice can itself be presumed based on the detailed allegations of its prior voluntary course of dealing. *See Trinko*, 540 U.S. at 409 (recounting that *Aspen* involved "a voluntary (***and thus presumably profitable***) course of dealing") (emphasis in original). Second, the States allege that Facebook reaped many benefits from granting Platform access that it sacrificed when it implemented its discriminatory access regime. *See* Compl. ¶ 14 (increased engagement, growth, data, ad profit); *id.* ¶ 81 (user data that enabled lucrative ad targeting); *id.* ¶¶ 195–98 (goodwill, positive press, expanded features, user retention, ad sales, revenue sharing). And Facebook received such benefits from the very apps it deemed to be competitive threats. *See, e.g.*, *id.* ¶¶ 191–96, 199–202, 213–14, 217–21. Facebook's discriminatory conduct naturally cost it some of those benefits, including the public relations and relationship problems Facebook knew it would experience from terminating popular apps' access. *See, e.g.*, *id.* ¶¶ 220–21, 223–24. Accordingly, the States sufficiently allege that Facebook sacrificed short-run benefits to impede apps that were competitive threats. *Id.* ¶ 231.

   c.   *Facebook's Platform conduct is exclusionary on its face.*

Although the States sufficiently allege both a prior course of dealing and short-term

sacrifice, the Court does not need to look further than the face of Facebook's Platform policies to

determine that they are exclusionary. As discussed above, after it became a monopolist,

Facebook adopted policies for its Platform that explicitly discriminated against "competing

social platforms," apps that linked or integrated with them, and apps that "replicat[e]

[Facebook's] core functionality." *See, e.g.*, *id*. ¶¶ 68, 199–202.

In addition, the States' allegations include explicit admissions of anticompetitive purpose

on the part of Facebook executives, demonstrating that Facebook understood the anticompetitive

effects its policies would have and pursued them for that exclusionary purpose. *See, e.g.*, *id.*

¶ 215 (senior executive states that if other messenger apps "have hit the growth team's radar

recently," "we'd like to restrict them at the same time"); *id.* ¶ 218 (terminating API access on

pretextual basis for an app seen as a threat); *id.* ¶ 219–20 (terminating an app's API access for

pretextual reasons after Zuckerberg noticed its rapid growth; declining to reinstate access when

app cured the purported issues since "the replicating [Facebook's] core functionality piece . . .

can't be 'fixed'"); *id.* ¶ 214 (Zuckerberg directing termination of Vine's API access).

Taken together, these allegations are sufficient to establish that Facebook's policies were

exclusionary on their face, and were "prompted not by competitive zeal but by anticompetitive

malice." *Trinko*, 540 U.S. at 409; *see also Viamedia Inc. v. Comcast Corp.*, 951 F. 3d 429, 462

(7th Cir. 2020) (a short-term profit sacrifice is "neither necessary nor sufficient for conduct to be

exclusionary"); *In re Thalomid & Revlimid Antitrust Litig.*, Civ. No. 14–6997 (KSH) (CLW),

2015 WL 9589217, at *15 (D.N.J. Oct. 29, 2015) ("Both [*Aspen* and *Trinko*] indicate that

motivation is central."); *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 311

F. Supp. 3d 468, 483 (D.R.I. 2018) ("The [*Trinko*] Court's descriptive, provisional language

makes clear that it regarded *Aspen Skiing* as a paradigmatic example of—not a paint-by-numbers kit for—unlawful refusals to deal.").

> ### d.   Facebook's refusals to deal are starkly anticompetitive in context.

Facebook argues that *Trinko* establishes a "clear, general no-duty-to-deal rule," Facebook FTC Br. 36, but *Trinko* indicated that a monopolist's duty to deal can vary depending on the nature of the industry, and that regulatory context "may also be a consideration in deciding whether to recognize an expansion of the contours of § 2." 540 U.S. at 412. Indeed, the *Trinko* Court emphasized that its rejection of a refusal-to-deal claim was influenced by the fact that the industry in which the challenged conduct took place was specially regulated, "significantly diminishing the likelihood of major antitrust harm." *Id*. at 411–13.

No such regulatory framework exists for Facebook.[7] That lack of regulatory framework, along with the distinctive characteristics of the relevant market the States allege, *see* Compl. ¶¶ 41–46, 67 (discussing barriers to entry and monetization, including high network effects and switching costs, the importance of data, along with the "tipping" of markets), weigh in favor of the court applying greater skepticism to Facebook's conduct and rejecting Facebook's unduly narrow construction of the refusal-to-deal doctrine. *See* Herbert Hovenkamp, Antitrust and Platform Monopoly, 130 Yale L.J. 1901, 1954 (forthcoming 2021), *available at* https://ssrn.com/abstract=3639142 ("[R]efusals to deal are inherently more problematic in networked industries than in standalone markets where each firm ordinarily supplies its own inputs and finds its own sales.").

