**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW YORK, et al.,

       Plaintiffs,

       v.

FACEBOOK, INC.,

       Defendant.

Case No. 1:20-cv-03589-JEB

**REPLY BRIEF IN SUPPORT OF FACEBOOK, INC.'S**
**MOTION TO DISMISS STATES' *PARENS PATRIAE* COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 2

I.      THE STATES LACK *PARENS PATRIAE* STANDING..................................................... 2

II.     LACHES BARS THE STATES' ACQUISITION CHALLENGES................................... 8

III.    THE STATES' "NASCENT COMPETITION" SECTION 7 CLAIM HAS
        NO LEGAL OR FACTUAL BASIS ................................................................................13

        A.      There Is No Legal Support For The States' Overreaching Legal
                Theory ...................................................................................................................13

        B.      The States Fail To Allege Facts Supporting Their Section 7
                Theories.................................................................................................................16

        C.      The Internal Documents Cited By The States Are Not Probative Of
                The Merits Of Their Claim ...................................................................................19

IV.     THE STATES FAIL TO STATE A CLAIM UNDER SECTION 2 ................................19

        A.      The States Fail To Plead A Cognizable Relevant Market .....................................20

        B.      The States Fail To Plead That Facebook Has Monopoly Power ...........................20

        C.      The States Fail To Allege Exclusionary Conduct..................................................23

                1.      The States Fail To Allege That Any Facebook Acquisition
                        Was Unlawful ..........................................................................................23

                2.      The States' Challenge To Facebook's 2011-2018 Platform
                        Policies Fails As A Matter Of Law............................................................24

                3.      The States Have Not Pleaded Any Consumer Harm ................................25

CONCLUSION...........................................................................................................................25

# TABLE OF AUTHORITIES[*]

Page

CASES

\* *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ........................3, 6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ...................................24

\* *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................................16, 23

\* *California v. Am. Stores Co.*, 495 U.S. 271 (1990) .........................................2, 3, 4, 9, 10

*Chesapeake & Del. Canal Co. v. United States*, 250 U.S. 123 (1919) ...........................................9

*Clearfield Tr. Co. v. United States*, 318 U.S. 363 (1943) .................................................................9

*CollegeNET, Inc. v. Common Application, Inc.*, 711 F. App'x 405 (9th Cir. 2017) ...................25

*Costello v. United States*, 365 U.S. 265 (1961) ...........................................................................11

*Council of Athabascan Tribal Gov'ts v. United States*, 693 F. Supp. 2d 116
    (D.D.C. 2010) ................................................................................................................12

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001) .....................................................10, 11

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482
    (S.D.N.Y. Sept. 30, 2002) ...............................................................................................19

*Edstrom v. Anheuser-Busch InBev SA/NV*, 2013 WL 5124149 (N.D. Cal. Sept. 13,
    2013), *aff'd*, 647 F. App'x 733 (9th Cir. 2016)................................................................18

*Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221 (9th Cir. 2012) ..........................10

*FTC v. Alliant Techsystems Inc.*, 808 F. Supp. 9 (D.D.C. 1992)...................................................25

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967)............................................................14, 15

*FTC v. W. Meat Co.*, 272 U.S. 554 (1926) ..................................................................................11

*Gaudreau v. Am. Promotional Events, Inc.*, 511 F. Supp. 2d 152 (D.D.C. 2007)........................10

\* *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439 (1945)............................................................4, 6

*Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019)..................................................7

*Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126 (1938)........................................................9

---

[*] Authorities principally relied upon are marked with an asterisk.

*Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838 (D.C. Cir. 1982)...........................12

*Ins. Antitrust Litig.*, *In re*, 938 F.2d 919 (9th Cir. 1991), *aff'd in part, rev'd in part, and remanded sub nom. Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993)..........................................................................................................3

\* *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913 (9th Cir. 1975) .......................12

*Intel Corp. v. Fortress Inv. Grp. LLC*, --- F. Supp. 3d ---, 2021 WL 51727 (N.D. Cal. Jan. 6, 2021) ..........................................................................................................22

*Kansas v. Colorado*, 514 U.S. 673 (1995)..................................................................................9

*Love v. Stevens*, 207 F.2d 32 (D.C. Cir. 1953) ...........................................................................8

*Massachusetts v. Bull HN Info. Sys., Inc.*, 16 F. Supp. 2d 90 (D. Mass. 1998)............................7

*McKinney v. Waterman S.S. Corp.*, 925 F.2d 1 (1st Cir. 1991)....................................................8

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004)................................10

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978)...........................................25

*New York v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ..............................................................2

*New York v. Griepp*, 991 F.3d 81 (2d Cir. 2021) ......................................................................7

*New York v. Kraft Gen. Foods, Inc.*, 862 F. Supp. 1030 (S.D.N.Y.), *aff'd*, 14 F.3d 590 (2d Cir. 1993)...................................................................................................8

*New York v. Microsoft Corp.*, 209 F. Supp. 2d 132 (D.D.C. 2002)...................................3, 4, 6, 7

*Packaged Seafood Prods. Antitrust Litig.*, *In re*, 338 F. Supp. 3d 1079 (S.D. Cal. 2018) ...........................................................................................................7

\* *Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976) .....................................................4, 5, 6

\* *Pennsylvania v. Mid-Atl. Toyota Distribs., Inc.*, 704 F.2d 125 (4th Cir. 1983).....................3, 4, 6

\* *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923) ..........................................................5, 6

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)...................................................................23

\* *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020)....................8

*Russell v. Todd*, 309 U.S. 280 (1940) .......................................................................................10

*Shtauber v. Gerson*, 239 F. Supp. 3d 248 (D.D.C. 2017) ..........................................................11

*Solow Bldg. Co. v. Nine W. Grp., Inc.*, 2001 WL 736794 (S.D.N.Y. June 29, 2001), *aff'd*, 48 F. App'x 15 (2d Cir. 2002) ...............................................................................8

*Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012) ....................20

*Talley v. United States*, 6 Cl. Ct. 807 (1984) ...............................................................................12

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ................................................5

*Tobacco/Gov't Health Care Costs Litig., In re*, 83 F. Supp. 2d 125 (D.D.C. 1999), *aff'd sub nom. Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068 (D.C. Cir. 2001) ........................................................................6

*United States v. Admin. Enters., Inc.*, 46 F.3d 670 (7th Cir. 1995) .................................................9

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) .....................................................14

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) .....................................................18

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990) .............................................18

*United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ...........................19

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) .................................11, 17

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ....................................................15

*United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974) .......................................................16

*United States v. ITT Cont'l Baking Co.*, 420 U.S. 223 (1975) ......................................................11

* *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) ...............................14, 15, 16

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ................................15, 22, 23, 25

* *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ...........................................................................................................................24

*Virginia v. Ferriero*, --- F. Supp. 3d ---, 2021 WL 848706 (D.D.C. Mar. 5, 2021) .......................6