---

[7] Facebook argues (incorrectly) that being subject to HSR review for certain of its mergers—a process that applies to all mergers above a certain size—is akin to being regulated by the FCC as the defendants were in *Trinko*. *See* Facebook FTC Br. 26. That assertion is absurd. It would improperly insulate large segments of the economy from antitrust scrutiny of mergers.

   *e.   Facebook's remaining arguments relating to its exclusionary Platform conduct
         have no merit.*

Facebook's claims of legitimate business justifications for its exclusionary Platform

conduct should not be entertained on this motion to dismiss. As an initial matter, the States

specifically allege that Facebook lacked any such justification for its refusal to deal. *See* Compl.

¶ 231. Moreover, even if such concerns might justify Facebook's actions (which they do not),

Facebook's bald assertions merely introduce new (disputed) facts that cannot serve as a basis for

dismissal at the pleading stage. *See Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 676

(D.C. Cir. 2005) (Section 2 defendant's claimed justification "depends upon a question of fact

and therefore is not cognizable in support of a motion to dismiss"); *see also Viamedia*, 951 F.3d

at 460 ("Valid business justifications are relevant only to the rebuttal of a *prima facie* case of

monopolization."). Facebook's citation to *Morris Communications Corp. v. PGA Tour, Inc.*, 364

F.3d 1288 (11th Cir. 2004), decided on summary judgment, is thus unavailing.

Facebook also attempts to create new requirements for a refusal-to-deal claim that are not

supported by the law. The States need not plead that Facebook has "monopoly control over a

necessary input." Facebook FTC Br. 36–37. Facebook cites no case supporting this proposition.

The States allege that its Platform APIs were important resources for developers, and that

Facebook's restricting and terminating them harmed competition. *See* Compl. ¶¶ 186–205, 224–

25, 228. To the extent Facebook means to question the ultimate significance of Platform access

to developers, it raises a factual dispute that the States will be happy to address. However, such

assertions cannot support a motion to dismiss.

Similarly, the States need not allege that "Facebook ever sold [Platform] access in a retail

market." Facebook FTC Br. 37. A history of a resource being sold in a retail market *may* be

relevant to evaluating a defendant's motivations behind its refusal to deal. *See Trinko*, 540 U.S.

at 410 (contrasting the *Aspen* defendant's refusal to sell an existing retail product with the *Trinko* defendant's failure to comply with a "brand new" obligation "brought out on compulsion"). But Facebook has cited to no authority that requires a past retail sale to make out a refusal to deal claim. Nor must the States allege that the challenged conduct is "irrational but for its anticompetitive effect." Facebook cites to no decision that establishes such a requirement in this case, and while some courts have suggested such a standard, *see* Facebook FTC Br. 32, others have declined. *See Viamedia*, 951 F.3d at 462 ("no economic sense" factor is relevant but should not always be dispositive). The States' allegations meet the standard for exclusionary conduct established by the Supreme Court in *Aspen* and *Trinko*.

Finally, Facebook asserts that allegations related to its Platform policies should be dismissed because courts in California previously dismissed claims brought by private litigants. As the FTC explains in its response to Facebook's Motion to Dismiss, FTC Opp. Br. § I.B.2.c, Facebook's claim misconstrues these cases: no court has ruled that Facebook's Platform policies cannot form the basis of either a refusal-to-deal or conditional dealing claim. Whether evaluated as conditional dealing or a refusal to deal, the States sufficiently allege that Facebook's Platform policies and practices, by willfully deterring developers' competitive behavior and suppressing actual and perceived competitive threats, were exclusionary.

3.  Facebook made several other acquisitions as part of an overall course of conduct that protected its monopoly power.

The States allege that the Instagram and WhatsApp acquisitions serve as the core conduct in the "buy" half of Facebook's "buy or bury" scheme, part of a broader acquisition strategy that served to entrench Facebook's monopoly. Indeed, the Complaint alleges that Facebook's overall acquisition strategy was "driven by its objective to acquire rivals and potential rivals to make its moat even wider and more impenetrable." Compl. ¶ 181.