*Washington v. Chimei Innolux Corp.*, 659 F.3d 842 (9th Cir. 2011) .............................................7

*Zuckerman v. Metro. Museum of Art*, 928 F.3d 186 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 1269 (2020) ..........................................................................................................8

iv

STATUTES

Clayton Act, 15 U.S.C. § 12 *et seq.* ..................................................................................1, 2, 9, 10

    § 4c, 15 U.S.C. § 15c ..................................................................................................................3, 4

    § 7, 15 U.S.C. § 18.....................................................................1, 2, 8, 10, 13, 14, 15, 16, 17, 18

    § 15, 15 U.S.C. § 25 ....................................................................................................................10

    § 16, 15 U.S.C. § 26 ....................................................................................................3, 4, 8, 9, 10, 11

Sherman Act, 15 U.S.C. § 1 *et seq.*:

    § 2, 15 U.S.C. § 2 ............................................................................................2, 8, 10, 19, 23, 24

    § 4, 15 U.S.C. § 4 ...........................................................................................................................8


LEGISLATIVE MATERIALS

51 Cong. Rec. 14,476 (Aug. 31, 1914) .........................................................................................9

*Reviving Competition, Part 3:  Strengthening the Laws to Address Monopoly
    Power:  Hearing Before the Subcomm. on Antitrust, Commercial, and
    Admin. Law of the H. Comm. on Judiciary*, 117th Cong. (Mar. 18, 2021),
    https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=4453 ...............................1


OTHER MATERIALS

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2020)............................8, 14, 17

Douglas H. Ginsburg & Koren W. Wong-Ervin, *Challenging Consummated
    Mergers Under Section 2*, George Mason Univ. Law & Econ. Paper
    Series, No. 20-14 (May 2020)..........................................................................................15

Mem. Amicus Curiae of the United States, *New York v. Microsoft Corp.*, 209 F.
    Supp. 2d 132 (D.D.C. 2002) (No. 98-cv-1233) (D.D.C. Apr. 15, 2002),
    https://www.justice.gov/atr/case-document/file/504126/download ...................................9

Report of Special Master, *Kansas v. Colorado*, 514 U.S. 673 (1995) (No. 105,
    Orig.) (U.S. July 29, 1994), https://bit.ly/3tsS38Y .............................................................9

11A Charles A. Wright et al., *Federal Practice and Procedure* (3d ed. 2013)............................12

## INTRODUCTION

In their opposition, the States stake out positions at odds with current law.  They claim authority to enforce federal antitrust law equal to that of federal enforcers, claim exemption from the requirement to bring timely claims, and propose to make new law prohibiting acquisition of "nascent competitors" that is contrary to existing precedent.  *See Reviving Competition, Part 3: Strengthening the Laws to Address Monopoly Power:  Hearing Before the Subcomm. on Antitrust, Commercial, and Admin. Law of the H. Comm. on Judiciary*, 117th Cong. (Mar. 18, 2021) (statement by plaintiff State Attorney General complaining that "the antitrust laws, as they've been implemented, provide almost an incentive and an opportunity for dominant firms to keep a lookout for nascent rivals and purchase them").

But this Court is *not* the place for legislative expansion of state powers, elimination of long-recognized laches defenses, or creation of an unlimited new Clayton Act Section 7 prohibition applied to long-closed acquisitions.  The States ignore, because they cannot explain, that the Clayton Act's primary enforcer, the FTC, decided against filing a Section 7 claim when the Instagram and WhatsApp acquisitions were reviewed and cleared in 2012 and 2014, and again when it brought a different claim against Facebook in late 2020.  The States lack a valid legal theory for their novel claims, and they fail to allege any facts that could provide plausible support for such claims even if they became law.

The States do not have authority to bring this federal antitrust lawsuit, other than as *parens patriae*, and they have asserted no colorable, independent *state* interest that might provide a basis for proceeding.  *See infra* Part I.  Their unexplained and inexcusable delays (more than eight and six years after the highly publicized acquisitions they now challenge were announced) are apparent on the face of the complaint.  The prejudice to Facebook in defending these claims now, after it has expended billions of dollars developing its product offerings in reliance on

being able to move forward as an integrated company, is similarly obvious.  The claims are thus barred by laches.  No court has ever allowed such a tardy challenge to a corporate acquisition to proceed.  *See infra* Part II.

The Section 7 claims are also devoid of legal and factual substance.  Modern antitrust authority has never endorsed the sweeping legal theory undergirding this claim – the notion that the acquisition of a startup not claimed to be present in a market harms competition because the startup *might conceivably* someday transform that market to consumers' benefit – and the aged precedent on which the States rely is far off the mark.  Moreover, the allegations supporting the theory are little more than empty speculation about firms that purportedly "could have been a contender" and products that could have been more to the States' taste.  *See infra* Part III.  The States' tacked-on Section 2 claim echoes the FTC's claim and fails for the same reasons.  *See infra* Part IV.

The States have given the Court no sound reason to proceed with this deeply flawed case.  It should be dismissed.

## ARGUMENT

## I.   THE STATES LACK *PARENS PATRIAE* STANDING

The States sweepingly suggest that they are sovereign enforcers of federal antitrust law.  *See* States Opp'n 6, ECF No. 121.  As Facebook showed, the States do not have such authority and can proceed under federal law here only if they establish *parens patriae* standing.  *See* FB States Br. 4-8, ECF No. 114-1.  The States' cited cases (at 6) – in which states proceeded as *parens patriae* but where *parens patriae* standing was not at issue – are not to the contrary.  *See California v. Am. Stores Co.*, 495 U.S. 271, 283-84 (1990) (*parens patriae* standing not challenged); *New York v. Actavis PLC*, 787 F.3d 638, 662 (2d Cir. 2015) (preliminary-injunction public-interest factor is presumed in a *parens patriae* action where standing was not at issue);

*Pennsylvania v. Mid-Atl. Toyota Distribs., Inc.*, 704 F.2d 125, 127-28 (4th Cir. 1983) (authority to proceed as *parens patriae* under Clayton Act Section 16 not at issue where states sued under 15 U.S.C. § 15c).  Here, by contrast, standing is very much at issue, and the States have not alleged (as they must) any quasi-sovereign interest – let alone one sufficient to confer *parens patriae* standing – and so all of their claims must be dismissed.[1]