The States cite specific examples that reflect Facebook's evolving pattern of buying companies for anticompetitive reasons, as opposed to merger-specific efficiencies such as "increasing output, creating operating efficiencies, making a new product available, [or] enhancing service or quality." *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 38 (D.C. Cir. 2005). Early on, Facebook acquired Octazen to "l[eave] everyone else in the industry without a provider for contact importer libraries," which are "especially valuable." Compl. ¶¶ 88–89. In 2009, fearing competition from contact aggregator Friendfeed and concerned that Twitter might acquire it, Facebook bought Friendfeed to prevent Twitter from obtaining unique assets or achieving efficiencies. *See id.* ¶ 85. In 2012, after Facebook had entrenched its monopoly by buying Instagram, *see id.* ¶¶ 119, 128, Facebook acquired Glancee and, "having achieved its goal of keeping it out of the reach of another firm . . . simultaneously shut the app down," *id.* ¶ 184. In 2013, Facebook acquired a market intelligence firm called Onavo. This enabled Facebook to cut off other firms' access to a uniquely valuable tool, *id.* ¶¶ 139, 144, and gave Facebook access to and control over that tool to quickly identify emerging threats for Facebook to buy or bury, *see id.* ¶¶ 146–48. Facebook repeatedly attempted to buy Snapchat to prevent a feared acquisition by Google. *See id.* ¶¶ 129–36. And, in 2016, Facebook bought EyeGroove "upon learning that Twitter and Snapchat were interested—and then shut the app down." *Id.* ¶ 184.

These allegations are detailed, specific, and damning. They demonstrate the breadth and depth of Facebook's anticompetitive scheme in two ways. First, they support the States' arguments as to Facebook's true anticompetitive motivations in acquiring Instagram and WhatsApp. *See United States v. Swift & Co.*, 286 U.S. 106, 116 (1932) (monopolist's "size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past"); *Microsoft*, 253 F. 3d at 59 (intent evidence "helps [court]

43

understand the likely effect of the monopolist's conduct"). Second, they are clear illustrations of

a broader anticompetitive course of conduct that goes beyond the Instagram and WhatsApp

acquisitions. *See* Areeda & Hovenkamp ¶ 310c7 ("the pattern gives increased plausibility to the

claim").

    4.   <u>The States' Section 2 Claim is independent of the Section 7 Claims.</u>

Facebook wrongly asserts, without support, that the success of the States' Section 2 claim

depends on the success of the Section 7 claims. Facebook Br. 25–26. As the FTC explains in its

brief, FTC Opp. Br. § I.B.1.d, Sections 2 and 7 apply distinct standards, and the Clayton Act

does not circumscribe Section 2's application to acquisitions in any way. In addition, as detailed

in Sections IV and V, both claims are well-supported by the allegations in the States' Complaint.

**D.  Facebook's Anticompetitive Conduct Harmed Consumers.**

As a threshold matter, there is no requirement that the States allege specific consumer

harm at the pleading stage. *See* FTC Opp. Br. § I.B.1.b. Nonetheless, the Complaint alleges both

harm to competition and specific user harms that resulted from Facebook's exclusionary acts,

including harm to innovation, quality, and choice. *See* Compl. ¶ 247; *see also id.* ¶¶ 236–44

(degraded privacy protections and increased collection and use of personal data); *id.* ¶ 246

(reduced investment); *id.* ¶ 250 (increased ad load); *id.* ¶ 249 (inaction in removing fake

accounts); *id.* ¶ 254 (proliferation of misinformation and violent or otherwise objectionable

content). Moreover, the States allege that the harm caused by Facebook's conduct "far outweighs

any benefit, if any exists" that resulted from Facebook's anticompetitive conduct. *Id.* ¶ 255.

These allegations more than satisfy the State's burden at the pleading stage.

Facebook argues, incorrectly, that the States' allegations of reduced quality are

insufficient because reduced quality is not "objectively measurable." Facebook Br. 28. But the

law does not require that quality degradations—an antitrust concern for over a century—must be shown to be objectively measurable, and certainly not at the pleading stage. *See Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 52 (identifying quality degradation as one of the three "evils" of monopoly); *see also Viamedia*, 951 F.3d at 462 ("the calculation of procompetitive benefits net of anticompetitive harms does not easily lend itself to a *pleading* standard"). Indeed, courts routinely consider both subjective and objective indicia of quality. *See Nat'l Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679, 695 (1978) ("all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by" competition); *FTC v. Alliant Techsystems, Inc.*, 808 F. Supp. 9, 22–23 n.5 (D.D.C. 1992) (quoting same); *see also CollegeNET, Inc. v. Common Application, Inc.*, 711 F. App'x 405, 407 (9th Cir. 2017) (finding allegations of decline in quality and choice sufficient to survive the motion to dismiss stage). Indeed, Facebook's CEO recently testified to Congress that competition analysis in the tech industry should consider non-price harms.[8]

## CONCLUSION

For all of the foregoing reasons, Facebook's Motion to Dismiss should be denied.

---

[8]    Q.    Rep. Kelly Armstrong: "[D]o you think when we're conducting competition
             analysis in the tech industry, non-price factors should be considered?"
       . . .
       A.    Mark Zuckerberg: "Yes, Congressman. My understanding is that the law already
             includes quality of products in addition to price."

*Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Hearing before the H. Subcomm. on Commc'ns & Tech. and the H. Subcomm. on Consumer Prot. & Commerce*, 117th Cong. __ (Mar. 25, 2021), *video available at* https://www.c-span.org/video/?510053-1/house-hearing-combating-online-misinformation-disinformation (starting at 4:05:44), Biesanz Decl. ¶ 6.

DATED: April 7, 2021          Respectfully Submitted,

FOR PLAINTIFF STATE OF NEW YORK

LETITIA JAMES
Attorney General

*/s/ Christopher D'Angelo*
Christopher D'Angelo (D.C. Bar No. 502220)
Chief Deputy Attorney General
Economic Justice Division

Elinor R. Hoffmann, Antitrust Bureau Chief
Zachary Biesanz, Assistant Attorney General
Benjamin Cole, Assistant Attorney General
Nathaniel Kosslyn, Assistant Attorney General
Beatriz Marques, Assistant Attorney General
Amber Wessels-Yen, Assistant Attorney General

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8262
Email: Christopher.D'Angelo@ag.ny.gov

*Counsel for Plaintiff State of New York*

(additional signatories below)

FOR PLAINTIFF STATE OF CALIFORNIA

MATTHEW RODRIQUEZ
Acting Attorney General

KATHLEEN FOOTE
Senior Assistant Attorney General

*/s/ Mina Noroozkhani*
Mina Noroozkhani
Deputy Attorney General

Nicole Blizzard, Supervising Deputy Attorney General
Nicole Gordon, Deputy Attorney General
Nell Moley, Deputy Attorney General

California Office of the Attorney General
455 Golden Gate Ave. Suite 11000
San Francisco, CA 94102
Telephone: (415) 510-4400
Email: Paula.Blizzard@doj.ca.gov

*Counsel for Plaintiff State of California*


FOR PLAINTIFF STATE OF COLORADO

PHILIP J. WEISER
Attorney General

*/s/ Jeffrey H. Blattner*
Jeffrey H. Blattner, (DC Bar No. 340604)
Special Assistant Attorney General

Steven M. Kaufmann, Deputy Attorney General for
   Consumer Protection (DC Bar No. 1022365) *(inactive)*
Diane R. Hazel, First Assistant Attorney General (DC
      Bar No. 1011531) *(inactive)*
Natalie Klee

Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: 720-508-6000
Email: Jeff.Blattner@coag.gov

*Counsel for Plaintiff State of Colorado*

47

FOR PLAINTIFF DISTRICT OF COLUMBIA:

KARL A. RACINE
Attorney General

KATHLEEN KONOPKA (DC Bar No. 495257)
Deputy Attorney General

*/s/ Catherine A. Jackson*
Catherine A. Jackson (DC Bar No. 1005415)
Chief, Public Integrity Section

Arthur T. Durst, Assistant Attorney General (DC Bar No.
   888273305)
Joshua E. Morris, Assistant Attorney General (DC Bar
   No. 1617411)

Office of the Attorney General for the District of
   Columbia
400 6th Street, NW, 10th Floor
Washington, DC 20001
Telephone: (202) 442-9864
Email: catherine.jackson@dc.gov

*Counsel for Plaintiff District of Columbia*


FOR PLAINTIFF STATE OF FLORIDA

ASHLEY MOODY
Attorney General

*/s/ R. Scott Palmer*
R. Scott Palmer
Interim Co-director, Antitrust Division

Lee Istrail, Assistant Attorney General (DC Bar No.
   495170)
Nicholas Niemiec, Assistant Attorney General
Colin Fraser, Assistant Attorney General

Florida Department of Legal Affairs
PL-01 The Capitol
Tallahassee, FL 32399
Telephone: (850) 414-3300
Email: scott.palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

48

FOR PLAINTIFF STATE OF IOWA

THOMAS J. MILLER
Attorney General

*/s/ Bryce A. Pashler*

Bryce A. Pashler
Assistant Attorney General

Office of the Attorney General of Iowa
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 382-5164
Email: Bryce.Pashler@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*


FOR PLAINTIFF STATE OF OHIO

DAVE YOST
Attorney General

*/s/ James S. Roberts*

James S. Roberts
Principal Assistant Attorney General

Jennifer L. Pratt, Chief, Antitrust Section
Beth A. Finnerty, Assistant Chief, Antitrust Section

Ohio Office of the Attorney General
150 East Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: James.Roberts@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

49

FOR PLAINTIFF STATE OF TENNESSEE

HERBERT H. SLATERY III
Attorney General and Reporter

*/s/ J. David McDowell*
J. David McDowell
Senior Assistant Attorney General

J. Tate Ball, Assistant Attorney General

Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN  37202
Telephone: (615) 741-8722
Email: David.McDowell@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*