    **A.**      The States' assertion (at 7) that they have *parens patriae* standing to protect "the economic well-being of [their] residents," *see also* Compl. ¶¶ 17-18, tracks nearly verbatim the "well-being of their populace" formulation the Supreme Court has rejected as overly "broad[ ]," insufficiently "concrete to create an actual controversy," and "too vague to survive the standing requirements."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602 (1982).  The States assert (at 7) that courts "have held repeatedly that states have a quasi-sovereign interest in preventing or remedying harm to competition," but the States identify no such categorical holding.  *See Am. Stores*, 495 U.S. at 283-84 (*parens patriae* standing not contested); *In re Ins. Antitrust Litig.*, 938 F.2d 919, 922, 927 (9th Cir. 1991) (*parens patriae* standing, not apparently challenged, where states alleged manipulations of reinsurance markets "for bodily injury or property damage," threatening the "physical and economic" well-being of their residents and state economies), *aff'd in part, rev'd in part on other grounds, and remanded sub nom. Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993); *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 152 (D.D.C. 2002) (*parens patriae* standing where states proved

---

[1] The States (at 6 n.2, 7) mischaracterize, by partially quoting, Facebook's position in the *Klein* case management statement, which is that:  "*If* Facebook prevails against the States" on the merits, then that would preclude private lawsuits "because the States are deemed to represent all of their citizens under the doctrine of *parens patriae*."  Biesanz Ex. 1, at 25 (emphasis added).  Facebook did not agree that the States alleged a quasi-sovereign interest, but rather noted only that a "final judgment" on the merits in this litigation, if it is allowed to proceed as a *parens patriae* action, could have preclusive effect elsewhere.  *Id.* at 38.

damage to "the economy as a whole" because "thousands" of businesses relied on "PCs running on Microsoft software").  The States' proposed rule cannot be squared with the many cases in which antitrust courts – including the Supreme Court – have scrutinized the sufficiency of *parens patriae* allegations and found hand-waving similar to the States' assertions here to be insufficient.  *See* FB States Br. 4-8.

Unlike in *New York v. Microsoft*, *Georgia*, and other cases cited by the States, there is no allegation here that anticompetitive conduct in the purported market for personal social networking impedes "a smoothly functioning economy."  *Mid-Atl. Toyota*, 704 F.2d at 132.  The States' repeated invocation of *American Stores* – which did not concern *parens patriae* standing – and *Mid-Atlantic Toyota* does not support their argument.  Indeed, *Mid-Atlantic Toyota* held only that "state laws and constitutions" do not constrain the "more expansive" statutory authority to seek damages under 15 U.S.C. § 15c – a statute the States do not invoke here.  *Id.* at 129 & n.8.  And the court warned that "actions such as those here in issue where the state sues on behalf of injured natural residents" would not give rise to "a state quasi-sovereign interest" but for a statute that expressly confers standing on the States – as Section 16 does not.  *Id.* at 129 n.8.

**B.**     The States point (at 8) to three supposed quasi-sovereign interests that are not actually supported by any facts alleged in their complaint.  Moreover, each is entirely derivative of private grievances and lacks a fact-based claim of harm to any State's economy as a whole:

**1.**     ***Consumers.***  The States do not allege that any of the supposed consumer harms – less innovation, choice, quality, and investment in personal social networks; less privacy; fake accounts – have caused "severe and generalized" damage to each State's "economy as a whole." *Pennsylvania v. Kleppe*, 533 F.2d 668, 675 (D.C. Cir. 1976) (affirming dismissal).  Allegations (¶¶ 247-248) that Facebook reduced users' privacy – allegedly to show more targeted advertising, an increase in commercial activity (¶¶ 53, 250) – at most establish "purely private

grievances" with no alleged connection to each State's economy as a whole.  *Pennsylvania v. West Virginia*, 262 U.S. 553, 591 (1923).  The States grasp (at 8) for unpleaded and implausible theories of harm, arguing that fake accounts "can erode consumers' trust in businesses" generally, but that vague and unsubstantiated conclusion bears no relation to the challenged conduct.  The States effectively concede (at 8) the absence of *parens patriae* standing by arguing that "reduced choice and diminished quality" affect "the value users get" – an "individualized" interest unconnected to each State's economy generally, *Kleppe*, 533 F.2d at 671.

2.      *Advertisers.*  The States also argue (at 8) that Facebook has harmed advertisers. But alleged "increased ad load" (¶ 250) – *i.e.*, increased advertising output – benefits advertisers and generates more commerce, not less.  The States' advertising-related complaints (at 8) – "loss of audience," "lack of transparency," and "diminished brand safety" – reflect complaints an advertiser might make, not "severe and generalized" state-wide economic harm.  *Kleppe*, 533 F.2d at 675.  In any case, these allegations do not establish *parens patriae* standing for claims alleging harm in the *user* market that the States allege.  *Cf. Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 610 (1953) (antitrust plaintiff must prove harm in the market alleged, even if defendant "is a dual trader in separate though interdependent markets").

3.      *Rivals.*  The States finally argue (at 8) that it is enough to allege (¶ 205) that Facebook's conduct steers "traffic" away from rivals and reduces the overall "output" of personal social networking.  But the States do not explain why shifting output from other firms to Facebook would reduce overall output; in any event, they do not allege that this "seriously jeopardize[s]" the "health, comfort, and welfare" of the States' residents, *Pennsylvania*, 262 U.S. at 592, or wreaks "severe and generalized" economic harm on the States' economies, *Kleppe*, 533 F.2d at 675.  Such a claim would be implausible and incongruous with the States' own description of Facebook's services:  the States do not allege that "personal social networking"

5

output is akin to a state's supply of energy (*Pennsylvania*), transportation infrastructure (*Georgia*), or enterprise software (*New York v. Microsoft*).  On the contrary, the States allege (¶ 1) that personal social networks like Facebook are a "forum for sharing personal milestones and other intimate details about [users'] lives to friends and family."  No matter how enjoyable and entertaining that product might be for consumers, the States do not allege it is essential to "a smoothly functioning economy."  *Mid-Atl. Toyota*, 704 F.2d at 132.

In sum, the States identify merely private grievances, not quasi-sovereign interests; furthermore, the States do not dispute that, in these circumstances, the pending class action suits brought by private claimants (themselves without substantive merit) weigh heavily against *parens patriae* standing.  *See* FB States Br. 7 & n.1.  As this Court has instructed, *parens patriae* standing "is rarely appropriate in the presence of a more appropriate party or parties capable of bringing suit."  *In re Tobacco/Gov't Health Care Costs Litig.*, 83 F. Supp. 2d 125, 134 (D.D.C. 1999) (internal quotation marks omitted), *aff'd sub nom. Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068 (D.C. Cir. 2001).  The States effectively concede that is the case here.

**C.**     Finally, citing *New York v. Microsoft*, the States argue (at 9) that they established *parens patriae* standing by alleging that Facebook harmed many citizens.  But, as the Supreme Court has explained, an alleged injury to "an identifiable group of individual residents" – their number aside – is insufficient without more to establish *parens patriae* standing.  *Snapp*, 458 U.S. at 607.  The States must also identify a "quasi-sovereign interest" – economic harm qualifies only if it is borne by each State itself in a manner that is both "severe *and* generalized." *Kleppe*, 533 F.2d at 675 (emphasis added); *see Virginia v. Ferriero*, --- F. Supp. 3d ---, 2021 WL 848706, at *5 (D.D.C. Mar. 5, 2021) (*parens patriae* standing requires "'a quasi-sovereign

interest apart from the interests of particular private parties' "; making no numerosity exception) (quoting *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019)); *see also*, *e.g.*, *New York v. Griepp*, 991 F.3d 81, 131 (2d Cir. 2021) (*parens patriae* standing requires both "a quasi-sovereign interest" and, in addition, "injury to a sufficiently substantial segment" of a state's population); *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011) (same); *Massachusetts v. Bull HN Info. Sys., Inc.*, 16 F. Supp. 2d 90, 98-99 (D. Mass. 1998) (same).

 *New York v. Microsoft* stands for no contrary proposition. Facebook does not contend, as Microsoft did, that the States lack *parens patriae* standing because the alleged injuries affected too few citizens. *See New York v. Microsoft*, 209 F. Supp. 2d at 151-52. Rather, Facebook argues that the States failed to plead *any* quasi-sovereign interest, numerosity aside. Furthermore, the post-trial findings that Microsoft had damaged each state's "economy as a whole" – including by impairing "thousands" of businesses dependent on Microsoft's enterprise software – bear no resemblance to the threadbare allegations here. *Compare id.* at 152 *with* Compl. ¶ 19 (alleging only the conclusion that Facebook harmed the States' "general welfare and economies"). The only court ever to cite *New York v. Microsoft*'s discussion of *parens patriae* standing explained that the decision concerned numerosity – "the first element of the *Snapp* standing test" – and not whether the states also had "a quasi-sovereign interest." *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1079, 1097 (S.D. Cal. 2018) (granting motion to dismiss); *see also New York v. Microsoft*, 209 F. Supp. 2d at 149, 155 (characterizing the *parens patriae* decision as dicta because standing was "hobbled at the outset by the existing law of the case").

## II.      LACHES BARS THE STATES' ACQUISITION CHALLENGES

The States offer no justification for their inexplicably protracted, multi-year delay in

challenging acquisitions that closed in 2012 and 2014.  Instead, the States claim (at 9-10) that

laches is a fact-bound equitable defense that cannot be applied on a motion to dismiss.  But

where the facts that establish the defense are "clear on the face of [the] Complaint," courts

regularly dismiss lawsuits on this basis.  *Solow Bldg. Co. v. Nine W. Grp., Inc.*, 2001 WL

736794, at *6 (S.D.N.Y. June 29, 2001) (dismissing claims as barred by laches at motion-to-

dismiss stage), *aff'd*, 48 F. App'x 15 (2d Cir. 2002); *see*, *e.g.*, *Love v. Stevens*, 207 F.2d 32, 32

(D.C. Cir. 1953) (per curiam) (affirming dismissal of claims as barred by laches at motion-to-

dismiss stage); *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 190 (2d Cir. 2019) (same),

*cert. denied*, 140 S. Ct. 1269 (2020); *McKinney v. Waterman S.S. Corp.*, 925 F.2d 1, 2-3 (1st Cir.

1991) (same).

Another federal court recently dismissed effectively identical Section 2 and Section 7

claims against Facebook because it was clear from the face of the complaint that laches applied.

*See Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 990-92 (N.D. Cal. 2020).

The States make no attempt to distinguish *Reveal Chat* – or even acknowledge it – and their

arguments justify no different result here.

A.      The States argue (at 10-11) that laches generally does not apply against

"government enforcers."  But the States are not "government enforcers" of *federal* antitrust law.

Congress entrusted that role to the federal government exclusively.  *See* 15 U.S.C. § 4.  The

States can bring this lawsuit under the federal antitrust laws only as "person[s]" seeking

equitable relief.  *Id.* § 26; *see also New York v. Kraft Gen. Foods, Inc.*, 862 F. Supp. 1030, 1033

(S.D.N.Y.), *aff'd*, 14 F.3d 590 (2d Cir. 1993) (table); Phillip E. Areeda & Herbert Hovenkamp,

*Antitrust Law* ¶ 2412c (4th ed. 2020) ("Areeda") (states suing as *parens patriae* are not

sovereign law enforcers).  This was by design:  when Congress enacted Section 16, it rejected an amendment that would have granted each state the sovereign power to "bring suit in the name of the United States to enforce any of the antitrust laws."  51 Cong. Rec. 14,476 (Aug. 31, 1914). And suing as "[a]ny person" under Section 16, the States are subject to equitable defenses "includ[ing] the bar of laches."  *Am. Stores*, 495 U.S. at 298 (Kennedy, J., concurring).

The rule limiting the application of laches against governments "asserting 'sovereign' or governmental rights," *Chesapeake & Del. Canal Co. v. United States*, 250 U.S. 123, 125 (1919), does not apply where a governmental actor sues as *parens patriae*.  The common law elevates "sovereign" rights to ensure that law enforcement is not jeopardized "by the negligence of public officers" who decline to enforce public law.  *Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 132 (1938).  But this status flows from the exercise of public law enforcement authority – *e.g.*, when the states sue under their own laws – not the mere presence of a sovereign.  Even sovereigns are subject to laches when suing in a non-sovereign capacity.  *See, e.g.*, *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 369 (1943); *cf. United States v. Admin. Enters., Inc.*, 46 F.3d 670, 672-73 (7th Cir. 1995) (collecting cases supporting "the availability of laches in at least some government suits"); *see also* Mem. Amicus Curiae of the United States at 7, *New York v. Microsoft*, No. 98-cv-1233 (D.D.C. Apr. 15, 2002) ("[S]tate authority to seek injunctive relief under Section 16 of the Clayton Act is not based upon the sovereign interest in law enforcement.").

The States do not squarely argue that laches *cannot* apply in this context, much less cite any authority to that effect.  In *Kansas v. Colorado*, 514 U.S. 673 (1995), the state brought suit as a sovereign law enforcer of its own interstate territorial rights.  Moreover, the Special Master noted that "it should be borne in mind that no statute of limitations is applicable in this case, and therefore there is no outside limit to the period during which delay will be tolerated."  Rep. at 152, No. 105, Orig. (U.S. July 29, 1994), https://bit.ly/3tsS38Y.  Here, by contrast, the States

proceed well outside the Clayton Act's four-year statute of limitations.  And the States misread *American Stores*, in which the Supreme Court used the term "Government" to refer to the *federal* government – the only sovereign enforcer of federal antitrust law – as distinct from plaintiffs proceeding under Section 16, including the state of California in that case.  495 U.S. at 284; *see also id.* at 280-81 (distinguishing between "Government actions" under 15 U.S.C. § 25, which authorizes suits by the United States, and suits by states under 15 U.S.C. § 26).

**B.**     The States' assertion (at 12-13) that "ongoing conduct" excuses their multi-year delay fails because, as Facebook explained (at 9), the States' attempt to characterize long-closed acquisitions as "ongoing" "makes no sense" and is contrary to precedent holding that antitrust claims based on acquisitions of entire companies *accrue* at the time of closing.  *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004).  That is fatal to the acquisition challenges; the States' argument (at 14) that laches cannot bar "prospective" relief presumes "ongoing" conduct.  *See Gaudreau v. Am. Promotional Events, Inc.*, 511 F. Supp. 2d 152, 156, 159 (D.D.C. 2007) (laches does not bar "state law trademark infringement claims" because "[t]rademark infringement is a continuous wrong"); *see also Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 960 (9th Cir. 2001) (recognizing laches can bar "prospective injunctive relief" for ongoing conduct when the "future" conduct is "identical to the alleged" past conduct).

The period of delay in seeking equitable relief under Section 7 is thus measured from 2012 and 2014.  The same is true for the parallel Section 2 acquisition allegations.  For all claims, the relevant question is whether the plaintiffs' *delay* was unreasonable, which depends on when the claim accrued; delay may become unreasonable even long before the statute of limitations has expired.  *See Russell v. Todd*, 309 U.S. 280, 288 n.1 (1940); *see also Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1226-27 (9th Cir. 2012) (stating that – even for ongoing violations – "[w]hen evaluating the reasonableness of a delay, the evaluation period

begins when the plaintiff knew . . . of the allegedly [unlawful] conduct"). The States' argument that a claim challenging a wrongful acquisition can never be untimely – as long as the acquirer uses the acquired assets to compete – has never been accepted by any court.

Du Pont, ITT, and Western Meat are inapposite. First, the federal government – the only sovereign enforcer of federal antitrust law – was the plaintiff in all three. Facebook is not arguing that laches bars claims brought by the FTC to enforce federal law, but laches does apply to Section 16 plaintiffs, including the States. Second, none of these cases held that a completed corporate acquisition was an ongoing violation of federal antitrust law. See United States v. E.I. du Pont de Nemours & Co., 353 U.S. 586, 603-05 (1957) (monopolist actively using its stock interest to steer supply contracts to itself); United States v. ITT Cont'l Baking Co., 420 U.S. 223, 225-26 (1975) (partial stock acquisition violated "consent order"); FTC v. W. Meat Co., 272 U.S. 554, 559 (1926) (FTC proceeded in its administrative forum, where it can challenge past conduct, to address a prior stock acquisition that had not yet ripened (but might soon) into a total acquisition of a competitor's "plant and other property").

**C.** Finally, the States contend (at 10, 15) that equitable considerations excuse their delay. But the cases they cite provide no support for their attempt to complicate the laches inquiry – which bars claims from a plaintiff who, "with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." Danjaq, 263 F.3d at 950-51. Shtauber v. Gerson, 239 F. Supp. 3d 248, 256 (D.D.C. 2017), concerned the enforceability of a fee-sharing arrangement under D.C. ethics rules – it has nothing to do with laches. And Costello v. United States, 365 U.S. 265, 282 (1961), involved a denaturalization proceeding in which the Court found that the defendant could show no prejudice from delay (even assuming laches applied against the United States in that enforcement context). These inapposite cases aside, the States offer no support in the pleadings or precedent for their argument that their delay is reasonable.

The States' failure to explain, justify, or even address their multi-year delay in challenging these acquisitions itself creates a "presumption of prejudice," *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 926 (9th Cir. 1975), and "the magnitude of prejudice required before suit would be barred" decreases where – as here – "the delay is lengthy," *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C. Cir. 1982).  The States' only response (at 11) is that *IT&T* was not a case about the federal government – a distinction without a difference because the States, like the plaintiffs in *IT&T*, proceed as "plaintiff[s] under § 16" and their claims therefore fall squarely within *IT&T*'s holding.  518 F.2d at 926.

Moreover, the complaint lays bare the prejudice to Facebook:  the States' allegations establish that Facebook spent billions to acquire Instagram and WhatsApp (¶¶ 107, 166) and has operated those businesses for years as part of a unified company (¶ 12).  That is sufficient to establish "economic prejudice."  *See* FB States Br. 11-12; *see also Council of Athabascan Tribal Gov'ts v. United States*, 693 F. Supp. 2d 116, 123 (D.D.C. 2010) ("economic prejudice may arise where a defendant will suffer the loss of monetary investments") (internal quotation marks, ellipsis, and brackets omitted).  The States argue that Facebook profitably operated the acquired businesses, but this is irrelevant:  what matters is that Facebook would be prejudiced if the States' request for equitable relief were, after all this time, "now to be enforced."  11A Charles A. Wright et al., *Federal Practice and Procedure* § 2946, at 109 (3d ed. 2013); *see also Talley v. United States*, 6 Cl. Ct. 807, 809 (1984) ("unreasonable delay is the hallmark of laches").

Stated simply, the States' nearly decade-long inaction after concededly high-profile (and federally scrutinized) acquisitions, coupled with their claim that Facebook should now be dismembered, presents a compelling case for the application of laches to bar the claims.  The

States present no law suggesting otherwise and make no serious suggestion that discovery is necessary to uncover additional facts relevant to the inquiry.

## III.   THE STATES' "NASCENT COMPETITION" SECTION 7 CLAIM HAS NO LEGAL OR FACTUAL BASIS

The States' ambition is striking:  they seek (retroactively no less) to enjoin Facebook's acquisitions of Instagram and WhatsApp as violations of Section 7 because, they say, a monopolist's acquisition of any firm that poses a "competitive threat" (at 16) violates the statute. That is a proposition of law no court has ever accepted; such a rule would bar procompetitive acquisitions – like those at issue here, which concededly provided great benefits to consumers, *see* FB States Br. 20 – and would be contrary to decades of settled precedent.  Even if the law were to apply the sort of presumption the States propose, the States would at a minimum be required to plead *facts* plausibly establishing that Facebook was a monopolist in a properly defined relevant market *and* that it was probable (not merely possible) at the time of the acquisitions that consumers would suffer concrete, measurable harm in that market if Instagram and WhatsApp were no longer independent.  The States do not even try to allege such facts, resting entirely on conclusory labels (rote repetition of "monopoly power") and naked speculation (even better products *might* exist if Instagram and WhatsApp were separate from Facebook).  That can never be enough to state a claim; it is no accident that the FTC did not pursue Section 7 claims.

### A.   There Is No Legal Support For The States' Overreaching Legal Theory

Leapfrogging 50 years of modern antitrust precedent, the States argue (at 20-22) that a firm violates Section 7 by acquiring an alleged non-competitor "well positioned to begin to exert considerable competitive pressure."  Compl. ¶ 179.  But the hoary cases they cite fail to support the "could have been a contender" Section 7 theory of harm they seek to enshrine in law.

The Supreme Court clarified this point in *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 624-25 (1974), when it distinguished between the constraining effect of adjacent and viable existing firms who have not yet made sales in a particular market – "perceived" potential competition – from the possibility of additional competition from later entry – "actual" potential competition. *See also United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 75 (D.D.C. 2017). In the former case, the elimination of a "perceived" potential competitor by merger can remove a competitive constraint on pricing because, although the firm is not making sales in the market, the perception that it would enter the market if prices rose constrains present-day prices. For "actual" potential competition, by contrast, the potential entrant does not actively constrain the acquirer's pricing, and any possible future competitive effect rests on speculation that the target *might* have successfully entered had the acquisition not taken place.

The States rely most heavily on *FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967), a 1967 decision unwinding Procter & Gamble's acquisition of bleach manufacturer Clorox. Commentators have criticized the case as "illogical" and "curious." *E.g.*, Areeda ¶¶ 1130c1, 1130e1; *see also id.* ¶ 1128c6 ("findings . . . that the defendant would probably have entered a particular market[] are seldom persuasive"). In any event, the Court itself foreclosed the gloss that the States try to place on the case. *See* States Opp'n 20-21. The Court determined that the acquisition violated Section 7 because of its impact on the *bleach* market, where "the existence of Procter at the edge of the industry" constrained bleach manufacturers' ability to charge "the price that would maximize the profits of the existing firms." *Procter & Gamble*, 386 U.S. at 578-81. The case was thus about *perceived* potential competition – and the perceived competitor was the acquirer, not the acquired firm. The States do not claim or argue that Facebook's acquisition of Instagram harmed competition because it eliminated either Facebook's or

14

Instagram's pre-acquisition constraining effect on out-of-market competitors.  Indeed, the Supreme Court confirmed that neither *Procter & Gamble* nor *United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973), could be read to endorse the States' theory, which is based on the supposition that a target would expand into the acquirer's market but for the acquisition.  *See Marine Bancorporation*, 418 U.S. at 625.

Lacking apposite Section 7 cases, the States cite *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam), which says nothing at all about either Section 7 or acquisitions.  There is no valid analogy between the nakedly anticompetitive actions Microsoft took to prevent third-party distribution of competitive products and the productive combination of complementary assets that the States challenge here.  *See* FB FTC Reply 15-16.  And one of *Microsoft*'s judges, former Chief Judge Ginsburg, has taken pains to correct the mistaken analogy.  *See* Douglas H. Ginsburg & Koren W. Wong-Ervin, *Challenging Consummated Mergers Under Section 2*, George Mason Univ. Law & Econ. Paper Series, No. 20-14 (May 2020).  Reaching even farther into mistaken abstraction, the States argue (at 22) that Microsoft would not have been permitted to purchase Netscape.  But Microsoft's Internet Explorer and Netscape's Navigator were mature competitors in the *browser* market.  The States, meanwhile, do not allege that Instagram or WhatsApp were similarly situated or even that they competed in the same market as Facebook when they were acquired.  *See* FB States Br. 14-15.

The States have not cited *any* case adopting the theory that the acquisition of a company not claimed to be in the alleged market substantially harms competition based on the mere possibility that the alleged non-competitor could one day enter and provide consumers with benefits they would not otherwise get.  Indeed, any such claim necessarily devolves into unreliable speculation not only as to entry but also as to success and additional consumer

benefits.  *Marine Bancorporation* cast doubt on the viability of Section 7 claims for alleged non-competitors for that very reason – the inherently speculative nature of what a "nascent" firm might do in the future and what benefits that might provide for consumers.  *See* FB States Br. 13-18.

> **B.**     **The States Fail To Allege Facts Supporting Their Section 7 Theories**

Even under their misguided view of the law, the States cannot state a Section 7 claim without alleging facts indicating that Facebook was a monopolist; it is equally clear that an acquisition violates Section 7 only where objective harm to consumers is probable.  No court has accepted the States' invitation to ban transactions where the alleged harms are expressly limited to subjective quality.  *See infra* p. 25.  Nor can the States put off the job of identifying probable harms:  a claim may not proceed unless it is supported by *facts*, not conclusions, and the facts must amount to a plausible claim under a correct legal theory.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Marine Bancorporation*, 418 U.S. at 622-23 ("[Section] 7 deals in 'probabilities,' not 'ephemeral possibilities.' ").

The States plead no such facts.  As to monopoly, the States merely assert that Facebook had "monopoly power" without any concrete, factual allegations regarding market structure or market shares.  As to probable consumer harm, the States assert only the broad conclusions that Instagram and WhatsApp *might* have become competitors in the alleged "Personal Social Networking Market"; that they *might* have succeeded in that endeavor despite their alleged lack of demonstrated capability to do so; and that consumers *might* have gotten even better products as a result of their independent presence as market participants.  *See United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 509 (1974) ("[T]he hypothetical possibility that [the acquired company] might in the future acquire the expertise to mine deep reserves proves nothing – or too much.").

Such speculation is inadequate to state a claim for multiple reasons.  *First*, the States offer no more than a guess about what companies *not* alleged to be in the claimed market might become, supported by no facts indicating they had a plan to change their business, much less facts indicating they were likely to be uniquely successful in doing so or that their success would produce better products than what consumers have today.  No court has found such allegations sufficient to state a Section 7 claim or found liability on such a theory – which is both conclusory and speculative.  *See* FB States Br. 15-18.  *Second*, the States allege no facts to support any claim that Instagram and WhatsApp were uniquely situated to succeed among the broad universe of potential competitors – and that is crucial, because, if the States insist that Instagram and WhatsApp were competitive threats, why not also the many other potential competitors the complaint identifies?  *See id.* at 18-20.

*Third*, the States aim at the wrong target.  They say (at 23) that the legality of the acquisitions should be assessed based on circumstances as they exist today.  That is incorrect: there can be Section 7 liability only if it was probable, in 2012 and 2014, that these acquisitions would harm competition and consumers.  *See* Areeda ¶ 1205a (noting that "[c]ontrolling and especially total acquisitions should be judged on the basis of evidence of the situation existing at the time of the acquisition").  The States ignore this requirement because they cannot satisfy it. *See* FB FTC Br. 27-28 (No. 1:20-cv-3589-JEB, ECF No. 56-1).

The States effectively concede that their WhatsApp claim is pure guesswork:  the States at most argue (at 19) that WhatsApp *could* have made the pivot because it was adding new messaging features like "group chat" and "experiencing rapid user growth," but that just shows WhatsApp was succeeding at being a *messaging* app – which the States insist is outside the relevant market.  The States argue (at 17) that their claim regarding Instagram stands on a

17

different footing because it was an actual competitor circa 2012.  But it was not, according to the facts they pleaded (which contradict the conclusory statements they cite).  *See* FB States Br. 14-15.  In any event, whether or not Instagram allegedly had a toe in the claimed market, the States fail to allege facts indicating that Instagram was a significant competitor; that the market lacked other, similarly threatening competitors; or that the loss of a single startup harmed competition and, ultimately, consumers.  They do not even try to allege such facts.  Indeed, the States essentially admit as much when they argue (at 24) that the acquired firm need not have presented any special threat to the acquiring firm.  Under that position, *any* acquisition of a competitor or potential competitor by a monopolist, no matter how small or insignificant, is unlawful.  But that is not the law and should not become the law.

It may be correct that, in general, a merger within a concentrated market is more likely to lead to higher prices that harm consumers.  *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990).  But that is why so many Section 7 enforcement cases rely on the presumption of illegality created where the acquiring and acquired firms have measurable market shares above stated levels.  *See*, *e.g.*, *United States v. Anthem, Inc.*, 855 F.3d 345, 351 (D.C. Cir. 2017) (noting evidence supporting "a presumption of anticompetitive effect based on the combined company's market share"); *see also* FB States Br. 14 (citing cases).  The States have not alleged that Instagram or WhatsApp had *any* detectable share of the asserted "personal social networking" market in 2012 or 2014.  The States' failure to allege that the acquisition of either Instagram or WhatsApp affected market concentration in any measurable way underscores the legal insufficiency of the complaint.  *See*, *e.g.*, *Edstrom v. Anheuser-Busch InBev SA/NV*, 2013 WL 5124149, at *6 (N.D. Cal. Sept. 13, 2013), *aff'd*, 647 F. App'x 733 (9th Cir. 2016).

The States' blunderbuss approach is legally as well as factually unsupported and singularly unsuitable for assessing the competitive significance of acquisitions, given the generally acknowledged potential for acquisitions, even acquisitions involving alleged monopolists, to benefit consumers. *See Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482, at \*12 (S.D.N.Y. Sept. 30, 2002).

### C.   The Internal Documents Cited By The States Are Not Probative Of The Merits Of Their Claim

Lacking law and facts, the States seek cover in sound bites from internal communications, all to the effect that Facebook was concerned about competition from other firms.  But allegations that Facebook's executives saw threats lurking around every corner – from Instagram and WhatsApp and from many others – are no substitute for facts indicating that the challenged acquisitions were likely to harm competition and consumers.  "Intent" evidence has little or no role in this.  *See* FB States Br. 21.

*United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at \*32-33 (N.D. Cal. Jan. 8, 2014), relied not on sound bites but on evidence of market structure including high concentration and a probable price effect.  The case does not stand for the proposition that selective quotations from executives' emails can substitute for such facts, which are entirely absent here.  In any event, the "intent" evidence cited by the States shows only that there were a plethora of actual and potential rivals that spurred Facebook.  *See* Compl. ¶¶ 103, 134, 137, 146-147, 154, 183-184, 207, 213-215, 218-219, 222, 225-226.  That is the essence of competition, not its antithesis.

## IV.   THE STATES FAIL TO STATE A CLAIM UNDER SECTION 2

The States' copycat Section 2 allegations also fail for reasons explained in Facebook's opening memorandum and its reply to the FTC's opposition.  To the extent the States depart from or amplify the FTC's contentions, they do nothing to improve the deficient claim.

### A.    The States Fail To Plead A Cognizable Relevant Market

The States piggyback entirely on the FTC's deficient market allegations.  They do not

contest that, if the FTC's market definition allegations are insufficient, their complaint must be

dismissed for the same reason.  *See* FB FTC Reply 4-8.

### B.    The States Fail To Plead That Facebook Has Monopoly Power

As Facebook showed in its motion to dismiss (at 22-24), the States fail to allege that

Facebook has monopoly power because they have not made the factual allegations necessary to

support either a direct or an indirect case of monopoly power.  *See also* FB FTC Reply 8-11.

**1.**    The States argue (at 29-30) that they have alleged facts that support an inference

of monopoly power based on high market share and barriers to entry.  But the allegations they

cite say *nothing* about Facebook's market share in the claimed relevant market:  the first (¶ 68)

is a 2011 statement referring to shares of undefined "social media" and not tied to the "personal

social networking" market that the States attempt to define.  The second (¶ 69) is a 2016 survey

indicating the number of respondents who then visited Facebook monthly – which makes no

attempt to quantify Facebook's share of anything relative to other online products.  The third

(¶ 242) is a 2010 study that similarly makes no attempt to quantify or compare Facebook's share.

These allegations thus miss the mark entirely.  *See Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL

4473228, at *11 (E.D. Pa. Sept. 28, 2012) (granting motion to dismiss where plaintiff "failed to

put forth any allegations regarding [defendant's] market share in th[e] particular product market,"

because market-share percentage referred to a different product market); *see also* FB FTC

Reply 9-10 (collecting cases).  And for the reasons set out in Facebook's reply to the FTC, the

States have not alleged barriers to entry.  *See* FB FTC Reply 10.

**2.**    Nor have the States plausibly alleged, as they argue (at 30-32), market power

based solely on quality "degradations" below competitive levels – which are nowhere defined,

much less in quantifiable terms.  No court has held that market power can be established this

way.  And, if it could, assertions that quality could be better – which is all the States claim –

would be far from sufficient.

 The States argue (at 31-32) that certain changes Facebook implemented were supposedly

worse for users (changes to default privacy setting and data collection practices); but at the same

time they allege (¶¶ 237-238, 240-241) that these changes permitted Facebook to provide new

functionality and features for users (including giving users ability to customize "privacy

settings," personalized "deals, events, and ads," ability to process "financial transactions," tools

"to identify users in photos, videos, and camera experiences," and new features for "content

creators").  And, importantly, the States allege that such functionalities and features are part of

the overall product quality mix.  *See id.* ¶ 32 ("Personal Social Networking providers compete

for users based on a variety of factors, including quality of the user experience, functionality, and

privacy protections, among other factors.").  Unlike claims of supracompetitive prices or reduced

output, economic analysis that guides proper application of antitrust law cannot evaluate such a

claim.  Even if it could, the States do not attempt to offer any basis to measure the net effect of

these changes on overall quality – they simply assert that Facebook is "worse" than it might

otherwise be.  This does not amount to a plausible claim equivalent to a price increase or output

restriction.  It does not amount to facts establishing that Facebook systematically lowered

subjective aspects of quality (assuming that decrease could even be measured) below a

competitive level (assuming that level could even be determined).  Rather, the States' attempt

to substitute a policy debate about data privacy for an economic inquiry into market power

underscores that their case lies far outside antitrust law's domain.  This is not a dispute for later

resolution, as the States argue, but a legal defect in the States' pleading, which lacks any facts to support this necessary element.

The States also rely on an alleged (¶ 250) increase in ad load on Facebook's mobile feed (one part of one of Facebook's services) between 2015 and 2020.  Their attempt to analogize this to a price increase above competitive levels fails.  *First*, there are no facts plausibly establishing that an increase in *relevant* advertising is a reduction in product quality.  Consumer preferences regarding advertising are, as the States acknowledge, *see* Compl. ¶ 247, both subjective and varied.  *Second*, the States suggest that consumers are harmed because they are getting *too much* information through advertising about products and services that might interest them, all of which keeps Facebook's products free.  The States cannot plausibly allege that any increase in ad load reflects monopoly power without accounting for those facts.  *Third*, even if all consumers hated all ads, an increased ad load would not demonstrate market power in the absence of facts establishing that the competitive level of advertising had been exceeded. *See United States v. Microsoft*, 253 F.3d at 51 (power can be shown only by an increase "substantially above the *competitive level*") (emphasis added); *Intel Corp. v. Fortress Inv. Grp. LLC*, --- F. Supp. 3d ---, 2021 WL 51727, at *16 (N.D. Cal. Jan. 6, 2021) (granting dismissal where "Plaintiffs have failed to adequately allege that there was supracompetitive pricing and/or that such pricing was attributable to" the alleged anticompetitive conduct).  No such facts are alleged here, which is hardly surprising:  antitrust law is concerned with firms restricting output; it provides no tool to identify the level at which Facebook is producing *too much* advertising. Not only do the States get antitrust law backwards, but they make no effort to show that an ad load increase, on its own, can satisfy their burden of pleading facts establishing monopoly power.

### C.   The States Fail To Allege Exclusionary Conduct

The States chiefly challenge Facebook's acquisitions of Instagram and WhatsApp, and Facebook's Platform-related conduct, as exclusionary conduct in violation of Section 2.  The States fail, however, to allege any facts amounting to conduct that "'harm[s] the competitive *process* and thereby harm[s] consumers.'"  *Rambus Inc. v. FTC*, 522 F.3d 456, 463 (D.C. Cir. 2008) (quoting *United States v. Microsoft*, 253 F.3d at 58) (emphasis in *Microsoft*).  The States cannot save their deficient allegations by pursuing an "overall course of conduct" claim, States Opp'n 42, as Facebook is permitted – indeed, encouraged – to pursue competitive success through lawful means; accordingly, individually lawful conduct cannot somehow support the States' Section 2 claim.  *See* FB FTC Reply 11.

### 1.   The States Fail To Allege That Any Facebook Acquisition Was Unlawful

The States concede (at 33-34) that the Section 2 claim is "based on substantially the same facts as support [their] claim that the acquisition[s] substantially lessened competition or tended to maintain Facebook's monopoly in violation of Section 7."  Accordingly, their argument fails for the same reasons.  *See supra* Part III; *see also* FB FTC Reply 13-17.  The States defend (at 42-43) their challenging of other acquisitions not claimed to have had any specific competitive impact as proof of Facebook's "motivations."  But an argument that Facebook intended to prevail in the marketplace – *i.e.*, the nature of competition – says nothing about whether any of the alleged acquisitions violated the antitrust laws.  *See* FB FTC Reply 18, 23-24. In the absence of allegations that the acquisitions harmed competition, their inclusion in the complaint underscores the States' "kitchen sink" approach to pleading – which the Federal Rules and *Twombly* do not countenance.

### 2.     The States' Challenge To Facebook's 2011-2018 Platform Policies Fails As A Matter Of Law

The States' allegations challenging Facebook's decision to provide less than full access to its proprietary Platform to competitors fail as a matter of law.  As explained in Facebook's reply to the FTC's opposition, none of the arguments the States or FTC raise adequately addresses their pleadings' defects.  *See* FB FTC Reply 17-22.

Two points in the States' opposition merit separate discussion.  *First*, the States argue (at 37-38) that they have alleged Facebook "sacrifice[d] short-term benefits" in imposing its Platform policies and that this sacrifice satisfies the *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), requirement of a sacrifice of short-term *profits*.  But obtaining *some* benefit from an exchange does not mean the exchange was *profitable*.  In the absence of factual allegations showing that the benefits Facebook allegedly sacrificed outweighed the short-term cost of allowing these competitors full access to Facebook's Platform, the States have not pleaded termination of a profitable course of dealing.

*Second*, the States argue (at 40) that *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), can be distinguished on the grounds that Facebook's specific industry poses more anticompetitive risk than Verizon's did.  The States' suggestion (at 40) that *Trinko* would not apply in "networked industries" with allegedly "high network effects and switching costs" cannot be reconciled with *Trinko* itself, where the defendant owned the telephone network.  *See* 540 U.S. at 402.  And the discussion of regulatory context in *Trinko*, which the States say is different here, was about whether to *expand* Section 2 liability.  *Id.* at 412.  The States' reliance on this argument reflects an acknowledgment that *current* law and binding Section 2 precedent do not prohibit, and indeed affirmatively permit, the alleged conduct.

### 3.      The States Have Not Pleaded Any Consumer Harm

As Facebook explained (at 28-29), the States have not alleged an actionable anticompetitive effect.  Rather, they rely (at 44) on the FTC's assertion that *United States v. Microsoft* requires harm to only the "competitive *process*" as a stand-in for consumer harm. That has matters backwards:  harm to consumers distinguishes "anticompetitive effect" from mere "harm to one or more *competitors*," which "will not suffice."  *United States v. Microsoft*, 253 F.3d at 58.  The States at most allege (¶ 247) that Facebook has reduced the number of competitors – true of any merger or acquisition – but not that this imposed a harm on consumers of the type that antitrust law prohibits.  The States do not explain how the social ills alleged – principally loss of "privacy" – could plausibly be measured as an *objective* decrease in service quality.  And they cite no case holding that a *subjective* decrease in quality is – without more – an actionable anticompetitive effect.  *Cf. Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978) (referring to measurable qualities, *e.g.*, "safety" and "durability"); *FTC v. Alliant Techsystems Inc.*, 808 F. Supp. 9, 22 (D.D.C. 1992) (holding FTC demonstrated likelihood of success "because the merger will probably raise the price"); *CollegeNET, Inc. v. Common Application, Inc.*, 711 F. App'x 405, 407 (9th Cir. 2017) (addressing antitrust injury). Here again, the States' case is social policy in (ill-fitting) antitrust clothing.  They cannot plausibly shoehorn their vague, conclusory allegations into settled precedent, which limits claims to those based on objective, measurable harm to consumers.

### CONCLUSION

For the foregoing reasons, and those stated in the opening memorandum, the Court should grant the motion and dismiss the States' complaint in its entirety.

Respectfully submitted,

April 21, 2021

/s/  *Mark C. Hansen*
Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Leslie V. Pope (D.C. Bar No. 1014920)
L. Vivian Dong (D.C. Bar No. 1722506)
Alex A. Parkinson (D.C. Bar No. 166695)
Ana Nikolic Paul (D.C. Bar No. 1531904)
Julius P. Taranto (D.C. Bar No. 230434)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Facebook, Inc.*